UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| GORDON M. PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-3672 (CKK) |
| WILLIAM P. BARR, | ) | |
| U.S. Attorney General, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants, William P. Barr, U.S. Attorney General, and others, respectfully move to dismiss for lack of jurisdiction and for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c) and 12(h)(3).  Plaintiff lacks standing to sue, but even if he established standing, his facial challenges based on the First Amendment fail as a matter of law.  A separate memorandum of law is attached hereto.

Dated: June 8, 2020

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

 /s/ Alan Burch
ALAN BURCH, D.C. Bar #470655
Assistant United States Attorney
United States Attorney's Office, Civil Division
555 Fourth St., NW
Washington, DC 20530
(202) 252-2550, alan.burch@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GORDON M. PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-3672 (CKK) |
| WILLIAM P. BARR, | ) | |
| U.S. Attorney General, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS</u>

Defendants William P. Barr, U.S. Attorney General, and others, submit this memorandum in support of their motion to dismiss and for judgment on the pleadings pursuant to Federal Rules of Civil Procedure ("Rules") 12(c) and 12(h)(3).  Plaintiff brings a facial challenge based on the First Amendment to a statute and its implementing regulations governing commercial filmmaking in national parks.  Plaintiff's nonspecific intention to film again at some point in the future is insufficient to establish standing to sue.  But even if he established standing, the filming activities at issue were not themselves expressive conduct and the filming did not occur in a public forum, and for either of those two reasons, the permit and fee requirements need only be reasonable in order to pass constitutional scrutiny.  Alternatively, even if Plaintiff's filming were considered expressive and deemed to have occurred in a public forum, the permit requirement would still be upheld under intermediate scrutiny, either because the restrictions apply to commercial activity or because they are content neutral, or both.

## Factual Background

**I.      Statute & Regulation**

Since 2000, Congress has required that the Secretary of the Interior and the Secretary of Agriculture require a permit and charge a fee for commercial filming within their respective administrative borders.  As amended, the statute now provides:

Commercial filming

(a) Commercial filming fee.--

(1) In general.--The Secretary shall require a permit and shall establish a reasonable fee for commercial filming activities or similar projects in a [National Park] System unit. The fee shall provide a fair return to the United States and shall be based on the following criteria:

>    (A) The number of days the filming activity or similar project takes place in the System unit.

>    (B) The size of the film crew present in the System unit.

>    (C) The amount and type of equipment present in the System unit.

(2) Other factors.--The Secretary may include other factors in determining an appropriate fee as the Secretary considers necessary.

(b) Recovery of costs.--The Secretary shall collect any costs incurred as a result of filming activities or similar projects, including administrative and personnel costs. All costs recovered shall be in addition to the fee assessed in subsection (a).

(c) Still photography.--

(1) In general.--Except as provided in paragraph (2), the Secretary shall not require a permit or assess a fee for still photography in a System unit if the photography takes place where members of the public are generally allowed. The Secretary may require a permit, assess a fee, or both, if the photography takes place at other locations where members of the public are generally not allowed, or where additional administrative costs are likely.

(2) Exception.--The Secretary shall require and shall establish a reasonable fee for still photography that uses models or props that are not a part of the site's natural or cultural resources or administrative facilities.

(d) Protection of resources.--The Secretary shall not permit any filming, still photography or other related activity if the Secretary determines that--

(1) there is a likelihood of resource damage;

(2) there would be an unreasonable disruption of the public's use and enjoyment of the site; or

(3) the activity poses health or safety risks to the public.

(e) Use of proceeds.--

(1) Fees.--All fees collected under this section shall be available for expenditure by the Secretary, without further appropriation and shall remain available until expended.

(2) Costs.--All costs recovered under this section shall be available for expenditure by the Secretary, without further appropriation, at the site where the costs are collected and shall remain available until expended.

(f) Processing of permit applications.--The Secretary shall establish a process to ensure that the Secretary responds in a timely manner to permit applicants for commercial filming, still photography, or other activity.

54 U.S.C. § 100905.[1]  This statutory language governing commercial filming also applies to other non-National Park Service ("NPS") bureaus.[2]

As it pertains to the NPS, Congress enacted this requirement to ensure that the lands entrusted to NPS' stewardship would be protected for future generations, by requiring a permit to protect resources and mandating the establishment of a reasonable fee for commercial filming activities or similar projects on federal lands that provides a fair return to the United States.  Congress was concerned with inequity under then-existing regulations that allowed certain agencies within the Department of the Interior ("DOI"), such as the Bureau of Land

---

[1] Prior to the creation of a new Title 54 in the U.S. Code for National Park Service laws on December 19, 2014, the commercial filming provision was found at 16 U.S.C. § 460l-6d.   See Pub. L. 113-287, § 3, Dec. 19, 2014, 128 Stat. 3117; Pub. L. 116-91; Pub L. 106-206. The language is substantially the same.  See 54 U.S.C. § 100905.  For simplicity, "Section 100905" is used throughout this Memorandum when referring to the previously codified version of the law as well as the current version.

[2] 16 U.S.C. § 460l-6d; see also 43 C.F.R. Part 5 (implementing regulations).

Management ("BLM"), to charge location fees, but it prohibited the U.S. Fish and Wildlife

Service ("FWS") and NPS from doing so, even though many parks had served as settings for

commercial films that grossed millions of dollars. H.R. Rep. No. 106-75 at 2-3, 5-6 (1999).

Under 43 C.F.R. § 5.1 (1998) and previous regulations, NPS already had the authority to issue

permits for filming.  These permits allowed NPS to "manage[] filming activities to ensure that

the natural, historical, and cultural resources are protected, and that filming should not conflict

with the public's normal use of the park."  S. Rep. No. 106-67, at 2 (1999).  The purpose of

Section 100905, introduced as H.R. 106-154 (1999), was to provide for the collection of fees by

repealing 43 C.F.R. § 5.1(b) (1998), the regulatory prohibition that prevented NPS and FWS

from charging location fees.  H.R. Rep. No. 106-75, at 3.  Further, Section 100905 was intended

to "standardize the authorities for all Federal land management agencies and allow them to retain

all fees and costs collected."  S. Rep. No. 106-67, at 3.

　　　"Congress declare[d] that it is the policy of the United States that . . . the United States

receive fair market value of the use of the public lands and their resources[.]" 43 U.S.C.

§ 1701(a)(9).  The policy must be implemented by specific statutory authority, id. § 1701(b),

which Section 100905 accomplishes. Implementing regulations for Section 100905 appear at 36

C.F.R. § 5.5[3]; 43 C.F.R. § 5; see also 72 Fed. Reg. 46,426 (Aug. 20, 2007) (proposed

regulations), and 78 Fed. Reg. 52,087 (Aug. 22, 2013) (final regulations).  The proposed rule

established permit requirements as set forth in the statute and mandated that BLM, FWS, and

NPS were to collect location fees for commercial filming and certain still photography activities.

---

[3] 36 C.F.R. § 5.5 redirects commercial filming applicants to follow the departmental regulations,
43 C.F.R. Part 5.

"The location fee is basically rent; i.e., a payment for the use of the land."  72 Fed. Reg. 46,428

(citing 43 U.S.C. § 1701 as authority for the proposed regulation).

    In accordance with the statutory purpose, the primary purpose of the regulatory permit

requirement is "to establish terms and conditions necessary to protect natural and cultural

resources and minimize the potential conflict with other visitors."  78 Fed. Reg. 52,091.  Filming

and photography are generally encouraged on DOI lands, and a permit will be denied only under

specific circumstances, all of which are enumerated in the regulation. See 43 C.F.R. § 5.5(a)-(g)

(listing seven possible reasons for permit denial).  "Applications for commercial filming

activities and still photography are evaluated based on the potential impact the activity may have

on cultural and natural resources, on other visitors, on agency operations, and on the health and

safety of visitors, permittee staff and agency employees. The agencies may not issue permits that

authorize an illegal activity or activities likely to cause resource damage."  78 Fed. Reg. 52,092.

    In response to public comments expressing concern about censorship, DOI made explicit

that the decision to approve or deny a permit would not depend on the content of subject matter

filmed:

> The decision to approve or deny a request for a commercial filming or still
> photography permit will not be based on content. Paragraphs (a)-(c) are mandated
> by Public Law 106-206, paragraph (d) is required by the National Park Service
> Organic Act and "National Park Service Management Policies 2006", paragraph
> (e) is required by the National Wildlife Refuge System Administration Act, and
> paragraph (f) is based on Section 302(b) of FLPMA, 43 U.S.C. 1732(b)).
> Paragraph (g) states that no permit may be issued that violates any law, including
> the Wilderness Act, (16 U.S.C. 1131-1136).

78 Fed. Reg. 52,092 (response to cmt. 28).

    In 2013, DOI promulgated additional regulations focused on commercial filming and still

photography in particular, on lands and waters administered by NPS, BLM, and FWS.  43 C.F.R.

Part 5.  These regulations provide that all commercial filming requires a permit, but the

regulations also exempt news-gathering activities from the permit mandate, whether or not

commercial media is involved, unless the agency determines "(1) a permit is necessary to protect

natural and cultural resources, to avoid visitor use conflicts, to ensure public safety or authorize

entrance into a closed area; and (2) obtaining a permit will not interfere with the ability to gather

the news."  43 C.F.R. §§ 5.2 & 5.4.  Commercial filming is defined as

> film, electronic, magnetic, digital, or other recording of a moving image by a
> person, business, or other entity for a market audience with the intent of
> generating income.  Examples include, but are not limited to, feature film,
> videography, television broadcast, or documentary, or other similar projects.
> Commercial filming activities may include the advertisement of a product or
> service, or the use of actors, models, sets, or props.

43 C.F.R. § 5.12.

Colonial National Historical Park implemented these requirements by including the

permit mandate for commercial filming in the Superintendent's Compendium and issuing

commercial filming guidelines.  See Superintendent's Compendium of Designations, Closures,

Permit Requirements and Other Restrictions Imposed Under Discretionary Authority

("Superintendent's Compendium") at 21 (36 C.F.R. § 5.5), available at

https://www.nps.gov/colo/learn/management/upload/2019-October-COLO-Superintendent-s-

Compendium-with-Maps.pdf (last visited June 2, 2020); Commercial Filming Guidelines,

available at https://www.nps.gov/colo/upload/Commercial-Filming-Guidelines-2015-

UpdatedA.pdf  ) (last visited June 5, 2020).  As explained in the Commercial Filming

Guidelines, applicants must complete an "Application for Special Use Permit—Commercial

Filming / Still Photography," pay applicable fees, and abide by the permit's terms and

conditions.  See id.

**II.      Plaintiff's Filming in Colonial National Historical Park**

Yorktown Battlefield, a component of Colonial National Historical Park, is comprised of numerous sites (including a National Cemetery) related to the last major battle in the Revolutionary War, in which General George Washington and his army laid siege to the British army in 1781. See Yorktown Battlefield NPS website, available at https://www.nps.gov/york/index.htm and Map of Yorktown Battlefield, available at https://www.nps.gov/york/planyourvisit/maps.htm (both last visited June 2, 2020).  The park has two primary tour road routes, and charges visitors an entrance fee to use those roads to view the various park locations.  Id.  The park is only open to the public from 6:00 AM to sunset.  See Superintendent's Compendium at 4 (36 C.F.R. § 1.5(a)(1)).  The bridge crossing Crawford Road (presumably the location plaintiff refers to as "Crybaby Bridge") is on one of the park's tour roads and runs from Surrender Field to the French Encampment Area, with points of interest for reflection and contemplation along the route such as the French Cemetery and General Washington's Headquarters.  See Yorktown Battlefield map, available at https://www.nps.gov/york/planyourvisit/maps.htm.

According to the Complaint, "Plaintiff Gordon M. Price is a part-time independent filmmaker who lives and works in Yorktown, Virginia.  Mr. Price filmed portions of a film on federal lands, and received a criminal citation for doing so without a permit."  Compl. ¶ 9.[4]  His complaint further alleges:

> 37. In 2018, Price and a colleague, James Person, released an independent feature film entitled Crawford Road about a stretch of road in York County, Virginia, that has long been the subject of rumors of hauntings and was the location of unsolved murders. Price and Person filmed Crawford Road largely on weekends between February 2017 and August 2018.

---

[4] The facts alleged in the Complaint are assumed to be true for purposes of resolving this motion.

38. Price and Person filmed some Crawford Road scenes in areas open to the general public at about four locations within the Yorktown Battlefield in the Colonial National Historical Park, which is property under NPS jurisdiction. Price neither sought nor received a permit from NPS before filming on the Battlefield.

39. Price and Person shot one scene on the Battlefield in summer 2017, a second in summer 2018, and a third during a separate one-hour visit to a location on Crawford Road known as Crybaby Bridge. No heavy equipment was employed (just a camera tripod and microphone), there were no film crews, no more than four people were present during any filmmaking session (except for a couple of observers at one of them), including both the filmmakers and actors. Only the two filmmakers were present during the third brief shooting at Crybaby Bridge.

40. Crawford Road premiered at the Boathouse Live Restaurant in Newport News, Virginia on October 17, 2018, with about 250 people in attendance, and it later ran at other venues in Hampton and Yorktown, Virginia. The premiere garnered some local press coverage. . . .

43. In December 2018, two NPS officers came to Price's music store and issued him a violation notice for failure to obtain a commercial filming permit under 36 C.F.R. § 5.5. The "offense charged" was specified as "36 C.F.R. § 5.5(a)" and the "offense description" was "commercial filming without a permit." The violation notice did not give Price the opportunity to directly pay a forfeiture amount, but rather stated "YOU MUST APPEAR IN COURT" and provided a court date of April 9, 2019. . . .

49. Price reluctantly resolved to plead guilty to put the matter behind him, but the court declined to accept his guilty plea and advised Price to obtain counsel before entering a formal plea.

50. After retaining counsel, Price filed a motion on July 31, 2019, to dismiss the criminal action on grounds that Section 100905 and the DOI rules implementing it are facially unconstitutional and that issuance of the violation notice, and the attempt to enforce it, violated his First Amendment rights.

51. Rather than oppose Price's motion to dismiss, the government, represented by the United States Attorney's Office within DOJ, filed its own motion to dismiss, stating that it "does not wish to pursue … an evidentiary hearing in this criminal case," and that it did not "believe that the interests of justice are served by pursuing this prosecution." . . .

55. On November 1, 2019, the District Court issued an order dismissing the violation notice against Price. It declined to issue any ruling on the constitutionality of the statute or rules, concluding it lacked jurisdiction to do so.

Compl. at 10-14.

## **Standard of Review**

In ruling on a motion to dismiss for lack of jurisdiction, the Court must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged.  See Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1106 (D.C. Cir. 2005).  In addition, the Court may "'consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003).  Plaintiff bears the burden to prove subject matter jurisdiction by a preponderance of the evidence.  See Cherdak v. Amer. Arbitration Ass'n, Inc., --- F. Supp. ---, 2020 WL 1149743 (D.D.C. Mar. 9, 2020).

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  The standard for reviewing a motion for judgment on the pleadings is virtually identical to that applied to a motion to dismiss under Rule 12(b)(6).  See, e.g., Baumann v. District of Columbia, 744 F. Supp. 2d 216, 221 (D.D.C. 2010).

Under Rule 12(b)(6), the Court is to accept the factual assertions in the complaint as true for the limited purpose of resolving the motion to dismiss or for judgment on the pleadings.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

"The court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record."  Baumann, 744 F. Supp. 2d at 222.

## Argument

### I.     Plaintiff Lacks Standing to Sue.

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient "causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision."  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  The case law is clear that for plaintiffs who "seek forward-looking injunctive relief, past injuries alone are insufficient to establish standing" and they must show "that they face an imminent threat of future injury."  In re Navy Chaplaincy, 697 F.3d 1171, 1175 (D.C. Cir. 2017).

Here, Plaintiff has failed to establish a sufficient injury in fact.  Plaintiff's professed risk of future harm is too speculative because his intentions are too diffuse, particularly in light of the nature of the undertaking at issue here—filming a commercial movie.  He claims only that he "intends to film future movies on-location on federal lands, but is impeded in doing so by the permitting and fee regime challenged here."  Compl. ¶ 9.  This is the sort of "some-day" aspirations that the Supreme Court rejected as insufficient in Lujan, in which plaintiffs alleged that they intended to travel internationally to observe the habitat of endangered species:

> And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough.  Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

504 U.S. at 564.  By contrast, many cases have found standing where the plaintiff alleged an intention to engage in conduct likely to result in governmental sanction, but the conduct in those cases was more clearly defined and involved other indicia of commitment or likelihood, such as being part of a continuous course of conduct or supported by concrete logistical planning.  See, e.g., Susan B. Anthony List, 573 U.S. at 158 (finding plaintiff had standing where state law banned certain false statements in political campaigns and plaintiff alleged an intention to continue making similar statements); Navy Chaplaincy, 697 F.3d at 1175 (finding plaintiffs had standing to challenge promotion selection practices where they were in line to be considered for promotion in the normal course); Dearth v. Holder, 641 F.3d 499 (D.C. Cir. 2011) (finding standing where plaintiff had present intention to purchase gun and visit relatives in USA on regular basis).

Plaintiff's alleged future intention is insufficient in this case because it does not specify that he seeks to engage in commercial filming, on NPS park land, in a location that is not a public forum, and that he intends to do so without seeking a permit and/or agreeing to pay the modest fee assessed under the schedule.  And even if he were to make a perfunctory assertion of his intention to do these things, the case law requires plans that are more concrete when the undertaking is one that necessarily involves planning on the level of that involved in Lujan.  For these reasons, Plaintiff has failed to establish standing to sue.

## II.    Permit and Fee Requirements Should be Upheld Under a Test of Reasonableness.

As explained below, there are two independent reasons why the Court should apply the test of reasonableness, rather than a stricter standard, to the permit and fee requirements challenged here.  First, the filming activity was merely facilitative of speech and did not itself constitute expressive activity.  As such, the case law applies only a test of reasonableness.  But

even if the filming were expressive, the fact that it took place in a nonpublic forum on

government property suffices to require the Court to apply the test of reasonableness.  The permit

and fee requirements easily pass that test, and that disposes of all of Plaintiff's First Amendment

claims.

### A.      Filming Itself Was Not Expressive Conduct, but Merely Facilitative.

Plaintiff's Complaint does not establish that the permit requirement was anything more

than a statutorily mandated imposition of a fee for a commercial use of public land.  While the

content of a film and its presentation once complete are protected speech under the First

Amendment, Plaintiff bears the burden of establishing that the First Amendment applies at all to

a person's use of public land as a location for a commercial film:

> Although it is common to place the burden upon the Government to justify
> impingements on First Amendment interests, it is the obligation of the person
> desiring to engage in assertedly expressive conduct to demonstrate that the First
> Amendment even applies.  To hold otherwise would be to create a rule that all
> conduct is presumptively expressive. In the absence of a showing that such a rule
> is necessary to protect vital First Amendment interests, we decline to deviate from
> the general rule that one seeking relief bears the burden of demonstrating that he
> is entitled to it.

Clark v. Cmty. for Creative Nonviolence, 468 U.S. 288, 294 n.5 (1984).  The same conclusion

follows the general burden a plaintiff bears under Iqbal to plead facts that support his case, not

merely that there may be some unarticulated set of facts that could conceivably support his case.

In order to constitute expressive conduct under the First Amendment, the actions must

(1) be intended to convey a message and (2) "in the surrounding circumstances the likelihood

was great that the message would be understood by those who viewed it."  White House Vigil v.

Clark, 746 F.2d 1518, 1539 (D.C. Cir. 1984); see generally Texas v. Johnson, 109 S. Ct. 2533

(1989); Spence v. Washington, 418 U.S. 405 (1974); see also Kaahumanu v. Hawaii, 682 F.3d

789, 798 (9th Cir. 2012) (the First Amendment "protects expressive conduct so long as that

conduct 'convey[s] a particularized message' and is likely to be understood in the surrounding circumstances"); accord ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 954 (D.C. Cir. 1995) ("With respect to ISKCON's audio tapes, we note that these may serve as media of communication.  When played, they transmit a message to the listener.").  In White House Vigil, the D.C. Circuit used the test to consider whether the First Amendment was implicated by a NPS regulation restricting the placement of parcels on sidewalks surrounding the White House, which regulation was implicated in protests on those sidewalks.  The court concluded that the parcel "merely facilitates expression.  The first amendment protects facilitative activity only insofar as its restriction imposes burdens on expression itself."  White House Vigil, 746 F.2d at 1540 (emphasis in original).  Applying this same test in Kaahumanu, the court found that conducting weddings on a beach in Hawaii constituted protected activity under the First Amendment, due to the evident desire of the participants to convey a message about their commitment and the fact that third parties viewing the ceremony, even at a distance, were likely to understand that message.

Here, facts alleged in the Complaint establish no more than that the use of the location for making the film would be considered "facilitative" of speech, and such conduct is not afforded the full panoply of speech protection.  See White House Vigil, 746 F.2d at 1540.  There are no facts alleged in the Complaint to support either of the two required showings—that the filming was, in and of itself, meant to be expressive (as opposed to facilitative) or that there was an audience at the filming site and that they were likely to understand the expression.  Plaintiff's Complaint would need to establish both elements and it cannot support either one. Instead, the action of filming is analogous to the antecedent work necessary to write a book, such as performing archival research, interviewing people or writing and editing drafts.  That preparatory

work is generally distinct from the resulting communication and there is no reason to suggest otherwise here.  There is no First Amendment right to do that sort of preparatory work on government property, be it filming or researching a book, unburdened by reasonable permit requirements.

Defendants are aware of the line of cases finding that the video recording of police making arrests in public constitutes protected First Amendment activity,[5] but those cases are distinguishable because such filming would satisfy the two-part test from Texas v. Johnson, above.  Filming police making arrests itself is a form of protest and is likely to be understood as such by others.  The police video line of cases is also distinguishable because such filming records important governmental activity that is of keen public interest, and indeed is akin to news gathering and so may also implicate freedom of the press.  Furthermore, such filming takes place generally in areas open to public.  The filming at issue in this case, by contrast, differs in all of these respects from the filming of arrests because it captured no government activities taking place nor was there unrestricted access to the location.  The police video cases do not establish a broader right to use government property to film or make video recordings without reasonable restrictions.  For example, there is no right to video airport security officers, Mocek v. City of Albuquerque, 813 F.3d 912, 930 (10th Cir 2015), nor even to record governmental proceedings

---

[5] There are numerous circuit decisions on video recording police activities, e.g., Toole v. City of Atlanta, 798 Fed. App'x 381, 388 (11th Cir. 2019) (holding that filming police arrest of person doing the filming was protected speech, subject to reasonable time, place manner restrictions, and the "First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); Fields v. City of Phila., 862 F.3d 353, 356 (3d Cir. 2017) ("the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public.").

that are open to the public, such has hearings, trials, or executions, Rice v. Kempker, 374 F.3d 675, 679 (8th Cir. 2004) (citing cases).

For these reasons, the case law applies only a "requirement of reasonableness" to the NPS permit and fee requirements.  See Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 682-683 (1992) (holding that "the purpose of the terminals to be the facilitation of passenger air travel, not the promotion of expression . . . therefore, therefore, need only satisfy a requirement of reasonableness.").

**B.     In a Nonpublic Forum the Court Should Apply the Test of Reasonableness.**

Even if the filming activities at issue here were considered expressive conduct, Defendants would still be subject only to the reasonableness test because the filming took place on government property that was a nonpublic forum.  As explained by the D.C. Circuit:

> We analyze [plaintiff's] claim under the familiar "public forum" doctrine, which divides government property into three categories for purposes of First Amendment analysis.  The "traditional public forum" includes public areas that have "by long tradition or by government fiat ... been devoted to assembly and debate."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).  The government must respect the open character of these forums, and can only impose speech restrictions that are "narrowly tailored to serve a significant governmental interest."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  Next is the "limited public forum" or "designated public forum," which comprises "public property which the State has opened for use by the public as a place for expressive activity."  Perry, 460 U.S. at 45.  Expressive activity in these forums may be restricted to particular speakers or purposes.  Third is the "nonpublic forum," which encompasses government property that is "not by tradition or designation a forum for public communication."  Id. at 46.  Here the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  Id.  This rule recognizes that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  Greer v. Spock, 424 U.S. 828, 836 (1976) (quoting Adderley v. Florida, 385 U.S. 39, 47 (1966)) (internal quotation marks omitted).

Oberwetter v. Hilliard, 639 F.3d 545, 551-52 (D.C. Cir. 2011). The D.C. Circuit noted that a variety of types of federal property could be treated as a public forum, but it also noted the

unassailable fact that much of the nonurban parks cannot realistically be considered part of a

public forum:

> [W]e have recognized that our country's many national parks are too vast and
> variegated to be painted with a single brush for purposes of forum analysis.
> "Presumably, many national parks include areas—even large areas, such as a vast
> wilderness preserve—which never have been dedicated to free expression and
> public assembly, would be clearly incompatible with such use, and would
> therefore be classified as nonpublic forums."

Id. at 552 (quoting Boardley v. Dep't of the Interior, 615 F.3d 508, 515 (D.C. Cir. 2010)).

Here, the Complaint alleges no facts that could be reasonably interpreted to establish that

the site of the filming was a public forum.  Indeed, when the facts alleged in the Complaint are

considered along with matters of public record that the Court may consider in deciding a motion

to dismiss, they establish that it was not within a public forum.  Colonial National Historical Park

has designated an area close to the Yorktown Battlefield visitor center and the York River for

demonstrations, making that portion of the park a designated public forum.  See Superintendent's

Compendium at 17 (36 C.F.R. § 2.51) & 25 (Attachment 3).  Also within the public record is the

NPS park map available at https://www.nps.gov/york/planyourvisit/maps.htm (last visited June

2, 2020); see generally https://www.nps.gov/york/index.htm.

The Complaint does not allege that Plaintiff filmed in the designated free speech area

near the visitor center at Yorktown Battlefield.   Instead, the Complaint asserts that: "Price and

Person filmed some Crawford Road scenes in areas open to the general public at about four

locations within the Yorktown Battlefield in the Colonial National Historical Park, which is

property under NPS jurisdiction."  Compl. ¶ 38.  Plaintiff further alleges that he filmed at a

location on Crawford Road "known as Crybaby Bridge."  Compl. ¶ 39.  The NPS maps clearly

show that Crawford Road does not go to or near the Visitor Center.  This necessarily means that

the bridge over Crawford Road (seen on the map just north of where Crawford Road crosses

Baptist Run) is also nowhere near the visitor center or the designated public forum. Consequently, the public record makes clear that the filming locations alleged in the Complaint were not in the designated public forum within the park.  The Complaint's allegation that the area where he filmed was open to the public is insufficient to remove it from the baseline category of a nonpublic forum.  See 36 C.F.R. § 2.51(c); Oberwetter, 639 F.3d at 552; Boardley, 615 F.3d at 521 (declining to decide the forum status of every part of a national park but holding that "it is at least clear that the locations designated as 'free speech areas' . . . are public forums.").

Because the filming did not take place within a public forum, the Oberwetter and Boardley decisions require the Court to apply the reasonableness standard, even if the Court finds that the filming was itself expressive activity protected by the First Amendment.

### C.     The Government Interests are Legitimate and the Permit and Fee Requirements are Reasonably Related to Them.

The permit and fee requirements pass the test of reasonableness, whether formulated as in Krishna Consciousness, 505 U.S. at 683 ("The restrictions here challenged, therefore, need only satisfy a requirement of reasonableness. We reiterate what we stated in Kokinda: The restriction 'need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'"), or Oberwetter, 639 F.3d at 553 ("viewpoint neutral and reasonable in light of the purpose [of] the forum").  First, DOI has a significant interest regulating commercial filming. DOI has at least four agencies with public land management and administrative responsibilities: NPS, FWS, BLM, and the Bureau of Reclamation. Collectively, DOI is responsible for over 445,500,000 acres of federal land, which is the largest land area administered by any federal agency. As stated previously, Congress authorized the NPS, FWS, BLM, and the Department of Agriculture to issue permits and charge fees for commercial film permits in order to efficiently manage the

lands each agency controls.  54 U.S.C. § 100905 (2020).  NPS explained the purpose for its

regulation as part of the process of issuing it:

> In many circumstances it is important for land managers to know the specific time
> and location of certain activities so permit terms and conditions may be used to
> mitigate the possibility of resource damage or impact to visitors.  For example,
> park units may have limited space, fragile resources, or experience high visitation
> during a specific time period.  Refuges may need to protect nesting areas of
> threatened or endangered species during certain times of the year.

Commercial Filming & Similar Projects & Still Photography Activities, 78 Fed. Reg. 52,087-02,

52089.  These interests are clearly legitimate and substantial, and Plaintiff's Complaint does not

appear to challenge this.

Second, the permit and fee requirements are reasonably related to the agencies' land

management  purposes because they provide managers the opportunity to use their discretion in

determining where, when, and if movie, television, and still photography sets are placed in parks,

so that they can protect park resources and manage use by the other visitors.  Finally, there is no

plausible argument that the permit and fee requirements are not viewpoint neutral under this

standard; Defendants are unaware of any cases holding that merely by distinguishing between

commercial and noncommercial activities, a regulation would fail this aspect of the test of

reasonableness.  More generally, Congress intended Section 100905 to create greater financial

fairness and consistency across DOI agencies, because regulations already required a permit for

commercial filming and certain commercial still photography.  See 43 C.F.R. § 5.1 (1998)

(requiring a permit before filming but prohibiting NPS and FWS from charging location fees); 36

C.F.R. § 5.5 (1998) (requiring a permit for commercial filming and commercial advertising

photography, not mentioning fees); 50 C.F.R. § 27.71 (prohibiting commercial filming except as

authorized by 43 C.F.R. § 5).  At the same time, it enabled NPS to "manage[] filming activities

to ensure that the natural, historical, and cultural resources are protected, and that filming should not conflict with the public's normal use of the park."  S. Rep. No. 106-67, at 2 (1999).

For these reasons, the permit and fee requirements easily pass the test of reasonableness and therefore the Court should uphold them and reject all of Plaintiff's First Amendment challenges.

### D.    The Court Need Not Decide Whether the Restriction is Content Based Because this Case Involves the Use of Proprietary Government Lands.

Even though Oberwetter and Krishna Consciousness, and cases that follow, make clear that the test of reasonableness disposes of Plaintiff's First Amendment claims, it is worth a brief explanation of why the Court need not resort to the wider body of First Amendment law, to include intermediate scrutiny, as an alternative argument.  Congress has power under the Property Clause to act as proprietor of land in the public domain.  Cons. of the United States, Art. IV, § 3, cl. 2.  Congress has complete power to make those "needful rules" which in its discretion it determines are necessary.  Id.  Accordingly, when Congress acts with respect to those lands covered by the clause, its legislation "overrides conflicting state laws," Kleppe v. New Mexico, 426 U.S. 529, 530 (1976), and it may generally charge fees for use of its property, like other private proprietors, Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 542 n.7 (1985).

Here, the permit fees are based on proprietary interests, and the principle of fair return was one the Congress enunciated in its use of the powers given to the legislative branch under the Property Clause.  Congress's stated intention to obtain a fair return for use of these areas through a ground rent, in the form of user fees for what is otherwise not a designated use of NPS lands, is well within the ambit of the proprietary powers given to Congress by the Property Clause.  A user fee based on this proprietary interest need only be a reasonable approximation of

a fair share of government costs of benefit.  Massachusetts v. United States, 435 U.S. 444 (1978)

(the amount of a fee may approximate the benefit even if unrelated to the cost); see also

Evansville-Vanderburgh v. Delta Airlines, Inc., 405 U.S. 707 (1972) (per-passenger fee; a fee is

valid if it is based on some fair approximation of the benefit or use, is not discriminatory, and is

not excessive in comparison with the benefit conferred); United States v. Sperry Corp., 493 U.S.

52 (1989) (requiring only fair approximation); Nw. Airlines v. Cty. of Kent, 510 U.S. 355 (1994)

(noting that Evansville's test has been adopted in a variety of setting).

 "The First Amendment does not guarantee access to government property simply because

it is owned or controlled by the government." U.S. Postal Serv. v. Greenburgh Civic Assns., 453

U.S. 114, 129 (1981).  "The State, no less than a private owner of property, has power to

preserve the property under its control for the use to which it is lawfully dedicated." Adderley v.

Florida, 385 U. S. 39, 47 (1966).  Indeed, the existence of a right of a type of access to public

property and the standard by which limitations upon such a right must be evaluated differ

depending on the character of the property at issue.  Perry Educ. Ass'n v. Perry Local Educators'

Ass'n, 460 U. S. 37, 44 (1983).  The mere fact that government property can be used as a vehicle

for communication does not mean that the Constitution requires such uses to be permitted.   City

Council v. Taxpayers for Vincent, 466 U.S. 789, 814 n.31 (1984).  Public property that is not by

tradition or designation a forum for public communication may be reserved by a State "for its

intended purposes, communicative or otherwise, as long as the regulation on speech is

reasonable and not an effort to suppress expression merely because public officials oppose the

speaker's view." Perry Educ., 460 U.S. at 46.  For these reasons, the Court should not apply any

form of heightened scrutiny but should instead uphold the permit and fee requirements under the

test of reasonableness and dismiss all of Plaintiff's First Amendment claims.

III.     **Alternatively, the Permit and Fee Requirements Pass Intermediate Scrutiny.**

Even if the Court were to apply a heightened scrutiny, there are two independent reasons why the Court should reject strict scrutiny and should instead apply intermediate scrutiny.  The first reason is that restrictions on commercial speech are consistently assessed under intermediate scrutiny.  Second, content neutral restrictions on speech are also subject only to intermediate scrutiny.  The permit and fee requirements here are perhaps unusual within the jurisprudence of the First Amendment because they are both commercial and content neutral, whereas most restrictions on commercial speech regulate commerce by making distinctions based on content.  In any event, the permit and fee requirements pass intermediate scrutiny and the arguments in Plaintiff's Complaint all fail in light of the applicable case law.

A.     **The Commercial Nature of the Regulated Speech is Enough to Merit Intermediate Scrutiny.**

In Central Hudson, the Supreme Court created a four-part test for analyzing commercial speech:

> For commercial speech to come within the First Amendment, it at least must [1] concern lawful activity and not be misleading.  Next, it must [2] be determined whether the asserted governmental interest to be served by the restriction on commercial speech is substantial.  If both inquiries yield positive answers, it must [3] then be decided whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 557 (1980).

"The first prong of the test excludes false or misleading commercial speech from First Amendment scrutiny, while the latter three parts impose a test on truthful commercial speech, in line with Virginia Pharmacy."  Lee Mason, "Content Neutrality & Commercial Speech Doctrine After Reed v. Town of Gilbert," 84 U. Chi. L. Rev. 955, 970 (2017).  Because there are no

allegations in the Complaint that suggest that illegal or misleading activity is at issue, the focus

here is on the latter elements of the test.

The Central Hudson test, referred to as intermediate scrutiny, is a lesser standard than

strict scrutiny.  See, e.g., State Univ. of N.Y. v. Fox, 492 U.S. 469, 475 (1989).  The Supreme

Court in the forty years since Central Hudson has consistently used its intermediate scrutiny test

whenever restrictions on commercial speech have been challenged.

> Under a commercial speech inquiry, it is the State's burden to justify its content-
> based law as consistent with the First Amendment.  Thompson v. Western States
> Medical Center, 535 U.S. 357, 373 (2002).  To sustain the targeted, content-based
> burden § 4631(d) imposes on protected expression, the State must show at least
> that the statute directly advances a substantial governmental interest and that the
> measure is drawn to achieve that interest.  See Fox, supra, at 480–81; Central
> Hudson, 447 U.S. at 566.  There must be a "fit between the legislature's ends and
> the means chosen to accomplish those ends."  Fox, supra, at 480 (internal
> quotation marks omitted).  As in other contexts, these standards ensure not only
> that the State's interests are proportional to the resulting burdens placed on speech
> but also that the law does not seek to suppress a disfavored message.  See Turner
> Broadcasting, 512 U.S., at 662–63.

Sorrell v. IMS Health, Inc., 565 U.S. 552, 572 (2011).[6]  Here, Plaintiff's Complaint repeatedly

alleges that the challenged permit and fee requirements regulate commercial speech.  As noted

---

[6] The Supreme Court first recognized that commercial speech was not entirely exempted from
free speech protection beginning in the 1940s.  See Winters v. New York, 333 U.S. 507, 510
(1948) (holding that although the Court could "see nothing of any possible value to society in
these [lewd] magazines, they are as much entitled to the protection of free speech as the best of
literature"); see also Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02 (1952) (holding that
the exhibition of movies for profit did not remove first amendment protection).  The Court
extended first amendment protections to purely commercial speech in Virginia State Bd. of
Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976).  In that case,
Plaintiffs challenged a state law that effectively prohibited the advertisement of prescription drug
prices as a violation of free speech rights.  The Court held that a strong societal interest in "the
free flow of information" existed and that as applied there, it invalidated the statute prohibiting
disclosure of drug prices in ads.  Id. at 762-64.  However, in so holding, the Court expressly
noted that it did "not hold that it can never be regulated in any way. Some forms of commercial
speech regulation are surely permissible."  Id. at 770.  Subsequent decisions affirmed that
commercial speech may be regulated.  See, e.g., Young v. Am. Mini Theatres, Inc., 427 U.S. 50
(1976) (upholding ordinance concerning the location of adult movie theaters).

above, Defendants accept the premise for the purposes of making their alternative argument that intermediate scrutiny applies.  The case law is clear that <u>Central Hudson</u>'s intermediate scrutiny applies to restrictions on commercial speech.

> **B.      Independent of the Commercial Nature of the Regulated Activity, Intermediate Scrutiny Applies under <u>Reed</u> because the Permit and Fee Requirements are Content Neutral.**

Independently of the fact that <u>Central Hudson</u> requires only intermediate scrutiny for regulations of commercial speech, the permit and fee requirements here would nevertheless be subject, at most, only to intermediate scrutiny because they are content neutral.

> **1.      The <u>Reed</u> Test**

As recently summarized by the D.C. Circuit, in assessing restrictions on the use of public forums, the Court must determine whether the restriction is content based to determine the level of scrutiny:

> The constitutionality of regulation of public forums depends first on whether the regulation is content based. Content-based regulations are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  <u>Reed v. Town of Gilbert</u>, -- U.S. --, 135 S. Ct. 2218, 2226 (2015).  Second, because traditional public forums are vital places for speech, even a content-neutral public-forum regulation is subjected to additional First Amendment scrutiny to determine whether it is a reasonable time, place, and manner restriction "narrowly tailored to serve a significant governmental interest" that "leave[s] open ample alternative channels for communication."  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989); <u>see also</u> <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983).

<u>ANSWER Coal. v. Basham</u>, 845 F.3d 1199, 1208 (D.C. Cir. 2017).  To qualify for intermediate scrutiny, the challenged restrictions must be content neutral and <u>Reed</u>'s test for content neutrality was also explained in <u>ANSWER Coalition</u>:

> To be subject to evaluation under the more lenient, "intermediate" scrutiny applicable to time, place, and manner regulations, a rule must not itself be content based, <u>see</u> <u>Reed</u>, 135 S. Ct. at 2228, and must be "justified without reference to the content of the regulated speech," <u>Ward</u>, 491 U.S. at 791.  "Government

> regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." <u>Reed</u>, 135 S. Ct. at 2227. Facial distinctions based on message, whether they regulate the speech's subject matter, function, or purpose, are content based and so subject to strict scrutiny.  <u>Id.</u>  Meanwhile, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." <u>Turner Broadcasting Sys., Inc. v. FCC</u>, 512 U.S. 622, 643 (1994).

<u>Id.</u>  The <u>Reed</u> test thus looks at the content of regulated speech and the distinctions that the regulation makes based on the content or subject matter of the regulation communication.

### 2.     The Permit and Fee Requirements Are Content-Neutral Under <u>Reed</u>.

Here, there is no allegation that the government would deny a permit for a commercial film because of its content, nor is there any language in the challenged statute or regulation that could support such an argument.  Plaintiff did not allege that the government would have denied Plaintiff a filming permit because of the film's subject matter. There is no factual allegation that one type of speech is allowed and another not based on point of view.  The only distinctions that the statute and regulations make that Plaintiff alleges to be based on content are the distinctions: (1) between commercial and noncommercial speech and (2) between news gathering and other activities.  These distinctions are simply insufficient under <u>Reed</u> to qualify as content based.

Neither distinction turns on the content of particular ideas, messages, or content, and instead the focus of the statute and the regulations is on the impact that the filming activities might have on the land and the park and on the NPS's ability to manage the flow of visitors in the park in light of the filming activities.  The exception for news gathering does not pertain to content either, and is properly addressed in any event under the narrow tailoring prong of the intermediate scrutiny test.  Similarly, the permit and fee requirements are plainly "justified without reference to the content of the regulated speech," <u>see Ward</u>, 491 U.S. at 791, because their justification rests squarely on the aforementioned statutory mandates to manage and protect the park in the face of potentially impactful commercial filming activity, to manage any resulting

24

impact on the other visitors to the park while the filming is taking place, and to obtain a fair return for use of the land.  The commercial filming statute and regulation do not authorize the NPS to deny a permit or charge a fee because of the subject matter, function, or purpose.  For these reasons, the permit and fee requirements are content neutral under <u>Reed</u>.

The Eighth Circuit addressed the constitutionality of a municipal regulation that treated commercial photographers differently from non-commercial photographers.  <u>Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks</u>, 864 F.3d 905 (8th Cir. 2017).  The court found that treating commercial and amateur photographers differently did not create a content based permit scheme because it can be justified without reference to the content of the regulated conduct.  <u>Id.</u> at 915.  The different treatment was "based on different levels of interference with use and enjoyment of the Park by all [because] commercial photographers' sessions last for longer periods of time, use more large equipment, are more intrusive, and likely involve more subjects in one group."  <u>Id.</u>  Section 100905 and the applicable regulations are akin to the scheme in <u>Havlak</u> that was found to be content neutral under <u>Reed</u>.  Defendants have not found any cases that have held to the contrary on analogous facts.

Plaintiff's Complaint mistakenly relies on <u>Reed</u> for the proposition that any statute that distinguishes between commercial and non-commercial speech is presumptively unconstitutional and subject to strict scrutiny.  <u>See</u> Compl. ¶ 5.  In fact, <u>Reed</u> looked much more deeply at the content of the speech, specifically at the numerous categories that the municipal ordinance at issue created based on the substance of those categories.  It was the content of the speech itself that was the distinguishing factor in establishing the numerous different rules for different types of signs.  Depending on the political or religious content of the speech, some signs had duration, size, and location restrictions. For instance,

25

"Ideological Signs," defined as signs "communicating a message or ideas" that do not fit in any other Sign Code category, may be up to 20 square feet and have no placement or time restrictions. "Political Signs," defined as signs "designed to influence the outcome of an election," may be up to 32 square feet and may only be displayed during an election season. "Temporary Directional Signs," defined as signs directing the public to a church or other "qualifying event," have even greater restrictions: No more than four of the signs, limited to six square feet, may be on a single property at any time, and signs may be displayed no more than 12 hours before the "qualifying event" and 1 hour after.

Id. at 2225.  The system was not uniform, and it was clear that some speech was preferred, because some signs had more restrictions than others.  For  example, disallowing the display of political signs during times other than election season, but simultaneously allowing the display of non-political signs throughout the year, was proof that that some speech was preferred. Id.  The Court made clear that "government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Id.

Unlike the sign ordinance issued by the Town of Gilbert, Section 100905 does not purport to limit the duration, film crew size, or location based upon whether filming is for news gathering or commercial filming purposes, nor does it differentiate between religious, political, or directional messages.  Further, unlike Gilbert's sign ordinance, the modest restrictions imposed by Section 100905 and its implementing regulations are consistently justified by the same governmental purposes (explained above) having to do with protection of the park land, managing visitors, and obtaining a rent-like return for use of the property.   This resource-based limitation is content neutral because the record does not support, nor is there an allegation, that the government prefers filming based on a message.  See, e.g., Mahoney v. Doe, 642 F.3d 1112, 1118 (2011) (finding D.C. ordinance content neutral that prohibited defacing the sidewalk near the White House).  The government simply assesses fees for a commercial use of public land based on size of crew, number of days of filming, sets and other non-content based restrictions.

For these reasons, the Court should find that the permit and fee requirements are content neutral under <u>Reed</u>.  For that reason, and/or because the permit and fee requirements regulate commercial activity, the Court should reject strict scrutiny in favor of intermediate scrutiny (assuming the Court does not accept the argument in part one of this Memorandum).

### C.     The Permit and Fee Requirements Satisfy Intermediate Scrutiny.

The tests for intermediate scrutiny under <u>Central Hudson</u> for commercial speech and <u>Ward</u> for content neutral speech are similar.  Both look to the importance of the government interest, the nexus between that interest and means used, and require a certain level of tailoring. The text laid out in the courts' holdings is also similar.  The commercial speech test under <u>Central Hudson</u> requires a "substantial governmental interest," 447 U.S. at 566, and the <u>Ward</u> test for content neutral regulations requires a "significant government interest," 491 U.S. at 791. The commercial speech test requires "a fit between the legislature's ends and the means chosen," <u>Fox</u>, 492 U.S. at 480, while the content neutral test requires that the restriction be "narrowly tailored," <u>ANSWER Coal.</u>, 845 F.3d at 1208 (quoting <u>Ward</u>).  Finally, the commercial speech test requires that the government's interests are proportional to burdens on speech and that the law does not "suppress a disfavored message," <u>Sorrell</u>, 564 U.S. at 572, while the content neutral test requires that the scheme "leave open alternative channels for communication," 845 F.3d at 1208.

#### 1.     The Government's Interests are Substantial and Significant.

##### a.     Cost Recovery

As discussed more briefly above, the government has several interests in the permit and fee requirements in Section 100905 and its implementing regulations.  First, "Congress declare[d] that it is the policy of the United States that . . . the United States receive fair market

value of the use of the public lands and their resources[.]" 43 U.S.C. § 1701(a)(9).  Congress

viewed location fees as a way to send some of the commercial profits from these commercial

uses of public lands to the park service, where NPS could then use the money to maintain

cultural resources and improve visitor services. <u>Commercial Filming & Similar Projects & Still</u>

<u>Photography Activities,</u> 78 Fed. Reg. 52,087-02, 52090. "As directed by Congress, the location

fee is strictly a fee to provide a "fair return" for the use of the Federal lands. No overhead costs

or other types of cost recovery costs are included in the fee." <u>Id.</u>  The fees were designed to

compensate the public for the use of park land and provide a public benefit by allowing the parks

to retain the fees collected and reinvest them into the public services offered. <u>Id.</u>  The statute and

regulation are clear that the government interest is to provide a tool for better management of

parks. This is made abundantly clear by the structuring of fees around impact to the resources

and disruption of designated use, rather than the expected return on the production in the

marketplace.

<b>b.      Protection of Park Land & Management of Visitors</b>

DOI has an important interest in regulating the use of its land, including commercial

filming. As stated previously, Congress authorized NPS, USFWS, BLM, and the Department of

Agriculture to issue permits and charge fees for commercial film permits in order to efficiently

manage the lands each agency controls.  54 U.S.C. § 100905. The reason why NPS issues

permits is that

> In many circumstances it is important for land managers to know the specific time
> and location of certain activities so permit terms and conditions may be used to
> mitigate the possibility of resource damage or impact to visitors. For example,
> park units may have limited space, fragile resources, or experience high visitation
> during a specific time period. Refuges may need to protect nesting areas of
> threatened or endangered species during certain times of the year.

28

Commercial Filming & Similar Projects & Still Photography Activities, 78 Fed. Reg. 52,087-02, 52,089.

**2.      The Permit and Fee Requirements are Narrowly Tailored.**

**a.      The Permitting System Lets NPS Assess Potential Cost & Harm.**

The commercial filming regulation, 43 CFR § 5.8, authorizes NPS to collect a reasonable location fee in lieu of any entrance or special use fee and cost recovery. The regulation expressly states that the location fee "represents a fee for the use of Federal lands and facilities" and that cost recovery is based "upon our direct and indirect expenses including, but not limited to, administrative costs for application processing, preproduction meetings and other activities, on-site monitoring of permitted activities, and any site restoration." Id.  The regulatory history of 43 C.F.R. Part 5 is clear that "applications for commercial filming activities and still photography are evaluated based on the potential impact the activity may have on cultural and natural resources, on other visitors, on agency operations, and on the health and safety of visitors, permittee staff and agency employees. The agencies may not issue permits that authorize an illegal activity or activities likely to cause resource damage."  78 Fed. Reg. 52,092.

The commercial filming permitting system is not a profit-making venture.  Id. at 52,090. Rather, it implements the congressional mandate to "manage[] filming activities to ensure that the natural, historical, and cultural resources are protected, and that filming should not conflict with the public's normal use of the park." S. Rep. No. 106-67, at 2 (1999). As Government Accountability Office stated in a report,

> Because costs recovered from permitting activities are used by park units for managing their permit program and other park programs, failing to recover such costs decreases the financial resources park units have for processing permits and monitoring permitted activities. Unless steps are taken to ensure that units fully identify and collect administrative and management (including monitoring) costs associated with special event permits and with commercial filming and still

29

photography permits, the Park Service will continue to deprive itself of funds important for managing and carrying out agency policy and delivering agency services.

National Park Service: Revenues Could Increase by Charging Allowed Fees for Some Special

Uses Permits, at 18-19, GAO (May 2005), available at https://www.gao.gov/assets/250/

246260.pdf (last visited June 5, 2020).  For this reason, this court determine that the permitting

system is narrowly tailored to address resource impacts to parks.

### b.   NPS' Fee Schedule is Graduated and Reasonable.

In Boardley, the D.C. Circuit considered whether all park forums are the same and

whether the NPS's demonstration and special events permitting system should treat all applicants

the same.  In that case, plaintiff Boardley and a small group of people attempted to distribute

religious material in an area designated for first amendment activity in Mount Rushmore

National Memorial.  Boardley, 615 F.3d at 512.  Initially, Boardley did not have a permit, so he

was not allowed to distribute the material, but later he obtained a permit to distribute the

literature. Id.  Boardley advanced two legal arguments: (1) he should not have needed a permit

for his activity and (2) all national parks are traditional public forums. The D.C. Circuit ruled

that small groups should not need a permit in order to demonstrate in designated public forums

and, importantly, that not all national park areas are traditional public forums. Id.  With respect

to permits for small groups, the court reasoned that

> The fit between means and ends is far more precise when the NPS regulations are applied to large groups. The most important function of a permit application is to provide park officials with the forewarning necessary to coordinate multiple events, assemble proper security, and direct groups to a place and time where interference with park visitors and programs will be minimized.  when "two or more individuals speaking or otherwise pros elytizing ... would not interfere meaningfully with WMATA's asserted interests.

Id. at 522.  Similar to the regulatory action that NPS took in response to Boardley, when the NPS

drafted its commercial filming regulation it created a small group exception for commercial

filming. Although Section 100905 required a permit for all commercial filming, the NPS has a graduated fee schedule.  The publicly available fee schedule provides:

| Number of People | Cost for Permittee |
|---|---|
| 1–2 people, camera & tripod only | $0/day |
| 1–10 people | $150/day |
| 11–30 people | $250/day |
| 31–49 people | $500/day |
| Over 50 people | $750/day |

See Commercial Filming and Still Photography Permits, available at https://www.nps.gov/aboutus/news/commercial-film-and-photo-permits.htm (last visited June 5, 2020).  In practice, this means that small commercial filming groups are not required to pay a fee to film in a park. Also, the smaller the group, the lower the fee that group pays. For instance, Plaintiff's filming at Crybaby Bridge would not have required him to pay any fees because he had no more than a tripod and the film crew was no more than two people. Compl. ¶ 39. This approach is consistent with the D.C. Circuit's ruling in Boardley: NPS does consider the size of a group when determining how much, if any money at all, a permittee should pay to use park resources. For this reason, this court should determine that graduated fee schedule is narrowly tailored.

### c.     News-Gathering Exceptions Are Narrowly Tailored.

Newsgathering is defined in First Amendment context as the means, methods, and mechanics of gathering information by members of the press for dissemination to the general public.  The Supreme Court has explicitly recognized rights to publish without prior restraint and with anonymity, to circulate and personally distribute literature, and to receive printed communications.  See N.Y. Times Co. v. United States, 403 U.S. 713 (1971); Near v. Minnesota,

283 U.S. 697 (1931); <u>McIntyre v. Ohio Elections Comm'n</u> , 514 U.S. 334 (1995).  The permit

and fee requirements here are narrowly tailored to achieve the government's stated interests

while carving out exceptions to accommodate the recognized particular needs of the press.  <u>E.g.</u>,

<u>Branzburg v. Hayes</u>, 408 US 665, 682 (1972) (charging fees could interfere with press).  Parks

are routinely used by the press to: (1) ask the President of the United States questions (e.g. Rose

Garden, South Lawn, etc.), (2) cover breaking news and current events taking place in parks (e.g.

Occupy Wall Street demonstrations, Women's March, Inauguration, etc.), (3) interview the

public about a current event, and (4) interview government officials. Some media companies are

international behemoths with millions of daily viewers or readers, and others are small outfits

with limited staff and audience. Consistent with <u>Reed</u>, the regulations do not distinguish between

types of media companies or types of commercial filming companies. <u>Reed</u>, 135 S. Ct. at 2227.

Also, the exemption applies only if the news organization is acting in a newsgathering capacity.

<u>Cause of Action v. FTC</u>, 799 F.3d 1108, 1121 n.10 (D.C. Cir. 2015) (explaining that records are

"sought for commercial use" if a news-media entity requests them "in its corporate rather than

journalistic capacity").  Accordingly, the agency tailored the new-gathering exception to avoid

unnecessarily impeding the news media's ability "access to Federal lands to gather news."

<u>Commercial Filming & Similar Projects & Still Photography Activities,</u> 78 Fed. Reg. 52,087-02,

52,091.  For these reasons, the permit and fee requirements are narrowly tailored under the

intermediate scrutiny case law.

### 3. The Permit and Fee Requirements Leave Open Alternative Channels.

Finally, as noted above, to survive intermediate scrutiny, a regulation must leave open

alternative channels.  <u>ANSWER Coal.</u>, 845 F.3d at 1215. The permit and fee requirements here

place a minimal burden on the permit applicant, who already faces other uncontested restrictions

on access to the park (e.g., limited visiting hours).  Its restrictions have nothing to do with the

message conveyed in the final product.  The permitting system does not limit where commercial filming takes place; it prescribes only that "the agencies may not issue permits that authorize an illegal activity or activities likely to cause resource damage."  78 Fed. Reg. 52,092.  With a permit, Plaintiff would have had multiple alternative channels to film his movie, most obviously applying for a permit, but according to the Complaint, Plaintiff never applied for a permit nor does he allege that he will apply for one if he follows through on his asserted intention to film again in the park.  Compl. ¶¶ 8 & 9.   For these reasons, the Court should find that the permit and fee requirements provide alternative channels. ANSWER Coal., 845 F.3d at 1215.

Therefore, the permit and fee requirements satisfy all of the elements of intermediate scrutiny, and the Court should uphold them against First Amendment challenge, even if the Court were to apply intermediate scrutiny.

**IV.   Plaintiff's Arguments and Counts in the Complaint All Fail to State a Claim.**

**A.   The Complaint's Five Alleged "Violations"**

Plaintiff's Complaint asserts five ways in which the permit requirement violates the Constitution.  Each of these theories is incorrect, as demonstrated by the case law.  First, the Complaint asserts that the permit requirement violates the First Amendment because only "certain filmmakers" must get permits, unlike the "general public," and that this necessarily means that the permit requirement "imposes a prior restraint on freedom of speech and of the press, which is 'the essence of censorship'" that is presumptively unconstitutional. Compl. ¶ 3. The simple answer is that, because the film-making Plaintiff intends to perform is not in a public forum, the government is entitled to place reasonable restrictions on its use, even if Plaintiff's filmmaking here were itself expressive activity under the First Amendment.

And even if the film-making here were to take place in a public forum, the case law provides that content neutral permitting schemes are not treated as prior restraints.  See, e.g., Thomas v. Chi. Park District, 534 U.S. 316, 322 (2002) (upholding permit scheme for groups using municipal park); see also ANSWER Coal., 845 F.3d at 1210 (upholding the National Park Service's permitting system for the inauguration). Content neutral schemes are scrutinized only for reasonable restrictions on time, manner and place, and are not subject to the strong presumption of unconstitutionality.  Id. at 1212-13.  Similarly, restrictions on commercial speech are reviewed under intermediate scrutiny and are not treated as censorship under the case law.

Plaintiff's second theory is similar—that the permit requirement constitutes "press licensing," citing City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750 (1988), and asserting that NPS has carried out its authority arbitrarily in deciding "who is and who is not covered" by the permit requirement.  Compl. ¶ 4.  The most direct problem with this claim is that it has nothing to do with Plaintiff, who has not held himself out to be a member of the press.  But even if Plaintiff had standing to bring such a claim, and had pleaded supporting facts in his Complaint, the test of reasonableness analysis described above would still be the same because of the overriding fact that his claims involve the use of the government's land, and he has failed to show that he seeks the use of public forum (or that his film-making is itself expressive activity).

Moreover, the permit requirement at issue here is plainly distinguishable from the annual permit at issue in City of Lakewood.  In that case, the permit scheme failed to provide standards for approval but instead gave the mayor unbridled discretion to decide whether to permit the newspaper to place newsstands on public property.  City of Lakewood, 486 U.S. at 757.  The Lakewood ordinance imposed an annual approval requirement as well, effectively enabling the

mayor to monitor content of the newspaper at the same time as consideration of its applications for placement of newsstands.  Id. at 757-58.  The concerns that animated the Court in City of Lakewood are not present here because Interior's permit requirement here has objective standards related to cost and the flexibility to impose additional restrictions is clearly tied to the need to manage the use of the land and any particular impact on the specific site.  Moreover, the law itself in providing for fees to be assessed for commercial film uses require that the fee be based on specific criteria, including the number of personnel, days in the park and other objective, non-content based criteria.  The permit requirement here is not an example of press licensing but is instead a content neutral rule that is properly subject only to the "requirement of reasonableness." See Krishna Consciousness, 505 U.S. at 682-83.

Third, the Complaint argues that the permit requirement arbitrarily distinguishes between filming and still photography, that it "is content based both because it discriminates between commercial and non-commercial speech, . . . and because it cannot be justified without reference to the content of the regulated speech, . . . or the identity of the speaker."  Compl. ¶ 5 (citing Sorrell, 564 U.S. at 573-74, 577-78; and Reed, 135 S. Ct. at 2227, 2230).  The Complaint argues that "[t]he law is thus unconstitutional because it is neither supported by a compelling governmental interest nor the least restrictive means of advancing any such interest."  Id.  As explained above, however, the permit requirement is properly considered content neutral under the applicable case law standards, including Reed.

Each of these points is addressed in the arguments above.  As to the assertion that the law provides no explanation for the difference between commercial and still photography, the

Complaint ignores both the publicly available explanation in the filming fee schedule[7] and the common-sense reality that commercial filming is generally a larger operation than still photography and thus far more likely to impact potentially sensitive areas of the park and the use of the park by others.  As discussed above, the Eighth Circuit found that treating commercial and amateur photographers differently did not create a content based permit scheme because it can be justified without reference to the content of the regulated conduct.  See Havlak.  As explained in the district court decision in that case, the different treatment was "based on different levels of interference with use and enjoyment of the Park by all [because] commercial photographers' sessions last for longer periods of time, use more large equipment, are more intrusive, and likely involve more subjects in one group."  Josephine Havlak Photographer, Inc. v. Village of Twin Oaks, 195 F. Supp. 3d 1064, 1076 (E.D. Mo. 2016), aff'd, 864 F.3d 905 (8th Cir. 2017).  Moreover, the regulation of an area as a set location for purposes of a commercial filming permit are indistinguishable from the appropriate permit conditions for a play, or a concert, which would also require permits.

Fourth, the Complaint argues that distinguishing between commercial and noncommercial speech requires a "compelling" government interest that is not present here.  Compl. ¶ 6 (citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 789 (1985); and Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501 (1952)).  The arguments above refute this assertion in several ways.  Moreover, neither of these cited cases requires a compelling government interest to support a distinction between commercial and noncommercial speech.  Dun & Bradstreet was a defamation case and the cited page appears in a dissent that

---

[7] https://www.nps.gov/aboutus/news/commercial-film-and-photo-permits.htm; see also https://www.nps.gov/colo/upload/Commercial-Filming-Guidelines-2015-UpdatedA.pdf.

touches on First Amendment concerns, but certain establishes no such rule.  Joseph Burstyn struck down a public education board's rescission of a license for public exhibition of motion picture, and in its reasoning the Court rejected an argument that for-profit film-makers should receive less First Amendment protection than other.  343 U.S. at 501.  This too fails to establish the rule suggested by Plaintiff's Complaint.  Instead, the current case law treats the permit requirement as a content neutral scheme, subject only to requirement of reasonableness.

Fifth, the Complaint posits that the commercial/noncommercial distinction constitutes an improper tax on expressive activities and that it violates both the First Amendment and the Equal Protection Clause.  Compl. ¶ 7 (citing Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943); and Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 229 (1987)).  Murdock involved the door-to-door sales of religious tracts by Mormons, and simply does not apply here where there is no suggestion of any infringement on religious rights.  The taxation scheme struck down in Arkansas Writers' Project was explicitly content based, and so is clearly distinguishable from the permit requirement at issue here.  Thus, none of the five alleged violations of the First Amendment state a claim.

The equal protection claim is easily rejected, because the permit requirement need only pass minimum rationality review.  See FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993) ("a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").  The permit requirement here does not make distinctions based on protected categories nor infringe on fundamental rights, and as explained above, it reasonably advances a legitimate government

interest.  It easily passes minimum rationality review and is therefore constitutional under the Equal Protection Clause.

>B.     **Each of Plaintiff's Alleged Causes of Action Fail to State a Claim.**

Plaintiff's Complaint sets forth several counts in its "Claims for Relief."  Most of these line up with the alleged "violations" discussed above.  That is Count I (prior restraint) corresponds to Plaintiff's first theory (same); Count II ("unconstitutional licensing regime") corresponds to the second theory (press licensing); Count III (content based regulations fails strict scrutiny) corresponds to the fourth theory (discrimination between commercial and noncommercial speech); Count V (regulatory fees) corresponds to the fifth theory (unconstitutional tax); and Count VI (speaker discrimination) corresponds to the fourth theory.

Count IV alleges that the permit requirement is both unconstitutionally overbroad and under-inclusive.  This claim depends on the findings, all disputed above, that there is expressive conduct impacted by the requirement and that the requirement is content based.  It ignores both the public forum cases and the commercial speech cases.  Moreover, Plaintiff's cited cases do not support his claim.  Members of City Council v. Taxpayers for Vincent, 466 U.S. 789 (1984), found the ordinance at issue to be content neutral and did not apply the overbreadth doctrine. The solicitation ban in NAACP v. Button, 371 U.S. 415 (1963), was both content-based and regulated assembly, not speech, and the case does not require heightened scrutiny for content neutral restrictions on time, manner or place.  Thompson v. W. States Med. Ctr., 535 U.S. 357 (2002), involved a content based restriction on advertising drugs.  None of these cases establish a rule in conflict with Defendant's arguments above.

For these reasons, each of the Complaint's causes of action should be rejected.

## <u>Conclusion</u>

For these reasons, Defendants respectfully ask the Court to grant this motion and enter judgment for Defendants.

Dated: June 8, 2020                      Respectfully submitted,

                                          MICHAEL R. SHERWIN
                                          Acting United States Attorney

                                          DANIEL F. VAN HORN, D.C. Bar #924092
                                          Chief, Civil Division

                                           /s/ *Alan Burch*
                                          ALAN BURCH, D.C. Bar #470655
                                          Assistant United States Attorney
                                          United States Attorney's Office, Civil Division
                                          555 Fourth St., NW
                                          Washington, DC 20530
                                          (202) 252-2550, alan.burch@usdoj.gov

                                          *Counsel for Defendants*