# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GORDON M. PRICE,

     Plaintiff,

v.

WILLIAM P. BARR,
U.S. Attorney General, *et al.*,

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 19-3672 (CKK)

# PLAINTIFF'S CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

UNDISPUTED FACTS .................................................................................................... 2

    A.  The Permit Regime ............................................................................................ 2

    B.  Price Gets Cited for Filming at Yorktown Battlefield ...................................... 4

ARGUMENT .................................................................................................................... 6

I.  PLAINTIFF HAS STANDING TO CHALLENGE THE PERMIT REGIME'S
    CONSTITUTIONALITY .......................................................................................... 7

II.  DEFENDANTS CANNOT AVOID OR MINIMIZE THE FIRST AMENDMENT
    SCRUTINY APPLICABLE TO THE PERMIT REGIME ...................................... 9

    A.  Filming and Photography are Fully Protected by the First Amendment ........... 9

    B.  "Reasonableness" is the Not the Applicable First Amendment Test for the Permit
    Regime, Which Fails Under Any Level of Scrutiny ......................................... 12

        1.  The Permit Regime Cannot Be Justified on the Ground That it Regulates Only
        Nonpublic Fora ............................................................................................ 13

        2.  The Permit Regime is Unconstitutional No Matter What Level of First
        Amendment Scrutiny Applies ..................................................................... 18

III.  THE PERMIT REGIME VIOLATES THE FIRST AMENDMENT ..................... 23

    A.  The Permit Regime is Content-Based and Fails Strict Scrutiny ..................... 24

        1.  Strict Scrutiny ........................................................................................... 24

        2.  There is No Basis for Applying Intermediate Scrutiny ............................. 27

        3.  The Permit Regime Violates the First Amendment Even Under Intermediate
        Scrutiny ..................................................................................................... 31

    B.  The Permit Regime Unconstitutionally Discriminates Based on the Identity of
    Speakers in Violation of the First and Fifth Amendments ............................... 33

    C.  The Permit Regime Imposes Both an Unconstitutional Prior Restraint and
    Unconstitutional Licensing of the Press Under the First Amendment ............. 34

i

D.  The Permit Regime Imposes Unconstitutional Regulatory Fees ...................................... 37

E.  The Permit Regime is Unconstitutionally Overbroad and Underinclusive ..................... 40

IV. PLAINTIFF IS ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF ............. 43

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.N.S.W.E.R. Coal. v. Kempthorne*,
  537 F. Supp. 2d 183 (D.D.C. 2008) ..................................................................... 34

*ACLU of Fla. Inc. v. Dixie Cty.*,
  570 F. Supp. 2d 1378 (N.D. Fla. 2008) ................................................................. 8

*ACLU v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) .................................................................... 9, 10, 11

*Adderley v. Florida*,
  385 U.S. 39 (1966) ............................................................................................ 14

*Air Line Pilots Ass'n Int'l v. Dep't of Aviation of City of Chi.*,
  45 F.3d 1144 (7th Cir. 1995) ......................................................... 14, 16, 18, 20

*Alliance of Artists & Recording Cos. v. GM Co.*,
  162 F. Supp. 3d 8 (D.D.C. 2016) ........................................................................ 6

*Am. Target Adver. v. Giani*,
  199 F.3d 1241 (10th Cir. 2000) ........................................................................ 39

*American-Arab Anti-Discrimination Comm. v. City of Dearborn*,
  418 F.3d 600 (6th Cir. 2005) ............................................................................ 41

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2012) ..................................................................... 10, 11

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) .......................................................................... 10

*Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*,
  877 F.3d 1066 (D.C. Cir. 2017) ........................................................................ 18

*Arkansas Writers' Proj., Inc. v. Ragland*,
  481 U.S. 222 (1987) .......................................................................................... 37

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ............................................................................. 23, 34, 41

*Ashton v. Kentucky*,
  384 U.S. 195 (1966) .......................................................................................... 23

*Babbit v. Farm Workers*,
  442 U.S. 289 (1979) ............................................................................................ 8

*Barr v. Am. Ass'n of Pol. Consultants*,
    2020 WL 3633780 (U.S. July 6, 2020) .......................................................7, 25, 27

*Bays v. City of Fairborn*,
    668 F.3d 814 (6th Cir. 2012) ...................................................................43

*Black Hawk v. Pennsylvania*,
    225 F. Supp. 2d 465 (M.D. Pa. 2002), *aff'd*, 381 F.3d 202 (3d Cir. 2004) ............................27

*Boardley v. U.S. DOI*,
    615 F.3d 508 (D.C. Cir. 2010) ....................................................................... *passim*

*Boggs v. Bowron*,
    842 F. Supp. 542 (D.D.C. 1993), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995)...................................45

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)........................................................................11, 40

*Bynum v. U.S. Capitol Police Bd.*,
    93 F. Supp. 2d 50 (D.D.C. 2000), *as amended*, 96 F. Supp. 4 (D.D.C. 2000) .................12, 18

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 (1980)........................................................................30

*Citizens United v. FEC*,
    558 U.S. 310 (2010)........................................................................10

*City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)........................................................................14, 41, 42

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 424 (1993)........................................................................21, 22, 24, 30

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)........................................................................27, 42

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988)........................................................................36

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)........................................................................11, 12

*Cmty. for Creative Non-Violence v. Turner*,
    893 F.2d 1387 (D.C. Cir. 1990)........................................................................32

*Cmty. for Creative Non-Violence v. Watt*,
    703 F.3d 586 (D.C. Cir. 1983) (*en banc*),
    *rev'd on other grounds*, 468 U.S. 288 (1984)........................................................................18

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991) ........................................................................................... 39, 40

*Cox v. New Hampshire*,
   312 U.S. 569 (1941) ................................................................................................... 37

*Cutler v. HHS*,
   797 F.3d 1173 (D.C. Cir. 2015) ............................................................................... 40

*Doe v. Rogers*,
   139 F. Supp. 3d 120 (D.D.C. 2015) ................................................................... 33, 34

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................................... 43

*Evansville-Vanderburgh v. Delta Airlines, Inc.*,
   405 U.S. 707 (1972) ................................................................................................... 14

*FCC v. Beach Commc'ns*,
   508 U.S. 307 (1993) ................................................................................................... 34

*Fields v. City of Phila.*,
   862 F.3d 353 (3d Cir. 2017) ..................................................................................... 10

*Florida Star v. B.J.F.*,
   491 U.S. 524 (1989) ................................................................................................... 42

*Forsyth Cty. v. Nationalist Movement*,
   505 U.S. 123 (1992) ........................................................................................... *passim*

*Franklin Nat'l Bank v. Krakow*,
   295 F. Supp. 910 (D.D.C. 1969) ................................................................................. 6

*Freedman v. Maryland*,
   380 U.S. 51 (1965) ....................................................................................................... 8

*Garcia v. San Antonio Metro. Trans. Auth.*,
   469 U.S. 528 (1985) ................................................................................................... 14

*Glik v. Cunniffe*,
   655 F.3d 78 (1st Cir. 2012) ....................................................................................... 10

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ................................................................................. 44

*Grace v. District of Columbia*,
   187 F. Supp. 3d 124 (D.D.C. 2016) ......................................................................... 31

*Griswold v. Connecticut,*
    381 U.S. 479 (1965)..................................................................................................44

*Guffey v. Duff,*
    --- F. Supp. 3d ---, 2020 WL 2065274 (D.D.C. Apr. 29, 2020).................................43

*Harris v. McRae,*
    448 U.S. 297 (1980)..................................................................................................33

*Henderson v. Lujan,*
    964 F.2d 1179 (D.C. Cir. 1992) ....................................................................13, 15, 20

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978)......................................................................................................10

*IMDB.com v. Becerra,*
    --- F.3d ---, 2020 WL 3396306 (9th Cir. June 19, 2020).........................................30

*In re Papst Licensing GmbH & Co. KG Litig.,*
    602 F. Supp. 2d 22 (D.D.C. 2009) ...............................................................................6

*ISKCON of Potomac, Inc. v. Kennedy,*
    61 F.3d 949 (D.C. Cir. 1995) ..............................................................................12, 13

*Jacobellis v. Ohio,*
    378 U.S. 184 (1964)..................................................................................................37

*Jos. Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952)......................................................................................11, 25, 37

*Josephine Havlak Photographer, Inc. v. Village of Twin Oaks,*
    864 F.3d 905 (8th Cir. 2017) ..............................................................................12, 27, 29

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976)..................................................................................................14

*Kroll v. U.S. Capitol Police,*
    590 F. Supp. 1282 (D.D.C. 1983), *supplemented,* 683 F. Supp. 824
    (D.D.C. 1987), *rev'd on other grounds,* 847 F.2d 899 (D.C. Cir. 1988)...................13, 14, 22

*Leathers v. Medlock,*
    499 U.S. 439 (1991)..................................................................................................40

*Lehman v. City of Shaker Heights,*
    418 U.S. 298 (1974)..................................................................................................19

*Leigh v. Salazar,*
    677 F.3d 892 (9th Cir. 2012) ....................................................................................10

*Lockhart v. Coastal Int'l Sec.*,
    905 F. Supp. 2d 105 (D.D.C. 2012) ................................................................6

*Mahoney v. Babbitt*,
    105 F.3d 1452 (D.C. Cir. 1997) ................................................................14

*Massachusetts v. United States*,
    435 U.S. 444 (1978) ................................................................14

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
    851 F.3d 1 (D.C. Cir. 2017) ................................................................7

*Metro Lights, L.L.C. v. City of Los Angeles*,
    551 F.3d 898 (9th Cir. 2009) ................................................................21

*Minn. Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (2018) ................................................................18

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ................................................................24, 26, 27, 40

*Murdock v. Pennsylvania*,
    319 U.S. 105 (1943) ................................................................12, 37, 39, 40

*N.Y. Repub. State Comm. v. SEC*,
    799 F.3d 1126 (D.C. Cir. 2015) ................................................................7

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................25

*NAACP v. Button*,
    371 U.S. 415 (1963) ................................................................42

*Near v. Minnesota*,
    283 U.S. 697 (1931) ................................................................34

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ................................................................34

*News America Publ'g, Inc. v. FCC*,
    844 F.2d 800 (D.C. Cir. 1988) ................................................................33

*Nollan v. California Coastal Comm'n*,
    483 U.S. 825 (1987) ................................................................20, 21

*Northwest Airlines v. Cty. of Kent*,
    510 U.S. 355 (1994) ................................................................14

*Oberwetter v. Hilliard*,
   639 F.3d 545 (D.C. Cir. 2011) ............................................................................. *passim*

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
   274 F.3d 377 (6th Cir. 2001) ..................................................................................44

*Pearson v. Shalala*,
   130 F. Supp. 2d 105 (D.D.C. 2001) .........................................................................45

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U. S. 37 (1983) .............................................................................14, 15, 16, 18

*PHE, Inc. v. DOJ*,
   743 F. Supp. 15 (D.D.C. 1990) ...............................................................................44

*Pursuing America's Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ................................................................................44

*Rappa v. New Castle Cty.*,
   18 F.3d 1043 (3d Cir. 1994) ....................................................................................14

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ............................................................................... *passim*

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................................................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................................................30

*S.E. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ..............................................................................12, 16, 34

*Sable Commc'ns of Cal. v. FCC*,
   492 U.S. 115 (1989) ................................................................................................27

*Sentinel Commc'ns Co. v. Watts*,
   936 F.2d 1189 (11th Cir. 1991) ..............................................................................37

*Shuttlesworth v. City of Birmingham*,
   394 U.S. 147 (1969) ..........................................................................................36, 37

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ..........................................................................................38, 40

*Sorrell v. IMS Health*,
   564 U.S. 552 (2011) ............................................................................... *passim*

*Staub v. City of Baxley*,
   355 U.S. 313 (1958) ........................................................................................................36

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ..........................................................................................................9

*Stevens v. United States*,
   559 U.S. 460 (2010) ........................................................................................................25

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ......................................................................................................7, 8

*Swart v. City of Chi.*,
   --- F. Supp. 3d ---, 2020 WL 832362 (N.D. Ill. Feb. 20, 2020) ...........................10, 17

*Tele-Communications of Key West, Inc. v. United States*,
   757 F.2d 1330 (D.C. Cir. 1980) ....................................................................................33

*Thomas v. Chicago Park Dist.*,
   534 U.S. 316 (2002) ........................................................................................................12

*Thompson v. W. States Med. Ctr.*,
   535 U.S. 357 (2002) ........................................................................................................42

*Turner Broad. Sys. v. FCC*,
   520 U.S. 180 (1997) ........................................................................................................31

*Turner v. Lt. Driver*,
   848 F.3d 678 (5th Cir. 2017) ....................................................................................10, 11

*U.S. Postal Serv. v. Greenburgh Civic Assns.*,
   453 U.S. 114 (1981) ........................................................................................................14

*United Gov't Sec. Officers of Am., Local 52 v. Chertoff*,
   587 F. Supp. 2d 209 (D.D.C. 2008) ..............................................................................43

*United States v. Kokinda*,
   497 U.S. 720 (1990) ........................................................................................................19

*United States v. Playboy Entm't Grp.*,
   529 U.S. 803 (2000) ....................................................................................23, 24, 25, 27

*United States v. Sperry Corp.*,
   493 U.S. 52 (1989) ..........................................................................................................14

*Unity08 v. FEC*,
   596 F.3d 861 (D.C. Cir. 2010) ........................................................................................7

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ................................................................................................44

*W. Watersheds Proj. v. Michael*,
    353 F. Supp. 3d 1176 (D. Wyo. 2018) ...................................................................13

*W. Watersheds Proj. v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) ..............................................................................10

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .....................................................................................25, 29, 31

*Watts v. United States*,
    394 U.S. 705 (1969) ...............................................................................................23

*Wayte v. United States*,
    470 U.S. 598 (1985) ...............................................................................................23

*Weaver v. Nebo Sch. Dist.*,
    29 F. Supp. 2d 1279 (D. Utah 1998) .....................................................................25

*White House Vigil v. Clark*,
    746 F.2d 1518 (D.C. Cir. 1984) ......................................................................11, 12

*Winters v. New York*,
    333 U.S. 507 (1948) ...............................................................................................11

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020) ...........................................................................7, 8

*Zukerman v. U.S.P.S.*,
    961 F.3d 431 (D.C. Cir. 2020) ..............................................................................20

**State Cases**

*Churchill v. Univ. of Colo. at Boulder*,
    285 P.3d 986 (Colo. 2012) .....................................................................................19

*Colo. Racing Comm'n v. Smaldone*,
    492 P.2d 619 (1972) ...............................................................................................19

*Shakespeare Workshop v. Moses*,
    8 A.D.2d 343 (N.Y. App. Div. 1959) ....................................................................19

**Constitutional Provisions**

U.S. Const.
    amend. I.................................................................................... *passim*
    amend. V .................................................................................. *passim*
    amend. XIV ..............................................................................37
    art. III .......................................................................................7
    art. IV, § 3, Cl. 2 ....................................................................14

**Federal Statutes**

18 U.S.C. § 1865(a) ........................................................................4

43 U.S.C. § 1701(a)(9) ..............................................................3, 19

54 U.S.C.
    § 100102 ...................................................................................1
    § 100501 ...................................................................................1
    § 100905 ............................................................................ *passim*
    § 100905(a) ............................................................................39
    § 100905(a)(1) .......................................................................38
    § 100905(b) ............................................................................38
    § 100905(c)(1) .......................................................................18
    § 100905(e) ............................................................................38
    § 100905(e)(1) .......................................................................21

**Rules**

Fed. R. Civ. P. 12(c) ......................................................................6

**Regulations**

36 C.F.R.
    § 1.3..........................................................................................4
    § 5.5.................................................................................. *passim*
    § 5.5(c) ...................................................................................38

43 C.F.R.
    § 5 .........................................................................1, 2, 3, 8, 45
    § 5.1 ....................................................................................3, 25
    § 5.12 ............................................................................... *passim*
    § 5.2 ....................................................................................3, 35
    § 5.4..........................................................................................3
    § 5.7 ....................................................................................4, 35
    § 5.8 .............................................................................4, 35, 38
    § 5.8(b) ...................................................................................38

*Commercial Filming and Similar Projects*, 78 Fed. Reg. 52087 (2013) ............................... *passim*

**Legislative Materials**

*Commercial Filming and Photography on Federal Lands*, Cong. Res. Serv.,
   Apr. 23, 2014 ...................................................................................................38, 44

*Commercial Filming and Photography on Federal Lands*, Cong. Res. Serv.,
   June 28, 2019 ...............................................................................................4, 19, 38

S. Rep. No. 106-67 (1999) ..............................................................................................32

**Other Authorities**

*Civil War*, ENCYCLOPEDIA VIRGINIA (Oct. 27, 2015),
   https://www.encyclopediavirginia.org/Saltville_During_the_Civil_War .................................6

## INTRODUCTION

Observing that "[s]ome media companies are international behemoths with millions of daily viewers" and that "many parks had served as settings for commercial films that grossed millions,"[1] the federal government decided it wanted a piece of the action.  Congress thus enacted 54 U.S.C. § 100905 directing the Defendant Director of the Department of the Interior ("DOI") to require a permit and "reasonable fees" for commercial filming in any area administered by the Secretary, acting through the Defendant Director of the National Park Service ("NPS"), for park or recreational purposes.  *Id.*; *see also id.* §§ 100102, 100501 (supplying definitions).  The agencies carried out this charge, adopting rules at 43 C.F.R. Part 5 and 36 C.F.R. § 5.5 that established the scope of the statute's undefined reference to "commercial" filming and set fee levels.

The net result is a restriction on the First Amendment rights of those wishing to conduct commercial filming or certain types of photography on DOI-administered lands, while favoring those who engage in noncommercial filming or newsgathering.  Commercial filming is subject to a discriminatory and unconstitutional permitting regime, as well as an illegal fee provision that seeks to raise revenue as a *de facto* tax on expressive conduct.  In maintaining this regulatory scheme, Congress, DOI and NPS violate basic First Amendment rules, in multiple ways.

Plaintiff Gordon M. Price is a small commercial filmmaker who is perhaps as far from an "international behemoth" as may be possible, but was nonetheless ensnared by the permit and fee regime.  It is undisputed that Price was hauled into court by U.S. Park Police after filming at Yorktown Battlefield in Colonial National Historical Park without a permit.  When he raised First Amendment concerns, though, the government withdrew the criminal citation rather than defend the permitting and fee regime's constitutionality.  Price had planned future filming on lands under

---

[1]   Defs.' Mem. in Support of Def. Mot. for Judg. on Pldgs., ECF 18 ("Def. Mem."), 4, 32.

NPS jurisdiction as part of his next project, but is deterred by the threat of future criminal sanctions, and accordingly brought this civil action to have the statute and rules held unconstitutional.

In defending the permit and fee rules here, the government claims practically *carte blanche* to regulate expressive activity on federal lands. Defendants argue Price lacks standing to even raise constitutional concerns, despite settled law holding the citation he received and disruption to his specific, future filmmaking suffice. Defendants go even further, arguing that filmmaking falls outside the First Amendment's protection, notwithstanding *decades* of precedent holding otherwise. Meanwhile, the centerpiece of their defense of the permit and fee regime—that all federal lands to which it applies are nonpublic forums, despite a long history and tradition of parks being held open to public use, including for expressive purposes—lacks any basis in law.

The statute and the rules are unconstitutional for multiple reasons without regard to the fora they regulate, including that they impermissibly tax speech, impose an unlawful prior restraint and licensing, and serve as both overbroad and underinclusive speech regulation. The permitting and fee regime is invalid regardless of forum type because it applies based on content and speaker. And even putting aside that Defendants are wrong about all federal lands under this law being nonpublic fora, it lacks reasonableness due to absence of an essential nexus between having the statue and rules require permits and charge fees for commercial filmmaking, and any legitimate interest in the management of federal lands.

## UNDISPUTED FACTS

### A.    The Permit Regime

The permit and fee requirements that Price challenges arise out of 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5 (collectively, the "Permit Regime"). DOI substantively implemented the fee and permitting requirements of § 100905 at 43 C.F.R. Part 5, which "covers commercial filming and still photography activities on lands and

waters administered by the National Park Service, the Bureau of Land Management, and the U.S. Fish and Wildlife Service." *Id*. § 5.1.  Under 43 C.F.R. § 5.2, all commercial filming requires a permit and payment of a fee, while still photography does not, unless certain criteria are met.

As outlined in the Complaint,[2] Congress explicitly "declare[d] it … the policy of the United States" to "receive fair market value of the use of the public lands."  43 U.S.C. § 1701(a)(9).  DOI used identical language in the rules, stating that its purpose is to allow the government "to collect a 'fair return' for the use of lands for commercial filming and certain still photography activities," and confirmed that the requirements do not apply to "non-commercial" filming or photography. *Commercial Filming and Similar Projects*, 78 Fed. Reg. 52087, 52089 (2013).  It also emphasized that "[t]he basis for requiring a permit for commercial filming is the commercial nature of the project," not any potential damage to, or disruption of federal land, and that under the law, "[t]here is no basis for an exclusion based on crew size or amount of equipment."  *Id*. at 52090.

The Permit Regime defines "commercial filming" as "recording of a moving image … for a market audience with the intent of generating income," including but not limited to any "feature film, videography, television broadcast, or documentary, or … similar projects."  43 C.F.R. § 5.12. While DOI recognized that most news organizations are commercial, it decided "news gathering should not be treated … the same … as other commercial filming," 78 Fed. Reg. at 52091, and exempted it from permitting along with noncommercial activity, unless certain criteria are met (and when met, news-gathering still pays no location fee or cost recovery).  43 C.F.R. § 5.4.  For this purpose news is "information … about current events or … of current interest to the public."[3]

---

[2]  The Amended Answer did not deny the Complaint's explanation of how the challenged statute and regulations operate.  (Compl. ¶¶ 18-35; Am. Ans. ¶¶ 18-35.)

[3]  43 C.F.R. § 5.12.  "News-gathering" is any activity "carried out by a representative of the news media," defined as "television or radio stations broadcasting to the … public and publishers

Permittees must pay a location fee that provides the targeted "fair return," *id.* § 5.8, and—separately—reimburse DOI "for actual costs incurred in processing [the permit]" and "administrative costs for application processing, preproduction meetings …, on-site monitoring of permitted activities, and any site restoration." *Id. See also Commercial Filming and Photography on Federal Lands*, Cong. Res. Serv. June 28, 2019, at 1 ("*2019 C.R.S. Report*") ("Permit holders are responsible for two types of payments:  a *location fee* that provides a fair return … for the use of federal land *and repayment of costs* incurred by the government ….") (italics original; underscore added).  An additional financial burden is imposed by insurance requirements. *See* 43 C.F.R. § 5.7. Failure to comply with the Permit Regime violates 36 C.F.R. § 5.5, and carries criminal penalties, *id.* § 1.3, including fines, court costs, and up to six months in prison.  18 U.S.C. § 1865(a).

**B.      Price Gets Cited for Filming at Yorktown Battlefield**

Plaintiff Gordon Price is an independent filmmaker from Yorktown, Virginia.  (Compl. ¶ 36.)  In 2017 and 2018, he and a colleague made an independent feature entitled *Crawford Road*, about a desolate stretch of road in York County, Virginia, that has long been the subject of rumors of hauntings and the location of multiple unsolved murders.  (*Id.* ¶ 37; Am. Ans. ¶ 37.)  Price visited Yorktown Battlefield in Colonial National Historical Park three times in 2017 and 2018 to film *Crawford Road*, including a one-hour visit to a location known locally as "Crybaby Bridge."  (Compl. ¶¶ 38-39.)  Price used only a camera tripod and microphone, with no more than four people present for any shoot.  (*Id.* ¶ 39.)  Filming ended in August 2018.  (*Id.* ¶ 37.)  Price never sought or received a permit before filming at Yorktown Battlefield.  (*Id.* ¶ 38; Am. Ans. ¶ 38.)

---

of periodicals (but only if [they] qualify as disseminators of 'news') who make [] products available for purchase … or subscription … or free distribution to the … public."  *Id.*  However, DOI determined that documentaries do not qualify as "news-gathering" despite often "convey[ing] information to the … public" like news, because documentaries "are commercial in nature and generate income[.]"  78 Fed. Reg. at 52090; *see also* 43 C.F.R. § 5.12.

*Crawford Road* premiered on October 17, 2018, before 250 people at the Boathouse Live Restaurant in Newport News, Virginia.  (Compl. ¶ 40; Am. Ans. ¶ 40.)  Price also exhibited the film at other venues in Hampton and Yorktown, Virginia.  (Compl. ¶ 40; Am. Ans. ¶ 40.)  *Crawford Road* received coverage from local press, and appeared on social media where it garnered an audience buoyed by the media coverage.  (Compl. ¶¶ 40-42; Am. Ans. ¶¶ 40-42.)  Soon after, two NPS officers "visited" Price in December 2018 to issue a citation for failure to obtain a permit under 36 C.F.R. § 5.5.  (Compl. ¶ 43; Am. Ans. ¶ 43.)  When Price asked why *Crawford Road* was treated differently from YouTube videos on Crybaby Bridge he had seen, the officers told him that while other activities were covered by the First Amendment, the commercial nature of his film required a permit.  (Compl. ¶ 44; Am. Ans. ¶ 44.)  After the officers left, Price cancelled upcoming screenings of *Crawford Road* and re-edited it to remove scenes that included footage shot at Yorktown Battlefield.  (Compl. ¶ 46.)

Price originally intended to plead guilty so he could put the matter behind him.  (*Id.* ¶ 49.) The court, however, declined to accept his plea and advised him to retain counsel given prospects that the citation raised First Amendment concerns.  (*Id.*)  On obtaining undersigned counsel, Price moved to dismiss the citation on grounds the Permit Regime is facially unconstitutional, and that the citation and its enforcement violated his First Amendment rights.  (*Id.* ¶ 50; Am. Ans. ¶ 50.) In response, the U.S. Attorney notified the court that the government did not wish to pursue the charges and moved to dismiss.  (Compl. ¶ 51; Am. Ans. ¶ 51.)  While Price urged the court to rule on the constitutional issues, it dismissed the citation, observing that Price could instead assert his constitutional claims in a civil action.  (Compl. ¶¶ 51-53, 55; Am. Ans. ¶ 51-53, 55.)

While Price has resumed filmmaking since the government decided to abandon his criminal case, threat of future prosecution has nonetheless interfered with his exercise of First Amendment

rights through filming.  (Compl. ¶ 54.)  For example, Price had begun a project that was to include

a filmed re-creation of the Saltville Massacre of October 3, 1864,[4] and he had scouted locations at

Yorktown and Manassas National Battlefields in preparation.  (*Id.*)  However, after being cited by

NPS and hauled into court following the premiere of *Crawford Road*, Price has refrained from

filming in locations he believes best suited for his projects.  Specifically, he has not filmed at either

Yorktown Battlefield or Manassas National Battlefield for fear of violating the regulations at issue

and incurring additional criminal citations.  (*Id.*)

## ARGUMENT

The Court should enter judgment on the pleadings granting Price the injunctive and dec-

laratory relief he seeks because "no material fact is in dispute and [he] is entitled to judgment as a

matter of law," *Lockhart v. Coastal Int'l Sec.*, 905 F. Supp. 2d 105, 114 (D.D.C. 2012) (citation

omitted), so a ruling "on the merits can be rendered by looking at the substance of the pleadings

and any judicially noted facts."  *Alliance of Artists & Recording Cos. v. GM Co.*, 162 F. Supp. 3d

8, 16 (D.D.C. 2016) (citation omitted).  The pled facts here establish Price's entitlement to relief,[5]

as follows:  First, Price has standing to challenge the Permit Regime's constitutionality because

not only was it enforced against him, it is preventing him from engaging in specific filming at

DOI-managed lands.  As speaker- and content-based restriction, the Permit Regime is subject to

---

[4]   On October 2, 1864, Union troops that included the 5th Colored Cavalry unsuccessfully
attacked Saltville, Virginia in an attempt to destroy the town's salt mines.  The next day, Confeder-
ate soldiers murdered a number of wounded Black soldiers on the battlefield and in a nearby
hospital.  *See* Lizzie Dietzen, *Saltville during the Civil War*, ENCYCLOPEDIA VIRGINIA (Oct. 27,
2015), https://www.encyclopediavirginia.org/Saltville_During_the_Civil_War.

[5]   On a Rule 12(c) motion, uncontested allegations to which a party had opportunity to respond
are taken as true.  *See In re Papst Licensing GmbH & Co. KG Litig.*, 602 F. Supp. 2d 22, 24
(D.D.C. 2009); *accord Franklin Nat'l Bank v. Krakow*, 295 F. Supp. 910, 915 (D.D.C. 1969)
("[A]ll allegations of the opposing party's pleadings are taken as true and all allegations of the
moving party which have been denied are taken as false.").

strict scrutiny, which it cannot satisfy, and it violates not only the First Amendment but the Fifth Amendment as well. In this and other regards, the Permit Regime is unconstitutional regardless of the type of forum in which it operates, including as a prior restraint and press licensing scheme, a tax on speech, and an unconstitutionally overbroad and underinclusive regulation. Any argument that this Court should apply a "reasonableness" standard rests on faulty premises about the extent to which the First Amendment protects filming and photography, and about all federal lands, including in all national parks, somehow constituting "nonpublic" forums.

## I.   PLAINTIFF HAS STANDING TO CHALLENGE THE PERMIT REGIME'S CONSTITUTIONALITY

Plaintiff satisfies Article III standing based on facts in the Complaint that are undisputed by Defendants (even if some are ignored) that allege "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (citation, internal quotation marks, alterations omitted). In this Circuit, "willingness to permit pre-enforcement review is 'at its peak' when claims are rooted in the First Amendment." *N.Y. Repub. State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015) (quoting *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010)). The standard in cases like this is not onerous, requiring only that a plaintiff sufficiently "allege[] 'some desired conduct … that might trigger an enforcement.'" *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020) (quoting *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 4 (D.C. Cir. 2017)). Those challenging a law's constitutionality need not allege arrest, prosecution, or sanction, as pre-enforcement review lies if enforcement is sufficiently imminent, *Driehaus*, 573 U.S. at 158-59, and "a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others." *Barr v. Am. Ass'n of Pol. Consultants*, 2020 WL 3633780, at *7 (U.S. July 6, 2020) ("*AAPC*").

The government has already enforced the Permit Regime against Price, requiring him to appear in federal court, retain counsel, and seek dismissal of the charges.  (Compl. ¶¶ 48-50; Am. Ans. ¶¶ 48-50.)  The government ultimately acquiesced, not on grounds the citation was improper or erroneous, but because it wanted to avoid Price's constitutional challenge.  (Compl. ¶¶ 51-52; Am. Ans. ¶¶ 51-52.)  Notably, in dismissing, the criminal court expressly stated Price's remedy lies in a civil suit like this.  (Compl. ¶ 55; Am. Ans. ¶ 55.)  Further, Defendants have not indicated that they will refrain from enforcing the Permit Regime if Price engages in similar future filming. *Compare Woodhull*, 948 F.3d at 373 (standing where no disavowal of enforcement was made).[6]

Defendants claim Price suffered no "sufficient injury in fact" on grounds his "professed risk of future harm is too speculative because his intentions are too diffuse, particularly in light of the nature of the undertaking" of "filming a commercial movie."  Def. Mem. 10.  But this ignores pled facts that Defendants did not deny, even as their motion liberally block-quotes the Complaint. *Id*. 7-8.  Price establishes an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," *Driehaus*, 573 U.S. at 159 (quoting *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979)), in alleging he would film at Yorktown and Manassas but for the citation and Permit Regime.  (Compl. ¶ 54.)  Labelling this just a "some-day aspiration" is unfounded. *See, e.g.*, *ACLU of Fla. Inc. v. Dixie Cty.*, 570 F. Supp. 2d 1378, 1383 (N.D. Fla.

---

[6]  Nor is Price's standing affected by having not applied for a permit for the shoot for which he was cited.  Def. Mem. 33.  This claim—and Defendants' position on standing generally—is undercut by a case on which they heavily rely, *Boardley v. U.S. DOI*, 615 F.3d 508 (D.C. Cir. 2010) (cited Def. Mem. 16-17, 30-32), another First Amendment challenge involving permits for expressive activity in national parks.  Though Boardley never applied for a permit, *id.* at 512, the D.C. Circuit noted the government had not challenged his standing, crediting that decision, as "such an argument would be without merit." *Id.* at 513 n.2.  The same is true here. *See also Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute … whether or not he applied for a license. One who might have had a license for the asking may … call into question the whole scheme … when he is prosecuted for failure to procure it.") (citation, internal quotation marks omitted).

2008) (plaintiff's allegation that he would have purchased property in county but for courthouse display of Ten Commandments was not a "some-day" aspiration).   Given prior issuance of a citation and undisputed specific intent to engage in similar activity, and that Defendants' motion does not dispute causality and redressability, Price clearly has standing.  *Compare Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("threats of prosecution … cannot be characterized as imaginary or speculative" if plaintiff "has twice been warned to stop handbilling that he claims is constitutionally protected and has been told … that if he again handbills … and disobeys a warning to stop he will likely be prosecuted") (internal citation omitted).

## II.   DEFENDANTS CANNOT AVOID OR MINIMIZE THE FIRST AMENDMENT SCRUTINY APPLICABLE TO THE PERMIT REGIME

Plaintiff's principal constitutional arguments are set forth below in Section III, but for the sake of clarity will first address Defendants' efforts to deflect from the First Amendment questions. The government defends the Permit Regime's constitutionality on grounds that it need simply be "reasonable," and as having met that standard, based primarily on two "independent" arguments, each of which fails.  Def. Mem. § II.  First, Defendants claim filming and photography are not First Amendment-protected expression, contrary to *decades* of case law.  *Id*. § II.A.  Second, they claim the Permit Regime need satisfy only the lowest level of First Amendment scrutiny because federal lands are non-public fora operated in a proprietary capacity.  *Id*. § II.B-D.  That, too, is belied by precedent—including the D.C. Circuit cases on which Defendants primarily rely, *Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011), and *Boardley v. DOI*, 615 F.3d 508.

### A.   Filming and Photography are Fully Protected by the First Amendment

The government's effort to avoid the First Amendment altogether, on grounds that filming is not itself "expressive activity," Def. Mem. 12-15, ignores the bedrock principle that "there is no fixed First Amendment line between the act of creating speech and the speech itself."  *ACLU v.*

*Alvarez*, 679 F.3d 583, 596 (7th Cir. 2012); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2012).  In discussing its explicitly expressive nature, the Ninth Circuit observed that "[i]t defies common sense to disaggregate the creation of the video from the video … itself." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018).  As the court explained:

> The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score .…  Because the recording process is itself "inextricably intertwined" with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely expressive activity.

*Id.* at 1203-04.  The Seventh Circuit agreed, stating unequivocally that "making an … audiovisual recording is necessarily included within the First Amendment[.]"  *Alvarez*, 679 F.3d at 595.

The Supreme Court has recognized that "[l]aws enacted to control or suppress speech may operate at different points in the speech process," *Citizens United v. FEC*, 558 U.S. 310, 336 (2010), and the First Amendment in fact encompasses a wide range of conduct related to gathering information, including photography.  *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2012); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 7-8 (1978).[7]  "Restricting the use of an … audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording," *Alvarez*, 679 F.3d at 596, as other courts have uniformly agreed.[8]  This point is further

---

[7]   Collection of data from public lands also constitutes protected speech. *E.g.*, *W. Watersheds Proj. v. Michael*, 869 F.3d 1189, 1195-96 (10th Cir. 2017) (holding "collection of resource data [about public lands] constitutes [] protected … speech"); *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012) (holding qualified right of access exists to government proceedings and activities).

[8]   *E.g.*, *Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings … and for this … to have meaning [it] must protect the act of *creating* that material."); *Turner v. Lt. Driver*, 848 F.3d 678, 688-89 (5th Cir. 2017) ("[T]he Supreme Court has long recognized that the First Amendment protects film.  A corollary to this is … that the First Amendment protects the act of making film .…").  *Cf. Swart v. City of Chi.*, --- F. Supp. 3d ---, 2020 WL 832362, at *9 (N.D. Ill. Feb. 20, 2020) (citing "taking selfies"

brought home in even greater detail in the Brief of *Amici Curiae* National Press Photographers Ass'n, *et al.* ("NPPA Br.") 12-15.

Any claim that the First Amendment only protects video recordings of matters of "public interest," Def. Mem. 14, is contradicted by long-standing case law.  Where protected expression is concerned, the First Amendment does not differentiate factual or "public interest" matters from, *e.g.*, fiction. *Winters v. New York*, 333 U.S. 507, 510 (1948) ("We do not accede to [the] suggestion that the constitutional protection … applies only to the exposition of ideas.  The line between [] informing and [] entertaining is too elusive for the protection of that basic right."); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011).  Defendants cite not a single case to the contrary.[9]

Arguments that the Permit Regime regulates only activity "facilitative" of speech protected by the First Amendment, Def. Mem. 13, are akin to arguing writing or typing can be freely regulated because they merely "facilitate" speech and press rights, and may be summarily rejected.[10]  Defendants try to support this by relying on *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), and *White House Vigil v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984), Def. Mem. 12, but those cases involve solely *symbolic* speech, while this case does not.  In analyzing "symbolic" speech, the inquiry is whether the activity clearly "convey[s] a message" that can be "understood

---

as an expressive activity that unconstitutional regulation of a public forum restricted).  Notably, the government does not cite any case that actually dealt with filming or audiovisual recording.

[9]  Even where courts have upheld a First Amendment right to record police activity, *see* Def. Mem. 14, the decisions make clear their holdings are just a subset of the broader First Amendment principle that extends to film.  *See*, *e.g.*, *Turner*, 848 F.3d at 688 & n.40 (citing, *e.g.*, *Jos. Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952)); *Alvarez*, 679 F.3d at 595.

[10]  *E.g.*, *Anderson*, 621 F.3d at 1061-62 ("The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds.").

by those who view[] it," *CCNV*, 468 U.S. at 293-96, 305, 307; *White House Vigil*, 746 F.2d at 1537-38, which is irrelevant here, as filmmaking and photography are expressive, not symbolic.[11]

### B.   "Reasonableness" is the Not the Applicable First Amendment Test for the Permit Regime, Which Fails Under Any Level of Scrutiny

Defendants cannot dodge First Amendment review or gain the lowest level of scrutiny by arguing all federal lands governed by the Permit Regime are nonpublic forums operated in a "proprietary" capacity.  Besides lacking a basis in law, judgment cannot enter on that basis because the Permit Regime violates various constitutional protections that apply regardless of type of forum regulated.  It is well-settled that the First Amendment bars imposition of charges such as license taxes or permit fees on exercising free speech rights, *Murdock v. Pennsylvania*, 319 U.S. 105, 113-14 (1943), but the Permit Regime does just that.  *See infra* § III.D.  It is also presumptively invalid as a prior restraint and thus faces a "heavy presumption against its constitutional validity," whether it is content-based, *see*, *e.g.*, *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975), & § III.A *infra*, or content-neutral.  *Boardley*, 615 F.3d at 516 (presumption of invalidity for prior restraints applies to content-neutral rules, even if more easily rebutted in that setting).[12]  *See infra* § III.C. The Permit Regime's overbreadth and underinclusiveness, shown at § III.E, *infra*, also render it unconstitutional without regard to forum-type.  *See*, *e.g.*, *Bynum v. U.S. Capitol Police Bd.*, 93

---

[11]   Citation in this context to *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949 (D.C. Cir. 1995), Def. Mem. 13, is puzzling, as Defendants appear to cite its conclusion that audio tapes are expressive, *see* 61 F.3d at 954, which supports Plaintiff's case as outlined above.

[12]   Defendants cite *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002), to argue "case law provides that content neutral permitting schemes are not treated as prior restraints." Def. Mem. 34.  The short answers to this are that *Boardley* indicates otherwise, and in any event, the Permit Regime is not content neutral.  *See infra* § III.A.  Also, unlike the Permit Regime here, the one in *Thomas* was "not even directed to communicative activity … but rather to *all* activity conducted in a public park."  534 U.S. at 322.  It is thus similar to the restriction in *Josephine Havlak Photographer, Inc. v. Village of Twin Oaks*, 864 F.3d 905 (8th Cir. 2017), such that the showing below for why Defendants' reliance on *Havlak* is misplaced applies equally here.  *See infra* 29.

F. Supp. 2d 50, 57 & n.4 (D.D.C. 2000), *as amended*, 96 F. Supp. 4 (D.D.C. 2000).  Any of the above failings alone is grounds for invalidating the Permit Regime under the First Amendment.

Even if the Court accepts Defendants' invitation to conduct forum analysis, the Permit Regime is still unconstitutional.  For areas to which it applies that are traditional public fora, *see infra* 15-16, it is content-based regulation that fails to satisfy strict scrutiny, and is also unconstitutional under the First and Fifth Amendments as discriminating among similarly situated speakers. *See infra* §§ III.A-B.  The same applies for designated public fora, which by definition encompass federal lands the government opens to filming and photography.  *See infra* 16-18 & n.15.  And it is unconstitutional even for public lands that may be deemed nonpublic fora.  *See infra* § II.B.2.

### 1.     The Permit Regime Cannot Be Justified on the Ground That it Regulates Only Nonpublic Fora

The Defendants' claim that the Permit Regime is subject to only "reasonableness" review as a regulation of nonpublic fora, based on *Oberwetter* and *Boardley*, is incorrect.  Initially, insofar as the law applies based on whether material filmed or photographed is for commercial, noncommercial, or journalistic purposes, it is content- and speaker-based, *see infra* § III.A, and is thus the kind of regulation for which courts have found forum analysis inapt.  *E.g.*, *W. Watersheds Proj. v. Michael*, 353 F. Supp. 3d 1176, 1190 (D. Wyo. 2018) (citing, *inter alia*, *Reno v. ACLU*, 521 U.S. 844, 879 (1997); *Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011)).  If the Court nonetheless proceeds under forum analysis, it cannot short-circuit its review or avoid deciding whether the Permit Regime is content-based, as Defendants advocate.  Def. Mem. § II.D.[13]

---

[13]  When courts conduct forum analysis in reviewing speech regulations applicable to national parks and federal lands like the Permit Regime here—including in the cases Defendants rely upon—they generally identify the type of forum the statute or rule regulates, and assess whether it is viewpoint-based, content-based, or otherwise unconstitutional.  *E.g.*, *Oberwetter*, 639 F.3d at 551-54 (citing like cases) (discussed Def. Mem. 15-17); *Boardley*, 615 F.3d at 514-25 (cited Def. Mem. 16-17, 30-32); *ISKCON*, 61 F.3d at 954-58; *Henderson v. Lujan*, 964 F.2d 1179, 1182-85 (D.C. Cir. 1992); *Kroll v. U.S. Capitol Police*, 590 F. Supp. 1282, 1287-92 (D.D.C. 1983),

The government cannot avoid constitutional scrutiny by asserting the Permit Regime applies only to "proprietary government lands."  In the context of speech regulations, claims of "proprietary interest," *e.g.*, Def. Mem. 19, are just another way of arguing nonpublic forum.  *See*, *e.g.*, *Rappa v. New Castle Cty.*, 18 F.3d 1043, 1070 (3d Cir. 1994) ("In non-public fora, the state acts in its proprietary capacity[.]").  *Cf. Mahoney v. Babbitt*, 105 F.3d 1452, 1457 (D.C. Cir. 1997) ("[T]here is no authority for the proposition that the government may by fiat take a public forum out of … the First Amendment by behaving as … a private actor.").  That is why Defendants gain no traction citing non-First Amendment cases to argue "user fee[s] based on … proprietary interest need only … reasonabl[y] approximat[e] a fair share of government costs of benefit" [*sic*].[14]

Forum analysis examines whether speech regulation applies to "public" fora long held open for expressive purposes by tradition or government fiat, to "limited" or "designated" public fora the government opens for particular expressive activity, or to "nonpublic" fora not by tradition or design opened for communication.  Def. Mem. 15-16 (block-quoting *Oberwetter*, 639 F.3d at 551-

---

*supplemented*, 683 F. Supp. 824 (D.D.C. 1987), *rev'd on other grounds*, 847 F.2d 899 (D.C. Cir. 1988).  *Cf. Air Line Pilots Ass'n Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1158 (7th Cir. 1995) ("The fact that the government acts as a proprietor does not negate the need to engage in public forum inquiry.").

[14]  *See* Def. Mem. 19-20 (citing *Massachusetts v. United States*, 435 U.S. 444 (1978); *Evansville-Vanderburgh v. Delta Airlines, Inc.*, 405 U.S. 707 (1972); *United States v. Sperry Corp.*, 493 U.S. 52 (1989); *Northwest Airlines v. Cty. of Kent*, 510 U.S. 355 (1994)).  It is also why invocation of the Constitution's Property Clause, federal preemption, and *Kleppe v. New Mexico*, 426 U.S. 529 (1976), Def. Mem. 19, are equally irrelevant (and why citation of *Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528, 542 n.7 (1985), Def. Mem. 19, is a complete mystery).

The First Amendment cases that Defendants do bother to cite, to argue the government need not open its property to private speech, are inapposite.  Def. Mem. 20 (citing *U.S. Postal Serv. v. Greenburgh Civic Assns.*, 453 U.S. 114, 129 (1981); *Adderley v. Florida*, 385 U.S. 39, 47 (1966); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 814 n.31 (1984)).  These cases neither involve national parks, nor stand for the proposition that the government operates them in a "proprietary" capacity.  In any event, here, it has not declined to open the federal lands on which the Permit Regime operates, but rather "encourages" private filming and photography on them.  *See infra* 16-18.

52) (quoting *Boardley*, 615 F.3d at 515)).  The Court must "begin by analyzing the property … 'at a very high level of generality,' adopting 'a working *presumption* that sidewalks, streets, ***and parks are normally … public forums*."  *Oberwetter*, 639 F.3d at 552 (emphases added) (quoting *Henderson*, 964 F.3d at 1182) ("tradition operates at a very high level of generality" under "a working presumption that … parks are normally … public forums")).  It must then "examine the history and characteristics of the … property," recognizing that *only* when government dedicates property to a use *inconsistent* with expressive activity does it  preclude classification as a public forum.  *Id.*

The federal lands that the Permit Regime governs, and especially national parks to which it applies, are traditional public fora.  The court in *Boardley* invalidated as "antithetical" to the First Amendment regulations that made expressive activity unlawful in national parks unless an official issued a permit.  615 F.3d at 511.  It explained in doing so that "[w]hat makes a park a traditional public forum is … that it has 'immemorially been held … for the use of the public and, time out of mind … used for purposes of … communicating[.]'"  *Id.* at 515 (quoting *Perry*, 460 U.S. at 45).  This describes vast amounts of federal land to which the Permit Regime applies.  As the NPPA *amici* illustrate in detail, our national parks have long been open for First Amendment activity, including (but not limited to) photography, and in some ways would not be what they are without the efforts of filmmakers and photographers (like Ansel Adams).  *See* NPPA Br. 16-19.

Defendants admit that not only are these lands "open" for such use, "[f]ilming and photography are generally *encouraged* on DOI lands."  Def. Mem. 5 (emphasis added).  In fact, they insist the Permit Regime "does not limit where commercial filming takes place," *id.* 33, meaning these areas are open to photography and filmmaking.  This is the hallmark of traditional public fora.  As explained in *Oberwetter*, finding government land to be a nonpublic forum requires that it *not* be a place for public communication.  Def. Mem. 15.  The only way Defendants try to show

that here is to argue filming and photography are not expression, which is insupportable.  *See supra* § II.A.  *Boardley* itself contradicts Defendants point-blank, stating that "many national parks undoubtedly include areas that meet the definition of traditional public forums."  615 F.3d at 515.

Even if government "encouragement" that "does not limit" where filming occurs fails to make federal lands regulated by the Permit Regime traditional public fora (*Boardley* notwith-standing), that invitation at minimum makes them limited-purpose public forums for the expressive activity at issue here.  Such availability "indicates that the space is not only not disrupted by expressive activity but is conducive to" it.  *Air Line Pilots*, 45 F.3d at 1161 (Flaum, J., concurring). Defendants' own authority again makes the case, as limited public fora are "'public property which the State has opened for use … for expressive activity" that "may be restricted to particular speakers or purposes."  *Oberwetter*, 639 F.3d at 551 (quoting *Perry*, 460 U.S. at 45); *see also S.E. Promotions*, 420 U.S. at 555 (auditorium was public forum for theatrical uses).  Here, the speakers are in pertinent part filmmakers and photographers "encouraged" to use federal lands, and the relevant purpose is capturing the images that comprise their works.

Defendants cannot make a contrary case based on Price's filming at Crybaby Bridge.  Def. Mem. 16-17.  First, this is a facial challenge to a nationally applicable statute and its implementing rules, not an as-applied challenge to whether Plaintiff was required to obtain a permit and pay fees for the shoot for which he received a citation, or whether efforts to punish his not doing so offends the First Amendment.  *Compare Oberwetter*, 615 F.3d at 551 n.3 (broader constitutional analysis not required for as-applied rather than facial challenge).  If the government had wanted to defend their actions as-applied, it could have continued its prosecution in the face of Price's constitutional defense—but it opted against doing so.  For purposes of *this* case, it is undisputed that Price would have been free to film at the location at issue if he obtained a permit and paid a fee (and that, had

the rules been applied to *exempt* him, he would have been equally "encouraged" to undertake his expressive activity). Def. Mem. 5.  This establishes that the area he used was open to his expressive activity, rather than "remov[ing it] from the baseline category of nonpublic forum." *Id.* 17.[15]

*Oberwetter* and *Boardley* not only fail to support Defendants' nonpublic-fora arguments, but illustrate why they are wrong.  In *Oberwetter* (which, as noted, was an as-applied challenge to criminal charges, not a facial challenge to a prior restraint), the forum was "reserve[d] for purposes that preclude expressive activity," *i.e.*, the Jefferson Memorial rotunda, 639 F.3d at 552, which is quite different from the federal lands that the Permit Regime governs, where the government "encourages" the expressive activities of filmmaking and photography.[16]  And the references in *Oberwetter* (building on *Boardley*) to "vast and variegated" national parks that defy classification with a "single brush" also undermine rather than support Defendants' position.  Def. Mem. 15-16.

The court in *Oberwetter* did not dispute that, in the main, national parks are "quintessential examples of traditional public forums."  *See* 639 F.3d at 552.  Even if *some* parts of *some* parks are "vast wilderness preserve … never … dedicated to free expression," that characterization does not, by definition, apply to public lands governed by a Permit Regime that encourages filming.[17]

---

[15]   This is why the fact that Plaintiff did not shoot from the designated public forum near the Yorktown Battlefield visitor center is a red herring.  Def. Mem. 16.  Whatever may be allowed at that "free speech zone," it does not change the fact that the Permit Regime's "encouragement" of Price to film from the location he chose makes that location, at least, a limited purpose public forum.  *See also Boardley*, 615 F.3d at 263 n.3.

[16]   The key factor in *Oberwetter* that rendered the memorial a nonpublic forum was that "[v]isitors are not invited for expressive purposes," 639 F.3d at 553, which is, again, the opposite of the park lands here, where the government "encourages" filmmaking and photography.  Moreover, as the D.C. Circuit noted, "[o]utside the Jefferson Memorial, of course, Oberwetter and her friends have always been free to dance to their hearts' content."  *Id.* at 554.  *Cf. Swart*, 2020 WL 832362, at *7 (distinguishing *Oberwetter*'s holding as relevant only to the Jefferson Memorial).

[17]   Where Defendants quote *Oberwetter* (in turn quoting *Boardley*) as recognizing there are national park areas that "never have been dedicated to free expression" and/or are "clearly incompatible with such use," Def. Mem. 16 (quoting 639 F.3d at 552), the necessary implication is that

*See Air Line Pilots*, 45 F.3d at 1152 ("Even given … that a piece of government property is not

a public forum, channels for public communication … may well exist *within* the greater …

property" that *are* public fora.).  *Oberwetter* quotes the *en banc* D.C. Circuit's rejection of treating

national parks as a "monolithic whole,"[18] yet that is exactly what Defendants advocate here.

### 2.    The Permit Regime is Unconstitutional No Matter What Level of First Amendment Scrutiny Applies

The Permit Regime is unconstitutional for traditional and designated public fora, as shown,

*see supra* 12-13, but the same is true for limited public fora—which, at a minimum, it broadly

regulates, *see supra* 16-17—and even if (or insofar as) it governs nonpublic fora.  In limited public

fora, expressive activity may be restricted to particular speakers or purposes, *Oberwetter*, 639 F.3d

at 551, but the distinctions must be reasonable.  *E.g.*, *Archdiocese of Wash. v. Wash. Metro. Area

Trans. Auth.*, 877 F.3d 1066, 1067 (D.C. Cir. 2017).[19]  Speech regulations in nonpublic fora must

likewise be reasonable, as Defendants acknowledge.  Def. Mem. § II.D; *see also*, *e.g.*, *Minn. Voters

Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018).  To be reasonable, a regulation must be clear in

application, *Mansky*, 138 S. Ct. at 1888-91, and cannot be "arbitrary, capricious, or invidious."

---

*other* park areas *have* been dedicated to expression and *are* compatible with it—such as any por-
tions on which filming and photography are encouraged.  In fact, as to still photography, the Permit
Regime is specifically *designed* to account for areas not normally open to the public, 54 U.S.C.
§ 100905(c)(1), rendering even those areas limited public fora for still photography.

[18]   *Oberwetter*, 639 F.3d at 552 (citing *Cmty. for Creative Non-Violence v. Watt*, 703 F.3d
586, 599 n.35 (D.C. Cir. 1983) (*en banc*); *rev'd on other grounds*, 468 U.S. 288 (1984)).  *Boardley*
similarly suggested the government must "tak[e] into account the[se] vast differences in the sizes
and uses of the various parks."  615 F.3d at 524.

[19]   Arguably, to the extent federal lands open for film and photography are designated public
fora "the same standards [] apply [as] in a traditional public forum," *e.g.*, *Bynum*, 93 F. Supp. 2d
at 55 (quoting *Perry*, 460 U.S. at 46), meaning speaker- and content-based distinctions between
commercial and noncommercial filming and photography are unconstitutional.  *See supra* 13.

*United States v. Kokinda*, 497 U.S. 720, 725-26 (1990) (quoting *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974)).  The Permit Regime does not satisfy even this lower standard.

Defendants cite two interests for the Permit Regime.  First, Congress adopted fees "to send … profits from [commercial filmmaking] to the … NPS," Def. Mem. 28, via a "policy" of getting "market value [for] the use of the public lands."  *Id*. 4 (quoting 43 U.S.C. § 1701(a)(9)); *see also id*. 27-28.[20]  As this taxes speech to fund general government operation in violation of the First Amendment, *see infra* § III.D; *see also supra* 12; it cannot satisfy a reasonableness standard, as a regulation is "per se arbitrary and capricious if it violates … constitutional rights."  *Churchill v. Univ. of Colo. at Boulder*, 285 P.3d 986, 1006 (Colo. 2012) (*en banc*) (citing *Colo. Racing Comm'n v. Smaldone*, 492 P.2d 619, 620 (1972)); *cf. Shakespeare Workshop v. Moses*, 8 A.D.2d 343, 346 (N.Y. App. Div. 1959).[21]  A secondary interest is being able to "efficiently manage" federal lands, Def. Mem. 17, by "know[ing] the specific time and location of … activities" to "mitigate the possibility of resource damage or impact to visitors," such as by managing limited space or high visitation, protecting fragile resources and refuges, and/or preserving natural, historical, and

---

[20]   The statute sought to account for the facts that "parks had served as settings for commercial films that grossed millions," Def. Mem. 3-4, and Congress, apparently, sought to capitalize.  In fact, DOI even "carefully consider[ed] whether to tie location fees to the estimated profit of each project" but "concluded this … was not feasible."  78 Fed. Reg. at 52090.  As the Congressional Research Service reaffirmed, the fees are not used for the Permit Regime's administrative costs, but rather:  "The majority of funds are retained … for purposes such as backlogged repair and maintenance projects, interpretation, signage, facility enhancement, resource preservation, fee collection, and law enforcement."  *2019 C.R.S. Report*, at 1.

[21]   Needless to say, ensuring that all agencies and their components are equally empowered to unconstitutionally tax speech, in the name of creating "greater financial fairness and consistency" among them, is no less arbitrary, capricious and invidious.  *See* Def. Mem. 18-19.

cultural resources.  Def. Mem. 18-19.  Even taking this at face value, rather than as a fig leaf for the speech tax the Permit Regime represents,[22] the law still flunks "reasonableness" review.

As the D.C. Circuit recently held, "a rule limiting speech in a nonpublic forum is reasonable only if it is 'capable of reasoned application,'" including having a "sensible basis for distinguishing what may come in from what must stay out." *Zukerman v. U.S.P.S.*, 961 F.3d 431, 447 (D.C. Cir. 2020) (citation omitted).  For content-neutral permitting, the Court "must closely scrutinize the regulation" to ensure that it promotes the government interest "in more than a speculative way." *Boardley*, 615 F.3d at 519; *Air Line Pilots*, 45 F.3d at 1159 (court must "examin[e] both the governmental interest and the particular forum's nature and function").  The "government cannot establish inconsistency [with a forum's purpose] simply by declaring it and by enforcing restrictions on speech." *Henderson*, 964 F.2d at 1183.  Nowhere in the statute, the rules, or the motion here do Defendants explain how commercial filming and photography subject to the Permit Regime materially differ from identical activity undertaken for noncommercial or newsgathering purposes—other than in the extent to which the former may generate "profits" that can be diverted to NPS.[23]

This is principally because the government's interest is unrelated to (or undermined by) the Permit Regime's imposition of fees and operation as a prior restraint.  As explained in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), even under the most paradigmatic of speech

---

[22]   This non-pecuniary secondary interest appears to be an attempt to invoke interests credited in *Boardley*, 615 F.3d at 519-20, but Defendants make clear that the primary interest is sending commercial profits to NPS.  As shown by the discussion that follows, this is reinforced by the fact that these non-pecuniary interests are equally implicated by exempted noncommercial and film-making and photography and by news-gathering as by their commercial counterparts.

[23]   Defendants are internally inconsistent on this point.  They claim "Congress viewed … fees as a way to send some of the commercial profits … to the park service," Def. Mem. 28, but then argue "[t]he commercial filming permitting system is not a profit-making venture." *Id.* 29.

regulations (and assuming satisfaction of the most stringent scrutiny), elimination of the "essential nexus" between a regulation and its purposes converts it from constitutional to unconstitutional. *Id.* at 837 ("if [a] law forbade shouting fire in a crowded theater, but granted dispensations to those willing to contribute $100 to the state treasury," it "would not pass constitutional muster," even as the "contribution [may be] a lesser restriction on speech than an outright ban"). Even for "a core exercise of … police power" such as managing public lands, "adding the unrelated condition alters the purpose to one which, while it may be legitimate, is inadequate" constitutionally. *Id.*[24] The same applies where taking a cut of "profits" of commercial films (or photos), Def. Mem. 4, 28, has nothing to do with managing competing demands on specific areas, or protecting resources.[25]

Under the Permit Regime, commercial and noncommercial productions, engaged in the same activity, having the same impact, are treated differently absent any justification other than that Congress views noncommercial entities as not having "profits" worth siphoning.[26] Under *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 424 (1993), it is not "reasonable" to legislate differential treatment if the "distinction bears no relationship *whatsoever* to the particular interests … asserted." *Id.* at 424; *see also id.* at 425-26; *id.* at 428 (distinguishing commercial and

---

[24]   *Cf. Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 913 (9th Cir. 2009) ("What makes the tax on shouting fire in a crowded theater unconstitutional … is that, as a matter of logical necessity, it *changes* the purpose justifying the underlying ban on shouting fire—no longer for public safety but now for raising revenue. And raising revenue by taxation, though by itself [] legitimate …, does not allow a state selectively to prohibit constitutionally protected conduct.").

[25]   Except, of course, in a sense that funds can be used to pay for general agency operations, *see supra* 19 n.20; *see also* 54 U.S.C. § 100905(e)(1), but that is unconstitutional. *See infra* § III.D.

[26]   Defendants attempt to justify the Permit Regime in part based on how fees increase as shoot-size grows, Def. Mem. 31, but that is not a valid basis for singling out commercial film-makers and photographers for a tax on speech while the general public, noncommercial users, and newsgathering can all engage in the same activity with the same number of people without a permit or paying a fee. *Cf. id.* 26 ("Section 100905 does not purport to limit the duration, film crew size, or location based upon whether filming is for news gathering or commercial filming purposes.").

noncommercial uses of government property must have a basis "relevant to an interest asserted").[27] This directly negates Defendants' claim of being "unaware of any cases holding that merely by distinguishing between commercial and noncommercial activities, a regulation would fail … the test of reasonableness." Def. Mem. 18. *See Discovery Network*, 507 U.S. at 424-29 (invalidating law restricting commercial expressive conduct while leaving unregulated identical noncommercial activity having the same effects). *IMS Health* similarly invalidated—without applying heightened scrutiny—a law that "impose[d] a specific, content-based burden on protected expression" based on a commercial/noncommercial distinction. 564 U.S. at 564-79. Speakers engaged in the same expression "at the same time, in the same place, and in the same manner" must be treated similarly. *See Kroll*, 683 F. Supp. at 825.

If anything, it *undermines* resource protection and management of competing uses if only some (commercial) filmmakers and photographers are known to park officials because they must secure a permit, while other (noncommercial and newsgathering) filmmakers are unaccounted for because they are exempt. Even small commercial productions must secure a permit and pay a fee, *see* Def. Mem. 31 (permit required for all shoots, with fees if more than 2 people participate and/or more than camera and tripod are used), while even *large-scale* productions need not obtain a permit (or pay) so long as they are noncommercial. *See* 78 Fed. Reg. at 52089 (rule "does not … require a permit for non-commercial filming" even "where or when members of the general public are not allowed … because [the statute] does not address non-commercial filming"). DOI recognized that "it is important for land managers to know the specific time and location of … activities so permit terms and conditions may be used to mitigate … resource damage or impact to visitors," 78 Fed.

---

[27]   Nor it is constitutional to tax speech, regardless of whether it is commercial or noncommercial. *See infra* § III.D. For this reason, it is no answer to simply have the Permit Regime expand to encompass noncommercial and newsgathering uses.

Reg. at 52090, but there is no explanation why this is not equally true for noncommercial filming or newsgathering.[28]  Such "hopeless underinclusivity" as to the impact sought to be avoided, *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015), can hardly be "reasonable."  *See also infra* § III.E.

For all of these reasons, even on the terms of Defendants' argument, the Permit Regime is not "reasonable" under basic First Amendment principles.  And as shown next, proper application of the full range of those principles leaves no doubt the Permit Regime is unconstitutional.

## III.     THE PERMIT REGIME VIOLATES THE FIRST AMENDMENT

When a law restricts speech, "the Government bears the burden of proving the constitutionality of its actions."  *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000).  A "law imposing criminal penalties on protected speech is a stark example of speech suppression … [and] is unconstitutional on its face if it prohibits a substantial amount of protected expression."  *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).[29]  The Permit Regime is a content-based restriction that satisfies neither strict nor intermediate scrutiny.  It also violates the First and Fifth Amendments by discriminating against those who wish to engage in commercial filming on DOI

---

[28]  For these reasons, the government's attempt to justify the fee schedule as graduated and thus reasonable under *Boardley* fails.  *See* Def. Mem. § III.C.2.b.  *Boardley* counsels that treating large groups differently from small groups and individuals may help with the fit between the means and ends of a permitting regime.  *See* 615 F.3d at 522-24.  *See also* Def. Mem. 30-31.  But nothing in *Boardley* suggests it is reasonable, let alone constitutional, to treat *some* small groups differently from other small groups, and *some* large groups differently from other large groups—if anything, it counsels sameness of treatment among entities of similar sizes imposing similar burdens.  *See id.* at 522-23 (refusing to allow permitting system more burdensome to small groups than large groups, even to the extent some small groups might attract significant crowds of non-participants).

[29]  *See also Wayte v. United States*, 470 U.S. 598, 608 (1985).  Any law "which makes criminal a form of pure speech, must be interpreted with … the First Amendment clearly in mind."  *Watts v. United States*, 394 U.S. 705, 707 (1969); *Ashton v. Kentucky*, 384 U.S. 195, 198, 200 (1966) ("When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct … reachable by the police power, freedom of speech or of the press suffer.").

lands.  Additionally, and independently, it is an unconstitutional prior restraint, a press licensing scheme, and a tax on speech.  Any one of these, standing alone, is grounds to invalidate it.

## A.      The Permit Regime is Content-Based and Fails Strict Scrutiny

Because the Permit Regime is content based, it is subject to strict scrutiny, a standard the government makes no attempt to satisfy.  Instead, Defendants misapply *Reed*, 576 U.S. 155, and erroneously invoke the constitutional commercial speech doctrine.  Defendants also fail to show the Permit Regime is narrowly tailored to promote the government's interest.

### 1.      Strict Scrutiny

The Permit Regime is content-based and must face First Amendment strict scrutiny, because it specifically burdens commercial filming and certain photography by requiring permits and fees, while exempting newsgathering and noncommercial filming, which perforce singles out the former based on content and speaker.  "Strict scrutiny applies either when a law is content based on its face or when [its] purpose and justification … are content based." *Reed*, 576 U.S. at 166.  Such laws "are presumptively unconstitutional and may be justified only if the government proves … they are narrowly tailored to serve compelling state interests," *id*. at 163, and that includes any fee that "burdens rights protected by the First Amendment," unless the burden is "necessary to achieve an overriding governmental interest." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983).  Strict scrutiny is not satisfied "[i]f a less restrictive alternative would serve the Government's purpose." *Playboy*, 529 U.S. at 813.  "A law that is content based on is face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Discovery Network*, 507 U.S. at 429).

Defendants claim the Permit Regime is content-neutral, but it is in fact content-based—on several levels.  First, on its face, permits and fees are required based on whether a filmmaker (or

photographer) is commercial or noncommercial and on whether the content fits into the category of "commercial" as defined in the rules.  *See supra* 2-3.  A law that differentiates commercial from noncommercial filming is content-based for that reason.  *See IMS Health*, 564 U.S. at 571, 573-74, 577-78 ("a speaker- and content-based burden on protected expression" will "justify … heightened scrutiny").  "The law here, like … in *Sorrell*, does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers."  *AAPC*, at *7.  The fact that speech is sold for profit does not alter the application of this First Amendment protection.[30]

There is also no way to discern if the exception for news-gathering applies "without reference to … content."  *Reed*, 576 U.S. at 167-68; *see also id.* at 164-65 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  This is the essence of content-based regulation, and is "about as content-based as it gets."  *AAPC*, at *5.  *See also*, *e.g.*, *Playboy*, 529 U.S. at 811 ("The speech in question is defined by its content."); *Stevens v. United States*, 559 U.S. 460, 468 (2010).  Further, *Reed* recognized, distinctions based on "purpose" are content based, 576 U.S. at 163, and here, the Permit Regime plainly discriminates based on the purpose of filming—filming with intent to "generate income" is subject to a permit and fee requirement, while filming whose purpose is not generating income, is not.  43 C.F.R. §§ 5.1, 5.4, 5.12.

Defendants never attempt to show the Permit Regime survives strict scrutiny, perhaps because it does not satisfy either prong of the test.  We outline above in detail the reasons why the law cannot satisfy even "reasonableness" review, under either of the interests Defendants advance, *see supra* 19-23, and as that is the case, it certainly cannot satisfy strict scrutiny.  *See*, *e.g.*, *Weaver*

---

[30]    *Jos. Burstyn, Inc.*, 343 U.S. at 501 ("[T]hat books, newspapers, and magazines are published and sold for profit does not prevent them from being … safeguarded by the First Amendment."); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (noting the First Amendment protects paid advertisements).

*v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1290 (D. Utah 1998) ("actions [that] cannot be supported on any rational basis … obviously fail … strict scrutiny [.]"); *cf. IMS Health*, 564 U.S. at 571 ("[T]he outcome is the same whether [lesser scrutiny] or a stricter form of judicial scrutiny is applied.").  In any case, the Permit Regime flunks strict scrutiny.

First, as above, even under an asserted policy of getting "market value [for] use of public lands," regulation designed to "send … commercial profits" to NPS for general operations is a tax on speech that violates the First Amendment, which is never a legitimate government interest.  *See supra* 12, 19, 21 (citing Def. Mem. 4, 28); *see also infra* § III.D.  In *Minneapolis Star*, the Supreme Court cited the "main interest asserted by Minnesota" as "raising of revenue" which was "critical to the government," but, the Court held:

> Standing alone … it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available:  the State could raise the revenue by taxing businesses generally, avoiding the censorial threat.

460 U.S. at 586.  Thus, even if the Permit Regime were narrowly tailored to this purpose (which it is not, for reasons revisited next), it fails strict scrutiny on this basis.

As to the government's asserted interest in mitigating resource damage and/or impact on park visitors, the Permit Regime is not narrowly tailored toward that end.  It uniquely burdens commercial filming not only when there is no greater impact on federal lands than noncommercial filming and newsgathering, but also in instances when it has *less* of a burden.  *See supra* 20-22.  Additionally, it is just as true for strict scrutiny that requiring permits (and fees) for commercial filming and photography, but not their noncommercial and newsgathering counterparts, actually *undermines* rather than advances the "efficient management" of federal lands.  *See supra* 22-23.

In short, there is no direct connection under the Permit Regime between the burden on commercial filming and its effect on property managed by DOI.  This mismatch not only calls into

question whether the government's interest is compelling in the first instance, *see AAPC*, at *7

(citing *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994)), it defeats narrow tailoring.  *See*, *e.g.*,

*Minneapolis Star*, 460 U.S. at 585 ("[D]ifferential treatment, unless justified by some special

characteristic …, suggests that the goal of the regulation is not unrelated to suppression of

expression, and such a goal is presumptively unconstitutional.").  For example, in *Black Hawk v.

Pennsylvania*, 225 F. Supp. 2d 465 (M.D. Pa. 2002), *aff'd*, 381 F.3d 202 (3d Cir. 2004), the court

held that a permit fee required for possession of black bears for religious purposes did not satisfy

the compelling interest under the First Amendment of "promoting the welfare and prosperity of

wildlife populations" due to the number of people who fell into the fee's exceptions.  *Id.* at 477-

78.  The same applies here given the exception of noncommercial filming and newsgathering.

The Permit Regime is also not the least restrictive means to further the government's stated

interest.  *See Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).  "When a plausible, less

restrictive alternative is offered to a content-based restriction, it is the Government's obligation to

prove that the alternative will be ineffective[.]"  *Playboy*, 529 U.S. at 816.  Here, rather than inter-

posing a prior-restraint permitting requirement (and charging attendant fees), the government

could, like the village in *Havlak* (*see infra* 29), simply have any necessary permit or fee apply to

groups large or disruptive enough to affect public lands, rather than focusing on expressive

activities.  To address the asserted interest in land management, the relevant criteria could include

group-size, duration of stay, and/or type of equipment, not speech.  *Compare Boardley*, 615 F.3d

at 524.  Or the government can just impose a general tax.  *See supra* 26 (quoting *Minneapolis Star*,

460 U.S. at 586).  There is no shortage of less-restrictive alternatives.

## 2.    There is No Basis for Applying Intermediate Scrutiny

Defendants offer two bases for avoiding strict scrutiny and applying intermediate scrutiny

—first, that the Permit Regime is assertedly content-neutral, and second, the commercial speech

doctrine somehow applies—but both theories are wrong, and the Permit Regime would be invalid even if they applied.  The attempt to gain a "more lenient" level of scrutiny by claiming content-neutrality misapplies *Reed*.  Def. Mem. 23-36.  The analysis in § III.A.1 above shows the Permit Regime is content-based under proper application of *Reed* and the basic First Amendment rules the Supreme Court reaffirmed there.  Defendants admit the Permit Regime discriminates between commercial and noncommercial speech, and, as the Supreme Court held in *IMS Health*, 564 U.S. at 573-74, 577-78, regulating on that basis merits heightened scrutiny.  *See supra* 25.

Moreover, with the newsgathering exemption, the Permit Regime imposes differential treatment based on whether content is "about current events or that would be of current interest to the public," 43 C.F.R. § 5.12, and on whether it comes from a "representative of the news media." *Id*.  The government's attempt to wave away the newsgathering exemption runs afoul of *Reed*.  A distinction between newsgathering and other commercial filming is significant, as "restrictions based on the identity of the speaker are all too often simply a means to control content," and the Supreme Court has held "laws favoring some speakers over others demand strict scrutiny when the … speaker preference reflects a content preference." *Reed*, 576 U.S. at 170 (citation omitted).

Defendants urge the Court to "look[] much more deeply at the content of the speech" under *Reed*, Def. Mem. 25-26, but their argument is internally inconsistent.  They suggest *Reed*'s invalid-ation of a sign ordinance rested on "the numerous different rules for different types of signs" and that "some … had duration, size, and location restrictions," then argue the Permit Regime must be content-neutral because it "does not … limit the duration, film crew size, or location based upon whether filming is for news gathering or commercial filming purposes." *Id*. 26.  At the same time, Defendants recognize it "was the content of the speech itself that was the distinguishing factor in establishing the numerous different rules for different types of signs." *Id*.  This latter point is the

correct, core holding of *Reed*—that if "a law is content based on its face" strict scrutiny applies, *see supra* 24—and the Permit Regime's facial preferences for noncommercial filming and photography and for newsgathering make it content-based.

The Defendants' reliance on *Havlak v Village of Twin Oaks*, 864 F.3d 905, in attempting to demonstrate content-neutrality is misplaced. *See* Def. Mem. 25. *Havlak* involved an ordinance that prohibited *all* "commercial activity" in a municipal park without a permit. Unlike here, it did not target expressive activity or discriminate among speakers. 864 F.3d at 914, 916 (law regulated "all commercial activity—from … yoga classes to basketball tournaments" and applied equally "to commercial photographers and to hot dog vendors"). The law was content-neutral because it barred all commercial activity without consideration for any particular subset of actors. *Id.* at 914-15. Efforts to analogize to *Havlak* here fail because the Permit Regime squarely targets expressive activity, and discriminates based on whether filmmakers (or photographers) engage in newsgathering. The Permit Regime does not target speech "incidentally," *compare id.* (quoting *Ward*, 491 U.S. at 791); its focus is speech that the First Amendment protects.

The fact that a "decision to approve or deny a permit would not depend on the … subject matter filmed," Def. Mem. 5, is irrelevant. To be sure, if the agencies applied the statute and rules based on subject matter, that would be an *additional* way they are content-based. *Reed*, 576 U.S. at 169. But the Permit Regime is triggered entirely by an entity's filmmaking for profit, and thus turns on the nature and content of the project. The problem is not that a permit may be denied (though it could be), but that it is *required in the first place*. The Permit Regime differentially burdens speech based on content and speaker, so the fact that the government manages (arguably) to avoid viewpoint discrimination does not save the statute and rules from being content-based—

viewpoint discrimination is just a particularly invidious subset of content-based regulation. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Defendants also misapply the commercial speech doctrine. As set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980), and its progeny, it applies only to speech defined as doing no more than proposing a commercial transaction. *E.g.*, *Discovery Network*, 507 U.S. at 421. *See also IMDB.com v. Becerra*, --- F.3d ---, 2020 WL 3396306, at *6-7 (9th Cir. June 19, 2020). Hence, "commercial speech" as recognized in First Amendment doctrine is a far narrower concept than the expansive definition of "commercial filming" in the Permit Regime. While some "commercial" filmmaking and photography on federal lands may be for advertising purposes, that is not the distinction the Permit Regime makes, which is instead whether a filmmaker or photographer creates a work for-profit as opposed to not-for-profit (or journalistic) purposes. Specifically, the Permit Regime defines "commercial filming" as:

> the film, electronic, magnetic, digital, or other recording of a moving image … for a market audience with the intent of generating income. Examples include, but are not limited to, feature film, videography, television broadcast, or documentary, or other similar projects. Commercial filming activities may include the advertisement of a product or service, or the use of actors, models, sets, or props.

43 C.F.R. § 5.12. Nothing in that definition implies that commercial filming only includes speech that proposes a commercial transaction.[31] Defendants do not conduct any contrary analysis, but rather simply *assume* the commercial speech doctrine applies. However, its invocation cannot net the government a lower level of constitutional scrutiny here.

---

[31] If commercial filming had been defined that narrowly, Price's film would not have run afoul of the Permit Regime.

###  3.   The Permit Regime Violates the First Amendment Even Under Intermediate Scrutiny

The Permit Regime cannot withstand even intermediate scrutiny, in any event, as it cannot be said "it advances important governmental interests unrelated to the suppression of free speech" without "burden[ing] substantially more speech than necessary," *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997), or that it leaves open alternative channels for communication. *See Boardley*, 615 F.3d at 524 (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)). As with strict scrutiny, the Permit Regime's inability to survive even reasonableness review means it cannot satisfy intermediate scrutiny. *See*, *e.g.*, *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 142-43 (D.D.C. 2016). As to the asserted government interests, raising revenue by redirecting profits as a tax on speech, unconnected to costs agencies incur (which are collected separately), *see* Def. Mem. § III.C.1.a, is still an unconstitutional non-starter. *See supra* 12, 19, 21, 26; *see also infra* § III.D. And while effective management of public lands may be a significant interest (and assuming only for intermediate scrutiny the Permit Regime is content-neutral), the law is still unconstitutional because it is not "narrowly tailored." *Boardley*, 615 F.3d at 516.

In this context, a regulation is narrowly tailored where it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and it must also not "burden substantially more speech than is necessary" to achieve that interest. *Ward*, 491 U.S. at 798-99. The Permit Regime falls short of these standards. It is not clear, for example, that it makes oversight of competing uses of federal lands or protection of resources more rather than less manageable where even small commercial filmmaking outfits must obtain a permit (and pay a fee), while considerably larger noncommercial endeavors and/or newsgathering need not even provide notice of their activities (and can use even areas not open to the public). *See supra* 20-23.

Defendants cite *Boardley* and highlight the Permit Regime's "graduated fee schedule," Def. Mem. 31, but to no avail.  In *Boardley*, which involved straight permitting without attendant fees, the D.C. Circuit held the requirement unconstitutional because it applied "not only to large groups, but also to small groups and even lone individuals."  615 F.3d at 520-23.  No problem, say Defendants here, the Permit Regime imposes no fee where only 1-2 people film and only a camera and tripod are used, and beyond that, fees increase in stages based on number of people involved. Def. Mem. 31.  But that does nothing to resolve the prior restraint that having to obtain a permit imposes, which was the issue in *Boardley*.  Defendants candidly admit "Section 100905 require[s] a permit for all commercial filming," including individuals and small groups, *id.*, which is *exactly* what *Boardley* held unconstitutional, under intermediate scrutiny.  *See* 615 F.3d at 516-17, 521-23.  The Permit Regime is overbroad by burdening substantially more speech than necessary for the same reasons as the regulation in *Boardley*, *see id.* at 524; *see also infra* 41-42, and is thus anything but "consistent with the D.C. Circuit's ruling" there.  Def. Mem. 31.[32]

The Permit Regime also fails to leave "ample alternatives" available.  *E.g.*, *Boardley*, 615 F.3d at 524.  Under this element of intermediate scrutiny, alternatives must exist *within* the DOI managed property in question.  *Id.* at 524-25 (alternative channels requirement not satisfied if "[t]here is no intra-forum alternative" to obtaining a permit) (quoting *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990)).[33]  Defendants identify no such options,

---

[32]   And, of course, imposition of fees to take a cut of profits from commercial filmmaking still has no connection to resolving competing uses of federal lands, or protecting or preserving natural and historical resources.  *See supra* 12, 19, 26.

[33]   Even if this were not the rule, the government banked on the fact that outside alternatives are not an option, stating:  "It is often the unique nature of public lands that attracts filmmakers.  In some cases, public lands may be the only option for a filmmaker whose story is inextricably tied to something that may only exist on public lands.  We believe the public has the right to be compensated for the commercial use of this uniqueness."  S. Rep. No. 106-67, at 11 (1999).

but rather simply argue the "alternative" is compliance with the Permit Regime.  Def. Mem. 32-33.  That is not an alternative at all—it is acquiescence.  The government's position is essentially that "for someone who wishes to [engage in commercial filming] in a national park, there is no lawful alternative to a permit."  *Boardley*, 615 F.3d at 525.  The D.C. Circuit rejected that "option" in *Boardley*, and the Court should reject it here.

## B.      The Permit Regime Unconstitutionally Discriminates Based on the Identity of Speakers in Violation of the First and Fifth Amendments

The Permit Regime also violates the "guarantee of equal protection" under the Fifth Amendment's Due Process Clause, which includes the right "to be free from invidious discrimination in statutory classifications and other governmental activity."  *Harris v. McRae*, 448 U.S. 297, 322 (1980).  Under this protection, any law impinging a fundamental right is presumptively unconstitutional, *id*. at 312, and the right of speech under the First Amendment is well-recognized as fundamental.  *Tele-Communications of Key West, Inc. v. United States*, 757 F.2d 1330, 1340 (D.C. Cir. 1980).  The Fifth Amendment thus requires the government to treat similarly situated parties equally in the First Amendment context, *e.g.*, *News America Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988), and strict scrutiny applies to laws that implicate fundamental rights in that regard as well.  *Doe v. Rogers*, 139 F. Supp. 3d 120, 154-56 (D.D.C. 2015).

The Permit Regime discriminates because it applies to some speakers and not others, based solely on their identity and/or the content of their speech.  It restricts the ability of those who wish to enter federal lands to film with hopes of generating income from that expressive activity, even though there exists no material distinction between these speakers and non-exempt speakers whose filming is noncommercial.  The First Amendment proscribes both discrimination based on speaker identity, *Reed*, 576 U.S. at 163-64, 170, and between speech conducted for commercial as opposed to noncommercial purposes.  *IMS Health*, 564 U.S. at 573-74, 577-78.  Because the Permit Regime

regulates free speech as a fundamental right, it is required to satisfy strict scrutiny, *Rogers*, 139 F. Supp. 3d at 154-56, but cannot, for all of the reasons stated in § III.A.i, *supra*.[34]

Even apart from strict scrutiny that applies because First Amendment rights are implicated, the Fifth Amendment requires regulatory classifications to be rationally related to their legislative purpose. *Rogers*, 139 F. Supp. 3d at 157-58. The distinction drawn by the Permit Regime between similarly situated persons with respect to the burden imposed via use of federal lands for filming has no essential nexus to the permit and fee requirements. *See supra* 20-21. Therefore, the Permit Regime cannot satisfy even "reasonableness" review for equal protection purposes for the same reason it cannot under the First Amendment, *see supra* 19-23, and thus must be invalidated.

### C. The Permit Regime Imposes Both an Unconstitutional Prior Restraint and Unconstitutional Licensing of the Press Under the First Amendment

The Permit Regime further violates the First Amendment because it acts as a prior restraint and as press licensure. A permitting system is by definition a prior restraint on activity protected by the First Amendment. *A.N.S.W.E.R. Coal. v. Kempthorne*, 537 F. Supp. 2d 183 (D.D.C. 2008). As such, it bears a heavy burden against constitutionality, *e.g.*, *Reed*, 576 U.S. at 163; *Ashcroft*, 542 U.S. at 660, regardless of whether it is content-based or content-neutral. *See supra* 12 (citing *S.E. Promotions*, 420 U.S. at 558, and *Boardley*, 615 F.3d at 263). Bedrock First Amendment law teaches that prior restraints are "the essence of censorship," *Near v. Minnesota*, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They raise significant censorship

---

[34] Defendants' only response on equal protection is to cite *FCC v. Beach Commc'ns*, 508 U.S. 307 (1993), and claim the Permit Regime "easily passes minimum rationality review." Def. Mem. 37-38. But as their parenthetical quotation of the case reflects, rational basis review applies only if a statute "neither proceeds along suspect lines *nor infringes fundamental constitutional rights*," *id.* (quoting 508 U.S. at 313) (emphasis added), which cannot be said of the Permit Regime.

concerns in particular where they give government officials unrestricted freedom to determine who qualifies for a permit, and who does not. *Boardley*, 615 F.3d at 517.

The Permit Regime operates as a classic prior restraint by requiring all individuals who wish to engage in commercial filming and certain still photography to obtain a permit and pay a fee to DOI before filming or photographing on federal lands. 43 C.F.R. §§ 5.2, 5.7, 5.8. It also gives DOI and NPS too much latitude to determine what is commercial and what is not, especially as the term "commercial filming" is not defined in the statute. *See* 54 U.S.C. § 100905. As defined in the rules, the term requires NPS officials to divine the intended audience of the expressive activity, and whether its purpose is to generate income. *See* 43 C.F.R. § 5.12. The term "market audience" in the definition of "commercial filming" is also undefined. *Id.* The Permit Regime thus requires DOI and NPS officials to determine whether a particular film is for a market audience and whether the filmmaker intends it to generate revenue, without any mechanism for making that determination.[35] This lack of guidance opens the door for arbitrary enforcement.

The government's only responses to the Permit Regime's operation as a prior restraint are claims that it does not apply in any public forum, *see* Def. Mem. 33 ("[t]he simple answer is that … the film-making … is not in a public forum"), and that "case law provides that content neutral permitting schemes are not … prior restraints," *id*. 34, but those are both incorrect. As shown in § II.B.1 above, the Permit Regime does, in fact, apply in traditional public fora, and designated public fora as well. And, here, too, the *Boardley* decision, on which Defendants so heavily rely, undermines their argument, as it clearly treated the content-neutral permitting regime applicable there to national park land as a prior restraint. *See* 615 F.3d at 516, 524; *see also supra* 12, 34.

---

[35]   Notably, NPS issued Price a citation only after-the-fact, once his film was exhibited in a commercial setting and began to draw press coverage. (Compl. ¶¶ 40-43.)

The Permit Regime also operates as unconstitutional press licensing that bars commercial filmmaking and certain still photography without first securing a permit and paying a fee, thereby establishing a government precondition to that expressive activity.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988); *Boardley*, 615 F.3d at 516.  In exercising such authority, the government is forbidden from wielding arbitrary power,[36] and any regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation, because such discretion has the potential to become a means of suppressing a particular point of view.  This danger is at its zenith when power lies in the hands of a government official.  To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.  *Forsyth Cty.*, 505 U.S. at 130-31; *City of Lakewood*, 486 U.S. at 763-64.

The Permit Regime contain no such standards.  The licensing aspect of the Permit Regime distinguishes between and subjects to differential treatment filmmakers deemed "commercial" and those who are not, without regard to whether they impose the same, or differing burdens in their use of federal lands.  As noted above, the term "commercial filming" for these purposes is not statutorily defined in 54 U.S.C. § 100905 or elsewhere, but instead affords DOI discretion to decide who is and who is not covered by the requirements.  Ultimately, the Permit Regime is arbitrary and unconstitutional for the same reasons it is content-based.  *See supra* 24-25.  The First Amendment prohibits the government from arbitrarily deciding which activities require a permit

---

[36]   *City of Lakewood*, 486 U.S. at 763-64, 775.  *See also Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (law vesting city officials with broad discretion to deny permits for public demonstrations held unconstitutional); *Staub v. City of Baxley*, 355 U.S. 313 (1958) (ordinance prohibiting solicitation of members for organization without permit and leaving to discretion of city officials whether to grant permit without definitive guiding standards held unconstitutional).

and which are exempt, as do the regulations adopted under 54 U.S.C. § 100905. *See Forsyth Cty.*, 505 U.S. at 130; *Shuttlesworth*, 394 U.S. at 150-53.

The government's only response is to suggest that the restrictions against licensing requirements for expressive activity apply only to "free press" rights. Defendants offer no support for that assertion, which is contrary to settled law. *E.g.*, *Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) ("Motion pictures are within … the constitutional guarantees of freedom of speech *and of the press*.") (emphasis added); *Jos. Burstyn, Inc.*, 343 U.S. at 502 ("[E]xpression by means of motion pictures is included within the free speech *and free press* guaranty of the First and Fourteenth Amendments.") (emphasis added). For the same reasons, Defendants' assertion that Price is not a member of the press and thus lacks standing to raise this claim, Def. Mem. 34, is without merit.

### D.     The Permit Regime Imposes Unconstitutional Regulatory Fees

The First Amendment does not allow the government to raise revenue by taxing the exercise of constitutional rights, or charging fees in excess of costs of administering a legitimate regulation that governs speech. *Murdock*, 319 U.S. at 113-14; *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir. 1991). The cost of such a permit may not exceed "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Murdock*, 319 U.S. at 113-14. *See also Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (any amount imposed to recoup the cost of regulation must be limited to "expense incident to [its] administration"). The need to restrict recovery to actual administrative cost reflects that no one may be "compelled to purchase, through a license fee or a license tax, [a] privilege freely granted by the constitution." *Murdock*, 319 U.S. at 114 (citation, internal quotation marks omitted). Nor may the government impose inconsistent or discriminatory fees on First Amendment activities, *Arkansas Writers' Proj., Inc. v. Ragland*, 481 U.S. 222, 229 (1987), with content-based taxes or fees being particularly suspect. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims*

*Bd.*, 502 U.S. 105, 116 (1991).  Permit fees (and any costs) must be content- and speaker-neutral, and must adhere generally to First Amendment requirements.  *Forsyth Cty.*, 505 U.S. at 130.

The Permit Regime flies in the face of these limits.  It expressly applies to protected speech, specifically, commercial filming and photography, *see* 54 U.S.C. § 100905; 43 C.F.R. Part 5; 36 C.F.R. § 5.5, and explicitly states that the permit fee is above and beyond, and separate from, any costs of administering the permitting process.  *See* 54 U.S.C. § 100905(b); 43 C.F.R § 5.8(b); 36 C.F.R. § 5.5(c).  The government admits the permit fee is not designed to do anything but "send … profits from … use[] of public lands to the park service," Def. Mem. 28, and the funds are used for general agency operations having nothing to do with the Permit Regime.[37]  The DOI's diversion of "profits" from expressive activity to itself and subordinate agencies is unconstitutional.  The stated purpose in imposing fees under the Permit Regime is directed towards providing a "fair return" to the government for use of lands, 43 C.F.R. § 5.8; 78 Fed. Reg. at 52089, though as CRS has noted, that is an amorphous standard.  *2019 C.R.S. Report*, at 1 ("fees must provide a 'fair return' (undefined in the law)").  And DOI can spend the fees immediately, without going through the appropriations process.  54 U.S.C. § 100905(e).[38]

---

[37]  *See supra* note 20 (citing *2019 C.R.S. Report*, at 1 ("fees may be used for purposes such as backlogged repair and maintenance projects, … signage, facility enhancement …")).  *Cf. Commercial Filming and Photography on Federal Lands*, Cong. Res. Serv., Apr. 23, 2014, at 6 ("*2014 C.R.S. Report*") (fees "provid[e] revenue" that "supplement[s] federal appropriations").

[38]  Defendants claim their regulations "expressly state[] that the location fee 'represents a fee for the use of Federal lands and facilities' and that cost recovery is based 'upon our direct and indirect expenses including, but not limited to, administrative costs for application processing, preproduction meetings and other activities, on-site monitoring of permitted activities, and any site restoration.'"  Def. Mem. 29 (citing 43 C.F.R. § 5.8).  However, the statute, rule provisions and other authority cited in the text "expressly state" otherwise.  This claim is also inconsistent with the government's stated interest in obtaining a "fair return" for use of federal lands.  *See* 54 U.S.C. § 100905(a)(1).

Although DOI sets fees under the Permit Regime to take into consideration "number of days the filming … takes place," "size of the film crew," and "amount and type of equipment," the statute also allows the agencies to "include other factors in determining an appropriate fee." 54 U.S.C. § 100905(a).  The NPS posted a schedule that lists fees for commercial filming ranging from $150 to $750 per day, and for still photography ranging from $50 to $250 per day, based on the size of the "group" but has not drawn any connection between these fees and the alleged burden on lands it manages.[39]  Nor does the Permit Regime link the fees to the purported benefit conferred by the permit, and the government does not attempt to make such a link in its motion.  Such a fee remains impermissible even if minimal, *Forsyth Cty.*, 505 U.S. at 136-37, and is ultimately an unlawful tax on speech that "imposes a sizeable price tag upon … a guaranteed freedom."  *Am. Target Adver. v. Giani*, 199 F.3d 1241, 1249 (10th Cir. 2000).

The government's only other defenses are to suggest *Murdock* applies only to religious rights, and to claim *Arkansas Writers' Project* applies only to explicitly content-based restrictions, each of which is incorrect.  The Supreme Court has repeatedly applied the bedrock rule established in *Murdock* against taxes on exercise of constitutional rights in First Amendment free-expression cases having nothing to do with religion.  For example, in *Forsyth County*, the Supreme Court cited *Murdock* for the rule that an unconstitutional fee imposed on a public protest cannot be saved even if it is minimal.  505 U.S. at 136-37.  In *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), it cited *Murdock* for the proposition that the press may be required to pay non-discriminatory taxes.

---

[39]  Any claim that the fee is structured around alleged impact on DOI resources and not expected return is misleading for three primary reasons.  First, the Defendants admit elsewhere the revenue-raising intent, *see supra* 3, 19, 38 n.38 (and any claim to the contrary conflicts with their "market participant" theory).  Second, there is no showing in the statute or elsewhere of correlation between fees and incidental costs.  Third, there is no fee for noncommercial filming or news-gathering even where it has similar impact on DOI resources and public lands.  *See supra* 20-23.

*Id.* at 669.  And *Minneapolis Star* cited *Murdock* to note that imposition of a "tax as a condition of engaging in protected activity … imposed a form of prior restraint on speech, rendering the tax highly susceptible to constitutional challenge."  460 U.S. at 586 n.9.

With respect to *Arkansas Writers' Project*, the Supreme Court in *Leathers v. Medlock*, 499 U.S. 439 (1991), cited the tax at issue in *Arkansas Writers' Project* as not only content-based, but also as suspect in targeting a small group of speakers.  *Id.* at 447-49.  In *Cutler v. HHS*, 797 F.3d 1173 (D.C. Cir. 2015), the D.C. Circuit applied *Arkansas Writers' Project*'s standing analysis to conclude that an individual who challenged the religious exemption in the Affordable Care Act as an unconstitutional establishment of religion had standing.  *Id.* at 1175, 1181.  Ultimately, as the government cannot mount a defense that shows the Permit Regime's fees are anything other than a revenue-raising tax on speech, they should be invalidated as unconstitutional.

### E.    The Permit Regime is Unconstitutionally Overbroad and Underinclusive

The Permit Regime cannot withstand either strict or even intermediate scrutiny to the extent it is unconstitutionally overbroad and under-inclusive.  Even if the government can demonstrate legitimate ends, "when they affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive."  *Entm't Merchs. Ass'n*, 546 U.S. at 805.  In the First Amendment context, "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Id.* at 802.  A law is overinclusive when it burdens speech that is not related to the government's purported legitimate interest.  *See Simon & Schuster*, 502 U.S. at 121 (finding New York's "Son of Sam" law overinclusive because it would apply to work on any subject that "express[ed] the author's thoughts or recollections about his crime, however tangentially or incidentally" including works like *The Autobiography of Malcom X*, Thoreau's *Civil Disobedience*, and the *Confessions of St. Augustine*).

40

The Permit Regime is overinclusive because it burdens a substantial amount of protected expression unrelated to the government's interest in regulating use of DOI land and limiting impact on visitors.  The fact that the Permit Regime even applied to Price shows it is overinclusive—the only equipment brought to Yorktown Battlefield involved a camera tripod and microphone, and he never had more than three other people with him.  (Compl. ¶ 39.)  The need to obtain a permit at all for such a small contingent makes the Permit Regime overbroad for the same reasons the D.C. Circuit invalidated the permit requirement in *Boardley*.  *See* 615 F.3d at 520-22 (quoting, *inter alia*, *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("[p]ermit schemes … that potentially apply to small groups are nearly always overly broad")).  The DOI has been quite clear that "[i]f a filming project is commercial, then the statute *requires* that a permit be issued and a fee charged," 78 Fed. Reg. at 52089 (emphasis added), and that "[t]here is no basis for an exclusion based on crew size or amount of equipment under this statute."  *Id*. at 52090.

A law is "unconstitutional on its face if it prohibits a substantial amount of protected expression."  *Free Speech Coal.*, 535 U.S. at 244.  By imposing the fee and permit requirements on all commercial filming, regardless of the scope and size of the proposed filming, the Permit Regime sweeps into its regulatory net an unknown number of small filmmakers who will decide not to film on DOI managed lands rather than applying for the permit and paying the fee.  These concerns show it is overbroad.  *See Taxpayers for Vincent*, 466 U.S. at 799-800 (courts "weigh[] the likelihood that the statute's very existence will inhibit free expression … of third parties … not before the court" to determine if the statute is overbroad).[40]  The Permit Regime restricts

---

[40]  While the ultimate outcome in *Vincent* did not turn on application of the overbreadth doctrine, it nevertheless explains the principles and is thus applicable here, despite the government's protestations to the contrary.  *See* Def. Mem. 38.

commercial filming without any evidence that commercial filming has a greater impact on DOI managed lands and visitors than noncommercial filming or newsgathering.

By this same logic, the Permit Regime violates the First Amendment as impermissibly underinclusive.  *Gilleo*, 512 U.S. at 51 ("While surprising at first glance, the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles.").  It allows newsgathering and noncommercial filming without requiring any permit or fee even when that activity has the same or greater impact on federal lands and visitors as commercial filming.  As above, nothing in the Permit Regime would prevent a religious (or other noncommercial) group from bringing heavy equipment, a crew, and actors onto DOI managed property (including that not open to the general public) without acquiring a permit or paying a fee, *see supra* 3, 22, so long as its film is not intended to turn a profit.  This "under-inclusiveness … raises serious doubts about whether [the Permit Regime] is, in fact, serving … the significant interests" the government invokes.  *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

The limited defense the government mounts to the Permit Regime's overbreadth and underinclusiveness, *see* Def. Mem. 38, is already answered elsewhere herein.  Defendants urge that the Permit Regime does not impact expressive conduct, as is refuted at § II.A, *supra*, and invoke their claims that it does not apply to public fora, as refuted at § II.B.1 *supra*.  They also fall back on their claim that the Permit Regime is not content-based regulation, which is refuted at § III.A.1, *supra*,[41] and on their invocation of the commercial speech doctrine, which is inapplicable as shown *supra* at 30.  The Permit Regime must be invalidated.

---

[41]   Consequently, the attempt to claim that *Taxpayers for Vincent*, 466 U.S. 789, *NAACP v. Button*, 371 U.S. 415 (1963), and *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002), are not "in conflict with Defendant's arguments" must fail.  *See* Def. Mem. 38.

## IV.     PLAINTIFF IS ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF

Because Plaintiff establishes that the Permit Regime is unconstitutional as pled for reasons set out above, he is entitled to the injunctive and declaratory relief he seeks.  Although Defendants challenge the right to relief substantively, *e.g.*, Def. Mem. § IV; *see also id.*, *passim*, they do not dispute the propriety of injunctive and declaratory relief for claims on which Plaintiff prevails. Injunctive relief is proper because insofar as Plaintiff's merits claims succeed, he will suffer irreparable injury absent an injunction, and both the balance of interests and public interest favor relief.  *E.g.*, *Guffey v. Duff*, --- F. Supp. 3d ---, 2020 WL 2065274, at *9 (D.D.C. Apr. 29, 2020). Declaratory relief is also proper in that there is a substantial controversy between Plaintiff and Defendants regarding whether the First Amendment bars the Permit Regime and regarding the government's power to enforce it and seek criminal penalties for asserted violations, and there is a real and immediate need warranting a declaration of unconstitutionality.  *E.g.*, *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008).

As Plaintiff is right on the merits, injunctive relief naturally follows.  *See*, *e.g.*, *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (injunction factors essentially collapse when First Amendment rights are implicated).[42]  The Supreme Court has repeatedly held that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The Permit Regime was already applied to Price, necessitating retention of counsel and mounting a criminal defense, *see supra* 5; he edited the original version of *Crawford Road*, and avoided further distribution of the original due to concern that continued distribution with material shot on federal lands without a permit could

---

[42]   Though *Bays* involved a preliminary injunction, the permanent and preliminary injunction standards are effectively the same.  *Guffey*, 2020 WL 2065274, at *9.

further expose him to sanctions, *see supra* 5, *cf.* Compl. ¶ 45; Am. Ans. ¶ 45 (Park Police told Price he could not receive a permit after-the-fact); and, he avoided filming on federal lands for a new production involving the Saltville Massacre. *See supra* 5-6. The Permit Regime will thus continue to irreparably harm Price absent injunctive relief, and will similarly affect other commercial projects seeking to shoot films and take photos on federal lands.[43]

The balance of equities clearly tips in Plaintiff's favor, given these harms to constitutional rights faced by Price (and others) under the Permit Regime, and that "no substantial harm to others can be said to inhere" in allowing violations of constitutional rights to continue. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001). Defendants cannot claim any counterbalancing harm. As filming and photography on federal lands had long proceeded on federal lands before enactment of the Permit Regime, *see infra* note 44, the only harm Defendants can claim is inability to (unconstitutionally) extract fees from commercial filmmaking and photography—but even there, it will be kept economically whole insofar as costs of managing those activities are collected separately from permitting fees, *see supra* 4, 38, and are not challenged here.[44] For these reasons, the public interest favors injunctive relief, as allowing unconstitutional laws to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511-12 (D.C. Cir. 2016) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). *See also PHE, Inc. v.*

---

[43] The constitutional rights of prospective audiences for these works also remain at risk due to the effect of the Permit Regime on the rights of willing listeners to receive information from willing speakers. *E.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

[44] The agencies also managed just fine prior to enactment of the statute authorizing the Permit Regime and its attendant fees. *See 2014 C.R.S. Report*, at 2 ("P.L. 106-206 necessitated that [DOI] revise earlier regulations that had prohibited the NPS and FWS from collecting fees for the making of motion pictures, television productions, and soundtracks on their lands.").

*DOJ*, 743 F. Supp. 15, 26 (D.D.C. 1990) ("Simply stated, 'it is in the public interest to uphold a constitutionally guaranteed right.'") (citation omitted); *Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001) ("it is clearly in the public interest to ensure [the] government[] … fully compl[ies] with the law, especially when that law concerns … a party's First Amendment rights").

Many of these same considerations support granting the declaratory relief sought in the Complaint. *Boggs v. Bowron*, 842 F. Supp. 542, 547 (D.D.C. 1993) (actions for declaratory relief are a common method for challenging federal statutes that threaten First Amendment rights), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995).   It is the substantial uncertainty over the Permit Regime's constitutionality, and Defendants' prior effort and presumed continuing desire to see it enforced, that are interfering with Price's (and others') exercise of First Amendment rights through filming and photographing on federal lands.  A real and immediate need thus exists for a declaration of the constitutional rights that expressive users of federal lands hold, and on the limits the First Amendment places on the Defendants.

## CONCLUSION

For the reasons above, Plaintiff respectfully request that this Court grant him judgment on the pleadings, declare that the requirements in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5 that those engaged in "commercial filming" must obtain permits and pay fees are unconstitutional under the First and Fifth Amendments of the United States Constitution, and permanently enjoin their enforcement and any prosecution or imposition of criminal liability thereunder.

DATED:  July 8, 2020

Respectfully submitted,

_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
PATRICK J. CURRAN, JR.
D.C. Bar No. 1026302
**Davis Wright Tremaine LLP**
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
          ronnielondon@dwt.com
          patcurran@dwt.com

Attorneys for Plaintiff