# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GORDON M. PRICE,

*Plaintiff,*

v.

Civil Action No. 19-3672 (CKK)

WILLIAM P. BARR,
U.S. ATTORNEY GENERAL, ET AL.,

*Defendants.*

---

## BRIEF OF AMICI CURIAE
## NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION,
## FIRST LOOK MEDIA WORKS, INC., AND
## NINE MEDIA AND FREE SPEECH ORGANIZATIONS
## IN SUPPORT OF PLAINTIFF

July 8, 2020

MICKEY H. OSTERREICHER*
ALICIA WAGNER CALZADA*
NATIONAL PRESS
PHOTOGRAPHERS ASSOCIATION
120 HOOPER STREET
ATHENS, GA 30602
(716) 983-7800
LAWYER@NPPA.ORG
ADVOCACY@NPPA.ORG

* MOTION FOR ADMISSION
  *PRO HAC VICE* PENDING

MARK I. BAILEN (D.C. BAR #: 459623)
  *COUNSEL OF RECORD*
BAKER & HOSTETLER LLP
WASHINGTON SQUARE, SUITE 1100
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036-5304
(202) 861-1500
MBAILEN@BAKERLAW.COM

*COUNSEL FOR NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION,
FIRST LOOK MEDIA WORKS, INC., AND OTHER AMICI CURIAE*

## CORPORATE DISCLOSURE STATEMENT

In accordance with LCvR 7(o)(4), FRAP 29(a)(4) and FRAP 26.1, amici state as follows:

**American Photographic Artists** has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**American Society of Media Photographers, Inc.** has no parent company and issues no stock.

**Digital Media Licensing Association** is a NY non-profit 501(c)(6) that has no parents or subsidiaries and issues no stock.

**First Look Media Works, Inc.** is a non-profit non-stock corporation organized under the laws of Delaware. No publicly held corporation holds an interest of 10% or more in First Look Media Works, Inc.

**Getty Images (US), Inc.**, a New York corporation that is not publicly traded, is a wholly owned subsidiary of **Getty Images, Inc. Getty Images, Inc.,** a Delaware corporation that is not publicly traded. No publicly traded company owns 10% or more of Getty Images (US), Inc.'s stock

**National Press Photographers Association** has no parent company and issues no stock.

**National Writers Union** has no parent company and issues no stock.

**The North American Nature Photography Association** has no parent company and no publicly held corporation owns 10% or more of its stock.

**Radio Television Digital News Association** is a nonprofit organization that has no parent company and issues no stock.

**Society of Professional Journalists** has no parent company and issues no stock.

**The White House News Photographers Association, Inc.,** is a 501(c)(6) non-profit organization that has no parents, affiliates, or subsidiaries and issues no stock.

/s/ Mark I. Bailen
Mark I. Bailen (D.C. Bar #: 459623)
  Counsel of Record
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
(202) 861-1500
mbailen@bakerlaw.com

Mickey H. Osterreicher*
Alicia Wagner Calzada*
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
120 Hooper Street
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org

* Motion for Admission Pro Hac Vice Pending

Counsel for National Press Photographers Association,
First Look Media Works, Inc., and Other Amici Curiae

July 8, 2020

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIES ......................................................... iv

INTEREST OF *AMICI CURIAE* ...................................................1

SUMMARY OF THE ARGUMENT ....................................................5

BACKGROUND ...........................................................................5

ARGUMENT ...............................................................................12

I. DEFENDANTS' CONTENTION THAT FILMING IS "FACILITATIVE OF SPEECH" AND NOT EXPRESSIVE ACTIVITY IS NOT SUPPORTED BY ANY CASELAW AND IN FACT IGNORES SUPREME COURT PRECEDENT THAT SAYS JUST THE OPPOSITE ........................................12

II. THE FIRST AMENDMENT PROTECTS FAR MORE THAN JUST PHOTOGRAPHING POLICE .....13

III. THE NATIONAL PARKS HAVE LONG BEEN OPEN FOR PHOTOGRAPHIC FIRST AMENDMENT ACTIVITY—MAKING THEM A PUBLIC FORUM WITH RESPECT TO PHOTOGRAPHY ...........................................................16

IV. THE NATIONAL PARKS HAVE A HISTORY STEEPED IN PHOTOGRAPHIC TRADITION..........17

V. AT A MINIMUM, A PUBLIC FORUM ANALYSIS APPLIES BECAUSE THE NPS IS PUBLIC PROPERTY OPENED FOR USE BY THE PUBLIC AS A PLACE FOR EXPRESSIVE ACTIVITY .....19

VI. A REQUIREMENT THAT SOME SPEAKERS—BUT NOT OTHERS—MUST BE SUBJECT TO AN ARBITRARY PERMITTING SCHEME IN ORDER TO ENGAGE IN EXPRESSIVE ACTIVITY IS A PRESUMPTIVELY INVALID SPEAKER-BASED PRIOR RESTRAINT ...............20

VII. THE GOVERNMENT'S ONLY LEGITIMATE PURPOSE HERE—MINIMIZING RESOURCE DAMAGE OR IMPACT TO VISITORS—HAS NO RELATION TO WHETHER A WORK IS FOR PERSONAL USE, NEWS, DOCUMENTARY, OR FICTIONAL FILM..................................22

CONCLUSION..................................................................................24

CERTIFICATE OF SERVICE ............................................................25

iv

## TABLE OF AUTHORITIES

Page

**CASES**

*ACLU of Ill. v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) .................................................................. 14

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ........................................... 13, 14, 23, 24

*Arkansas Writers' Project, Inc. v. Ragland*,
    481 U.S. 221, 107 S. Ct. 1722, 95 L. Ed. 2d 209 (1987) .................... 23

*Blackston v. State of Ala.*,
    30 F.3d 117 (11th Cir. 1994) .................................................................. 14

*Boardley v. U.S. Dep't of Interior*,
    615 F.3d 508 (D.C. Cir. 2010) ............................................................... 17

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ............................................................................... 14

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) .................. 16

*Buehrle v. City of Key W.*,
    813 F.3d 973 (11th Cir. 2015) ............................................................... 13

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) ............. 12, 20

*City of Ladue v. Gilleo*,
    512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) ...................... 12

*Fields v. City of Philadelphia*,
    862 F.3d 353 (3d Cir. 2017) .................................................................. 14

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) ............................................................................... 14

*Forsyth County, Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992) ................................................................... 15, 21, 22

*Garcia v. Montgomery Cty., Md.*,
    No. 8:12-cv-03592-JFM (D. Md. Mar. 4, 2013),
    Statement of Interest of the United States ........................................... 15

*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) ..................................................................... 14

*Henderson v. Lujan*,
    964 F.2d 1179 (D.C. Cir. 1992) ............................................................. 17

**TABLE OF AUTHORITIES—Continued**

Page

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ...................................................................... 14

*Iacobucci v. Boulter*,
  No. CIV.A. 94–10531, 1997 WL 258494
  (D. Mass, Mar. 26, 1997), *affirmed*, 193 F.3d 14 (1st Cir. 1999) ...................................... 15

*Jacobellis v. Ohio*,
  378 U.S. 184 (1964) .................................................................. 12

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495, 72 S. Ct. 777, 96 L. Ed. 1098 (1952) .................................................. 12, 16

*Lambert v. Polk County, Iowa*,
  723 F. Supp. 128 (S.D. Iowa 1989) ...................................................................... 15

*Mahoney v. Babbitt*,
  105 F.3d 1452 (D.C. Cir. 1997) ...................................................................... 17

*Mayo v. Jarvis*,
  177 F. Supp. 3d 91 (D.D.C. 2016)
  amended by 203 F. Supp. 3d 31 (D.D.C. 2016)
  *vacated sub nom. on other grounds by*
  *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017) *and aff'd sub nom.*
  *Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017) ...................................... 18

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) ...................................... 21

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
  460 U.S. 575, 103 S. Ct. 1365, 75 L. Ed. 2d 295 (1983) ...................................... 23

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) ...................................... 18, 19

*Promotions, Ltd. v. Conrad*,
  420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) ...................................... 19, 21

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) ...................................... 22

*Regan v. Time, Inc.*,
  468 U.S. 641, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984) ...................................... 22

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016) ...................................................................... 14

*Sandvig v. Sessions*,
  315 F. Supp. 3d 1 (D.D.C. 2018) ...................................................................... 14

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
  502 U.S. 105 (1991) ...................................................................... 21, 23

vi

## TABLE OF AUTHORITIES—Continued

Page

*Smith v. City of Cumming*,
212 F.3d 1332 (11th Cir. 2000) ........................................... 14

*Sorrell v. IMS Health Inc.*,
564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) ........................................... 12, 20

*Turner v. Lieutenant*,
848 F.3d 678 (5th Cir. 2017) ........................................... 13, 14

*United States v. Grace*,
461 U.S. 171, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) ........................................... 16, 20

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010) ........................................... 16

*United States v. Stevens*,
559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) ........................................... 14

*W. Watersheds Project v. Michael*,
353 F. Supp. 3d 1176 (D. Wyo. 2018) ........................................... 16

*W. Watersheds Project v. Michael*,
869 F.3d 1189 (10th Cir. 2017) ........................................... 13, 14

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
536 U.S. 150, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002) ........................................... 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................... passim

U.S. Const. amend. XIV ........................................... 12

## STATUTES

16 U.S.C. § 460l-6d (c)-(d) ........................................... 6, 21

26 U.S.C. § 501(c)(3) ........................................... 2

26 U.S.C. § 501(c)(6) ........................................... 2, 3, 4

54 U.S.C. § 100905 ........................................... 6, 12

Pub. L. 106-206 ........................................... 6

Pub. L. 113-287, § 3, 128 Stat. 3117 ........................................... 6

Pub. L. 116-91 ........................................... 6

## JUDICIAL RULES

FRAP 26.1 ........................................... i

FRAP 29(a)(4)(E) ........................................... 1

**TABLE OF AUTHORITIES—Continued**

Page

U.S. Dist. Ct. Rules D.C., LCvR 7(o) ........................................................................ 1

**REGULATIONS**

36 C.F.R. § 5.5 ................................................................................... 6, 12

43 C.F.R. Part 5 .............................................................................. 6, 12, 17

43 C.F.R. § 5.12 ................................................................................. 7, 11

43 C.F.R. § 5.4 ..................................................................................... 10

43 C.F.R. § 5.7 ..................................................................................... 21

43 C.F.R. § 5.8 ..................................................................................... 23

**LEGISLATIVE MATERIALS**

H.R. 154,
    116th Congress (2019-2020) ................................................................ 5

H.R. Rep. No. 106-75 (1999),
    https://www.govinfo.gov/content/pkg/CRPT-106hrpt75/pdf/CRPT-106hrpt75.pdf ............. 5

Society of Environmental Journalists et al.,
    *Comments on Proposed Commercial Filming Rule*,
    http://www.sejarchive.org/foia/fotofee5.txt ........................................... 7

**OTHER AUTHORITIES**

Archer, Phil,
    *A Silent but Most Effective Voice: Ansel Adams and Advocacy*,
    National Parks Conservation Association (Oct. 14, 2016),
    https://www.npca.org/articles/1307-a-silent-but-most-effective-voice-ansel-adams-and-
    advocacy .......................................................................... 18

CNN,
    *Experts: Ansel Adams Photos Found at Garage Sale Worth $200 Million* (July 27, 2010),
    http://www.cnn.com/2010/SHOWBIZ/07/27/ansel.adams.discovery/index.html ............... 10

Committee on Natural Resources U.S. House of Representatives,
    *New Fees for Filming and Photography on Public Lands*,  https://www.govinfo.gov/
    content/pkg/CHRG-110hhrg39581/html/CHRG-110hhrg39581.htm .................................. 9

Jackie Mansky,
    *How Photography Shaped America's National Parks*,
    SMITHSONIAN MAGAZINE (June 22, 2016)
    https://www.smithsonianmag.com/travel/how-photography-shaped-americas-national-
    parks-180959262/ .................................................................. 18

viii

**TABLE OF AUTHORITIES—Continued**

Page

National Park Service,
    *Be an Artist-in-Residence*,
    https://www.nps.gov/subjects/arts/air.htm ......................................................... 18

National Park Service,
    *Picturing the Parks*,
    https://www.nps.gov/subjects/photography/index.htm ....................................... 18

National Park Service,
    *About Photography*, https://www.nps.gov/subjects/photography/about.htm .......................... 18

National Park Service,
    *Colonial National Historical Park Commercial Filming Guidelines*,
    https://www.nps.gov/colo/upload/Commercial-Filming-Guidelines-2015-
    UpdatedA.pdf ....................................................................................................... 8

National Park Service,
    *First Amendment Rights Area Map*,
    https://www.nps.gov/puho/learn/management/upload/1st-Ammend-Rights-Area-Map-
    2010.pdf ............................................................................................................... 20

National Park Service,
    *Melting Glaciers*,
    https://www.nps.gov/glac/learn/nature/melting-glaciers.htm .............................. 11

National Parks Foundation,
    *When Nature is the Muse: Photography in National Parks*,
    https://www.nationalparks.org/connect/blog/when-nature-muse-photography-national-
    parks .................................................................................................................... 18

Share the Experience,
    *Share the Experience, Official Federal Recreation Lands Photo Contest*, https://www.
    sharetheexperience.org/home ............................................................................. 18

U.S. Department of Agriculture,
    *Commercial Filming and Still Photography on National Forest System Lands*, https://
    www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5355613.pdf ................................ 9



## INTEREST OF AMICI CURIAE [1]

The *amici curiae* in this case are a coalition of media companies and organizations engaged in press photography, videography, broadcast news, journalism (both online and in print) and free-speech advocacy. This case is of paramount importance to *amici* because it presents the Court with the opportunity to recognize and uphold the First Amendment right of filmmakers, photographers and journalists regarding unconstitutional regulations applicable to filmmaking and photography on federal lands, including national parks.

**American Photographic Artists** ("APA") is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

**American Society of Media Photographers, Inc.** ("ASMP") is a 26 U.S.C. § 501(c)(6) non-profit trade association representing thousands of members who create and own substantial numbers of copyrighted photographs. These members all envision, design, produce, sell, and license their photography in the commercial market to entities as varied as multinational corporations to local mom and pop stores, and every group in between. In its seventy-five-year history, ASMP has been committed to protecting the rights of photographers and promoting the craft of photography.

---

[1] Pursuant to Local Rule LCvR7(o) and FRAP 29(a)(4)(E) , *amici curiae* state that no counsel for a party has authored this brief in whole or in part, and that no party or party's counsel contributed money intended to fund the preparation or submission of this brief, and that no persons other than amici curiae, their members and their counsel, contributed money intended to fund preparing or submitting the brief. Pursuant to LCvR7(o) a motion for leave to file this brief is being filed contemporaneously with this brief, and all parties have consented to the filing of this brief.

**Digital Media Licensing Association** ("DMLA") represents the interests of digital licensing entities that offer, for license, millions of images, illustrations, film clips, and other content on behalf of thousands of individuals to editorial and commercial users. DMLA actively advocates on behalf of its members and their creators to ensure a fair licensing economy.

**First Look Media Works, Inc.** ("FLMW") is a 501(c)(3) non-profit media company devoted to supporting independent voices across all platforms. FLMW has three divisions. It publishes The Intercept, an award-winning online news organization dedicated to holding the powerful accountable through fearless, adversarial journalism. Field of Vision is the documentary unit that commissions and creates original non-fiction films. The Press Freedom Defense Fund provides essential legal support to journalists, news organizations and whistleblowers who are targeted by powerful figures because they have tried to bring to light information that is in the public interest. FLMW has an interest in ensuring that its journalism can continue unimpeded by the threat of legal liability under an unconstitutional licensing scheme.

**Getty Images (US), Inc.** ("Getty Images") is a leading source for visual content around the world, no other organization has the exact combination of creative imagery, vectors and video footage, along with a comprehensive editorial offering. Through both Getty Images and iStock, we have provided a platform for content creators to lawfully license and monetize their creative work and support these endeavors by advocating for the rights of creative photographers and journalists.

**National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's members include video and still photographers, editors, students, and representatives of

businesses that serve the visual journalism community. Since its founding in 1946, the NPPA has been the Voice of Visual Journalists, vigorously promoting the constitutional and intellectual property rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

**The National Writers Union** ("NWU") is a 501(c)(5) non-profit, independent national labor union that advocates for freelance and contract writers. The NWU works to advance the economic conditions of writers in all genres, media, and formats.

**The North American Nature Photography Association** ("NANPA") is a 501(c)(6) non-profit organization founded in 1994. NANPA promotes responsible nature photography (both stills and video) as an artistic medium for the documentation, celebration, and protection of the natural world. NANPA is a critical advocate for the rights of nature photographers on a wide range of issues, from intellectual property to public land access.

**Radio Television Digital News Association** ("RTDNA") is the world's largest professional organization devoted exclusively to broadcast and digital journalism. Founded as a grassroots organization in 1946, RTDNA's mission is to promote and protect responsible journalism. RTDNA defends the First Amendment rights of electronic journalists throughout the country, honors outstanding work in the profession through the Edward R. Murrow Awards and provides members with training to encourage ethical standards, newsroom leadership and industry innovation.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-

informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The White House News Photographers Association, Inc**. ("WHNPA"), is a 501(c)(6) non-profit organization dedicated to the public's right to freedom in searching for the truth and the right to be accurately and completely informed about the world in which we live. WHNPA believes that there is a direct linkage between the survival of a democratic society and an accurate and free press.



## SUMMARY OF THE ARGUMENT

The policy of the National Park Service ("NPS")—long a haven for expressive activity like photography—to require a costly permitting scheme for certain photographers and filmmakers based solely on the content of the work or their intent, is a presumptively unconstitutional prior restraint. For more than a decade, National Press Photographers Association ("NPPA") along with other *amici*, have warned of the constitutional infirmities of vague and overbroad permit requirements. In our written comments, hearing testimony at the House Committee on Natural Resources, and at other points during the legislative and regulatory process, we expressed our strong concerns over the Department of Interior's proposal to change its rules and enact new photography restrictions on public lands. By specifically requiring permits for "commercial" filmmaking and photography, the NPS is judging them not by the level of disruption or inconvenience to park visitors, but instead by whether or not the work will generate profits that can be levied. For these reasons, and because of the important First Amendment interests at stake, *amici* urge this court to grant the declaratory and injunctive relief sought by the plaintiff.



## BACKGROUND

Until 2000, there was an "existing regulatory prohibition on collecting fees for commercial film productions on lands administered by the Department of the Interior, including units of the National Park System and National Wildlife Refuge Areas." H.R. Rep. No. 106-75 at 3 (1999).[2] In its Committee Report on H.R. 154, Congress expressed an intent to regulate "significant

---

[2] *See* https://www.govinfo.gov/content/pkg/CRPT-106hrpt75/pdf/CRPT-106hrpt75.pdf.

disruption," meaning that "the activity must be a major interference or excessive disturbance of regular visitor uses. This standard is meant to have a high threshold." *Id.* Even "temporary inconveniences for park visitors caused by activities authorized by H.R. 154 shall not be considered a 'significant disruption' insofar as obtaining a permit for such activities." *Id.*

Congress also expressed the intent of regulating activity that would result in "the impairment of the values and resources which are to be protected on federal lands where these activities occur." *Id.* (emphasis added). But the current permitting scheme—enacted through 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5—as well as the application of that scheme, go far beyond these more acceptable goals. There is no evidence that the plaintiff, Mr. Price, caused even a minor inconvenience for park visitors—park employees never interacted with him. Only after Price's film had been released and received some local press coverage resulting in possible economic return did the park service choose to issue a citation for "failure to obtain a commercial filming permit under 36 C.F.R. § 5.5." Complaint at 8. Here the government chose to impose criminal penalties on a speaker after-the-fact, chilling Mr. Price from future expression as well as chilling others who wish to avoid the same penalty.

When Pub. L. 106-206 was enacted, Congress may have considered [3] "Commercial Filming" as entailing big, bulky, highly specialized equipment that would typically be used in large scale productions where there would almost certainly be more impact to the park land and greater administrative costs to manage the project. Advances in technology have obliterated those

---

[3] In 2000, Congress required the Secretary of the Interior and the Secretary of Agriculture "to establish a fee system for commercial filming activities on Federal land, and for other purposes." Pub L. 106-206, May 26, 2000. The defendants cite the commercial filming provisions found at 16 U.S.C. § 460l-6d. *See* Pub. L. 113-287, § 3, Dec. 19, 2014, 128 Stat. 3117; Pub. L. 116-91; Pub. L. 106-206. And then note "[t]his statutory language governing commercial filming also applies to other non-National Park Service ("NPS") bureaus." Defendants Memorandum in Support of Motion for Judgment on the Pleadings, p. 4.

assumptions. It was highly inconceivable in 1999 that almost every modern day visitor to a national park would be able to shoot, broadcast or publish high resolution digital stills or video with a tap of their finger, or that a photographer would be able to flip a switch on a professional digital single lens reflex camera and capture motion-picture quality video footage.[4] As a result, a law that was originally written to raise fees by obtaining a "fair return" from a relatively narrow group of park users (high impact/high budget commercial film productions) now arbitrarily places those same permitting requirements on low impact/low or no budget film makers who are often shooting solely on speculation and with only a mere hope of future sales or licensing. This has resulted in wild dichotomies and unequal treatment. For example, a photographer who shoots a digital still, with the goal of selling or licensing that single image later, does not need a permit. But if that same photographer then flips a switch or pushes a button on the same device and records a 30 second video clip that they hope to monetize, they are required to obtain a permit. There is no rational basis for such a distinction.

In response to a Notice of Proposed Rulemaking the NPPA, joined by other organizations filed Comments on a Proposed Commercial Filming Rule (1024-AD30) ("2007 Comments")[5] "to express our strong concern over the possible negative impact of the proposed rule on the First Amendment rights, and to suggest specific ways of improving the rule to alleviate these concerns." *Id.*

---

[4] The statute refers to "commercial filming" and defines it as follows: "Commercial filming means the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income. Examples include, but are not limited to, feature film, videography, television broadcast, or documentary, or other similar projects. Commercial filming activities may include the advertisement of a product or service, or the use of actors, models, sets, or props." 43 C.F.R. § 5.12.

[5] *See* Comments on Proposed Commercial Filming Rule, http://www.sejarchive.org/foia/fotofee5.txt (last visited June 28, 2020).

Foremost among our concerns in 2007—and now—is that the DOI rules, including Commercial Filming requirements for the Yorktown Battlefield and the Colonial National Historical Park, define commercial filming as being "for a market audience with the intent of generating income. Examples include, but are not limited to, feature film, videography, television broadcast, or documentary, or other similar projects."[6] By so doing, the government discriminates against speech based on the content of the work, the type of speech and the speaker, and the audience.

As we stated in 2007:

'Market' and 'audience' are words commonly and interchangeably used to describe those who watch 'commercial' television news or purchase and read newspapers or magazines. Video news that is delivered over paid-subscription cable or satellite channels could be considered filmed for a market audience. Any online newspaper or online news medium for which subscribers pay, could, as another example, be said to have a market or audience. Yet all of these are a form of filming for the presentation of news and do not represent commercial filming in the sense that Congress intended. The definition, simply, is overly broad.

*2007 Comments.*

The enormous emphasis placed on "commercial filming" in national parks unconstitutionally mistreats several classes of speakers, from freelance visual journalists to independent filmmakers. The effect of these vague, ill-defined, and arbitrary rules is the chilling of First Amendment protected activity. Such result is acutely apparent in the actions taken by NPS against the plaintiff. Before an oversight hearing of the House Committee on Natural Resources regarding New Fees for Filming and Photography on Public Lands, in 2007, we noted, "by including vague definitions of commercial photography, the DOI . . . [ ] end up equating the

---

6 *Colonial National Historical Park Commercial Filming Guidelines,* NATIONAL PARK SERVICE U.S. DEPARTMENT OF THE INTERIOR, https://www.nps.gov/colo/upload/Commercial-Filming-Guidelines-2015-UpdatedA.pdf (last visited June 28, 2020).

impact of a large-scale Hollywood production to that of a single photographer with a single camera operating in an open public area."[7] Thirteen years later that vague definition of "commercial photography has come to haunt Mr. Price and frighten others who may wish to similarly express themselves.

As acknowledged by defendants, the purpose of H.R. 154 was "to <u>standardize the authorities for all Federal land management agencies</u> and allow them to retain all fees and costs collected." *Id*. at 3 (emphasis added). Despite this stated goal of standardization by all federal land management agencies, that is not currently the case—different agencies have implemented the law differently, resulting in "arbitrary rules and enforcement." The current photography rules for National Forest System lands state that "Permits are not required for filming activities such as news and gathering of news related stories [and] other types of documentaries not requiring the use of actors, models, sets, or props."[8] The National Park Service, however, has not implemented the statute in a similar manner, and requires a permit for certain types of filming. In addition to this already unconstitutional content-based discrimination, these varying interpretations of the law allow for excessive discretion and leads to arbitrary results.

NPS action against certain expressive activities is exacerbated by other constitutional infirmities such as the statute's definition of commercial filming as applying when there is "*the intent of generating income*." 43 C.F.R. § 5 (emphasis added). This requires officials to search the subjective mind of photographers and filmmakers who may have mixed intentions. A

---

[7] *New Fees for Filming and Photography on Public Lands*, COMMITTEE ON NATURAL RESOURCES U.S. HOUSE OF REPRESENTATIVES, https://www.govinfo.gov/content/pkg/CHRG-110hhrg39581/html/CHRG-110hhrg39581.htm (lasted visited on June 29, 2020).

[8] *Commercial Filming and Still Photography on National Forest System Lands*, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5355613.pdf (last visited on June 29, 2020).

photographer may make an image with the sole intention of posting on their Instagram feed, a promotional use that does not generate income, but which is an overall piece of a marketing strategy. Or they may be taking pictures in furtherance of a hobby or interest, but later decide to make the image available for sale. Even a photographer's family vacation photos can later be integrated into a book or personal project, sold as stock photography, or used to illustrate an advertisement.

It is entirely unclear how a photographer, who does not yet know how the work will eventually be used, is supposed to navigate the rule. The vagueness of the permitting scheme combined with the absurdity of a subjective intent test puts photographers in an impossible position as they try to decide whether they need a permit before they film, afterwards, or at all.

The Complaint alleges that the NPS officers told Price that he could not get a permit after the fact. See Complaint at paragraph 45. Photographers—both amateur and professional— repeatedly find themselves in unexpected situations where they witness something extraordinary that later is commercially exploitable. The permit scheme requires someone in that situation to stop their activity, obtain a permit, and once acquired continue their filming—the moment likely being lost. One only need look at the iconic wilderness images created by Ansel Adams, that are now worth millions, to know the immense value of the "decisive moment."[9]

The regulations provide that "News-gathering activities involving filming, videography, or still photography do not require a permit." 43 C.F.R. § 5.4. Those activities are confusingly defined as "filming, videography, and still photography activities carried out by a representative of the news media" and "information that is about current events or that would be of <u>current</u>

---

[9] See Experts: Ansel Adams photos found at garage sale worth $200 million, CNN (July 27, 2010), http://www.cnn.com/2010/SHOWBIZ/07/27/ansel.adams.discovery/index.html

interest to the public, gathered by news-media entities for dissemination to the public." 43 C.F.R. § 5.12 (emphasis added). But who is a "representative of the news media" has dramatically changed in an era where news organizations have shed their staff and now rely heavily on independent journalists. Further, what "is of interest to the public" and what constitutes "news" can be interpreted in many ways and encompasses many categories such as breaking news of a forest fire or a light-hearted feature such as a haunted house on Halloween. Images filmed in national parks may be considered of public interest in a variety of ways. A video of a glacier shows breathtaking beauty which might be part of a commercial project. But it may also be demonstrative of the effects of global warming.[10] A wildlife photographer may spend days documenting bumble bees coming to wildflowers. But if a federally endangered rusty patched bumble bee lands on a flower and is the first sighting of that bee in decades, it may result in an expressive work that gets picked up by national news outlets and later documentary programing. The film permit requirement puts the photographer at risk of criminal penalties even though she did not intend to be engaging in commercial speech. And the idea that a photographer could capture extraordinary footage, and either be foreclosed from publishing it commercially or required to get a permit from the government to do so, is beyond offensive to the First Amendment.

    The efforts of amici over the years to encourage the DOI and the NPS to apply a more objective and less arbitrary permitting system, based on whether the activity was disruptive to visitors or likely to damage the resources of the land, fell flat. The NPS permit requirements at issue in this case still have restrictions on filming based on who the speaker is, the content of the

---

[10] *See, e.g.*, *Melting Glaciers,* U.S. NATIONAL PARK SERVICE, https://www.nps.gov/glac/learn/ nature/melting-glaciers.htm (last visited July 6, 2020).

photography or filming, and how the footage is used. The requirements in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. §5.5 thus violate the First Amendment.

## ARGUMENT

**I.  DEFENDANTS' CONTENTION THAT FILMING IS "FACILITATIVE OF SPEECH" AND NOT EXPRESSIVE ACTIVITY IS NOT SUPPORTED BY ANY CASELAW AND IN FACT IGNORES SUPREME COURT PRECEDENT THAT SAYS JUST THE OPPOSITE.**

*Amici* are unaware of any court that has adopted the Government's position that the act of filming is not protected speech, or that filming is merely "facilitative" of speech. And the government fails to cite to one. *See* Defendant's Memorandum in Support of Motion for Judgment on the Pleadings ("Motion"), p. 12-15 (citing to cases that do not stand for the proposition asserted).

Quite to the contrary, the act of creating speech has never been divorced from the protection of the speech itself.[11] The Supreme Court has repeatedly held that the creation of speech is explicitly protected by the First Amendment. These protections encompass a range of conduct related to the gathering of information-including photography. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570, 131 S. Ct. 2653, 2667, 180 L. Ed. 2d 544 (2011) ("The creation and dissemination of information are speech within the meaning of the First Amendment."). *See also*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336, 130 S. Ct. 876, 896, 175 L. Ed. 2d 753 (2010); *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S. Ct. 2038, 2042, 129 L. Ed. 2d 36 (1994). Any "claim that the act of creating an audiovisual recording is not speech protected by the First Amendment," is

---

[11] Photography and filming are unquestionably and unassailably protected First Amendment speech. *See, e.g.*, *Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) ("Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502, 72 S. Ct. 777, 781, 96 L. Ed. 1098 (1952) ("expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments.").

easily disposed of. *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018). "[T]he First Amendment protects the act of making film, as there is no fixed First Amendment line between the act of creating speech and the speech itself." *Turner v. Lieutenant*, 848 F.3d 678, 689 (5th Cir. 2017) (emphasis added). Directly on point to this case, the collection of data—including photographs—from public lands is the creation of speech protected by the First Amendment. *See W. Watersheds Project v. Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (overturning law that restricted taking photographs and collecting other data on public lands). Without protection for the collecting of information and the creation of speech, "the government could bypass the Constitution by simply proceeding upstream and damming the source" of speech. *Id.* at 1196.

The First Amendment protects each step of the creative process, from creation to dissemination to display. It is not a mantle to be "worn by one party to the exclusion of another and passed between them depending on the artistic technique employed, the canvas used, and each party's degree of creative or expressive input." *Buehrle v. City of Key W.*, 813 F.3d 973, 977 (11th Cir. 2015). Rather, "[t]he First Amendment protects the artist who paints a piece just as surely as it protects the gallery owner who displays it, the buyer who purchases it, and the people who view it." *Id.* at 977. The Plaintiff's filming in this case was without a doubt, protected speech.

## II. THE FIRST AMENDMENT PROTECTS FAR MORE THAN JUST PHOTOGRAPHING POLICE

While many contemporary cases surrounding the protection of the First Amendment right to record arose in the context of filming the police, that is hardly the upper limit of the First Amendment's application to photography and filming. As this district recognized recently, the long line of cases supporting the right to record police activity is rooted in the rights at issue in this case—the right to gather information "in order to preserve and disseminate ideas." *See*

*Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15–16, n.4 (D.D.C. 2018) (citing *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–89; *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *W. Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Rideout v. Gardner*, 838 F.3d 65, 75 (1st Cir. 2016)). The Supreme Court has repeatedly held that First Amendment protection extends beyond the press. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) (First Amendment reach "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw"); *Houchins v. KQED, Inc*., 438 U.S. 1, 11 (1978); *Branzburg v. Hayes*, 408 U.S. 665, 681–82 (1972). Filming police behavior is by no means the only area of interest entitled to a robust discourse among the American people.

The interests protected by the First Amendment right to record extends to a wide range of conversations. "Most of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation." *United States v. Stevens*, 559 U.S. 460, 479, 130 S. Ct. 1577, 1591, 176 L. Ed. 2d 435 (2010) (holding that a law banning the creation, sale or possession of a depiction of animal cruelty was unconstitutional); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1205 (9th Cir. 2018) (overturning ban on recording of agriculture facilities). *See also*, *Blackston v. State of Ala.*, 30 F.3d 117, 120 (11th Cir. 1994) (recording of a court committee meeting is "expressive conduct protected by the Free Speech Clause of the First Amendment . . . permissible only if it is supported by a substantial government interest and does

not unreasonably limit alternative avenues of communication"); *Iacobucci v. Boulter*, No. CIV.A. 94–10531, 1997 WL 258494 (D. Mass, Mar. 26, 1997), *affirmed*, 193 F.3d 14 (1st Cir. 1999) (arrest of reporter recording a public meeting violated his clearly established constitutional rights) *Lambert v. Polk County, Iowa*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) (citizen had a First Amendment right to his videotape of a deadly fight that occurred on the street). Against this extensive backdrop, Defendants' contention that filming is merely "facilitative" and akin to mail delivery, or limited to the recording of police activity, is extremely misplaced.

The right to record without criminal consequences based on subjective criteria is so crucial that the U.S. Department of Justice, has repeatedly expressed concern "that discretionary charges, such as disorderly conduct, loitering, disturbing the peace, and resisting arrest, are all too easily used to curtail expressive conduct or retaliate against individuals for exercising their First Amendment rights." *See, e.g.*, Statement of Interest of the United States, *Garcia v. Montgomery Cty., Md.*, No. 8:12-cv-03592-JFM (D. Md. Mar. 4, 2013) (addressing discretionary charges issued against a photojournalist). The criminal citation of Mr. Price for filming on federal lands without a permit almost a year after he had done so should be viewed with the same skepticism, and for the chilling effect it has on all expressive conduct. "A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

The status of a film as entertainment does not change the fact that it is protected First Amendment activity. The protection of discourse on public matters firmly extends to entertainment, in part because "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790, 131 S. Ct. 2729, 2733,

180 L. Ed. 2d 708 (2011) ("Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine."). Likewise, the for-profit status of a communication has no bearing on its protections under the First Amendment. The permitting scheme considers a documentary to be a commercial enterprise. But documentaries are core First Amendment speech and whether it is for profit or not has no bearing on its status as falling within the "aegis" of the First Amendment. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S. Ct. 777, 780, 96 L. Ed. 1098 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").

## III. THE NATIONAL PARKS HAVE LONG BEEN OPEN FOR PHOTOGRAPHIC FIRST AMENDMENT ACTIVITY—MAKING THEM A PUBLIC FORUM WITH RESPECT TO PHOTOGRAPHY.

Because the challenged statute is a content-based restriction on protected First Amendment speech, a public forum analysis is not required.[12] However, even if it were, the grand tradition of expressive activity such as photography in national parks requires a determination that they are public forums. Congress does not have the power to change the character of the areas of the National Park Service, that are held for public's use, via a new permitting scheme. Congress may not "destroy the 'public forum' status of streets and parks which have historically been public forums." *United States v. Grace*, 461 U.S. 171, 180, 103 S. Ct. 1702, 1708, 75 L. Ed. 2d 736 (1983). "Nor may the government transform the character of [a public forum by] including it within the statutory definition of what might be considered a non-public forum parcel of property." *Id. See also, United States v. Marcavage*, 609 F.3d 264, 278 (3d Cir. 2010) (sidewalk

---

[12] "Courts have repeatedly found forum analysis unnecessary in the case of content-based restraints on speech." *See, e.g.*, *W. Watersheds Project v. Michael*, 353 F. Supp. 3d 1176, 1190 (D. Wyo. 2018) (forum analysis was not necessary to hold that a law restricting photography and other types of data collection was unconstitutional).

in front of the Liberty Bell, in Independence National Historical Park is a public forum even though it's not a designated "free speech area"); *Henderson v. Lujan*, 964 F.2d 1179, 1181 (D.C. Cir. 1992) (area inside the national park Vietnam War Memorial is a public forum); *Mahoney v. Babbitt*, 105 F.3d 1452, 1458 (D.C. Cir. 1997) (sidewalk along Pennsylvania Avenue, though part of the National Park Service, is a quintessential public forum). Members of the public are welcome to—and in many cases encouraged to—engage in photography in the National Park Service. And yet the Department of Interior seeks to require some individuals to pay a hefty fee prior to engaging in the exact same expressive activities.

In *Boardley v. U.S. Dep't of Interior*, [13] the D.C. Circuit declined to address the question of whether all national parks in the system were public fora because there was nothing in the record about the "the history and tradition, or lack thereof, of expressive activities in the various national parks." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010). Through and with this brief, *amici* believe the record exists to establish a vast history and tradition of expressive photography and filming in the various national parks.

## IV. THE NATIONAL PARKS HAVE A HISTORY STEEPED IN PHOTOGRAPHIC TRADITION.

Given the role that expressive activities like photography and art have played in national parks, including their role in the very the inception and creation of the system, there should be no doubt that at least with respect to photography, the entirety of the publicly accessible portions of the National Park Service are a traditional/quintessential public fora which have "immemorially

---

[13] While the government relied on *Boardley* heavily, the Plaintiff has explained why *Boardley* does not support Defendants' position at all. *See* Plaintiff's Memo in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, Section II.B.1. Just as with the permit regulation, at issue in *Boardley* (which, unlike 43 C.F.R. Part 5, was content-neutral), the photography permit requirement applies to all of the areas of the National Park Service, including the "free speech areas."

been held in trust for *the use of the public*," and for "communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 954–55, 74 L. Ed. 2d 794 (1983) (emphasis added). "Artists have created art in national parks since the late 19th century," the NPS brags as it promotes over 50 Artists-in-Residence Programs "for visual artists, writers, musicians, and other creative media."[14] Throughout its communications, the National Park Service and its partners herald the intimate relationship between photography and park lands. "Photography is an important part of national park history . . . Today, professional and amateur photographers alike travel from around the world to capture scenic and historic vistas."[15] The connection between photography and national parks is so great that this court has expressly recognized the "concrete and particularized interests" of photographers as <u>indisputable</u> and sufficient to convey standing to challenge hunting regulations. *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 129 (D.D.C. 2016), amended by 203 F. Supp. 3d 31 (D.D.C. 2016) *vacated sub nom. on other grounds by Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017) *and aff'd sub nom. Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017). Whether in reference to the historic origins or the current use and enjoyment of the park, photography is and has been

---

[14] *Be an Artist-in-Residence*, NATIONAL PARK SERVICE, https://www.nps.gov/subjects/arts/air. htm (last visited July 6, 2020).

[15] *Picturing the Parks*, NATIONAL PARK SERVICE, https://www.nps.gov/subjects/photography/index. htm; *See also*, *When Nature is the Muse: Photography in National Parks*, NATIONAL PARKS FOUNDATION, https://www.nationalparks.org/connect/blog/when-nature-muse-photography-national-parks; *Share the Experience, Official Federal Recreation Lands Photo Contest*, https://www. sharetheexperience.org/home; *About Photography*, NATIONAL PARK SERVICE, https://www.nps. gov/subjects/photography/about.htm (outlining the importance of photography to the creation of the NPS); Archer, Phil, *A Silent but Most Effective Voice: Ansel Adams and Advocacy*, NATIONAL PARKS CONSERVATION ASSOCIATION (Oct. 14, 2016), https://www.npca.org/articles/1307-a-silent-but-most-effective-voice-ansel-adams-and-advocacy; Jackie Mansky, *How Photography Shaped America's National Parks*, SMITHSONIAN MAGAZINE (June 22, 2016) https://www.smithsonian mag.com/travel/how-photography-shaped-americas-national-parks-180959262/.

integral to the National Park Service and is a core part of its overall value to the American people.

**V.  AT A MINIMUM, A PUBLIC FORUM ANALYSIS APPLIES BECAUSE THE NPS IS PUBLIC PROPERTY OPENED FOR USE BY THE PUBLIC AS A PLACE FOR EXPRESSIVE ACTIVITY.**

Even if this court finds that the land in question does not rise to the character of a quintessential/traditional public forum, the public forum analysis would still apply. National parks are, without a doubt, "public property which the [government] has opened for use by the public as a place for expressive activity," namely, photography. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place."). The grand tradition of photography in national parks is expressive activity for which the parks have been opened up to the public. Once the National Park Service opened the parks up for the public to come and engaged in expressive activity—specifically photography—they created a public forum. *See Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S. Ct. 1239, 1245, 43 L. Ed. 2d 448 (1975) (holding that a public auditorium was a public forum dedicated to expressive activities—namely theatrical performances). Even if some expressive activities are not appropriate in every publicly accessible portion of the National Park Service, photography is an expressive activity that the general public has been invited and encouraged to engage in throughout the corners of the system. *Id*. *See also*, Section IV. *supra*.

The creation by the government of a "free speech" area in a national park does not change the fact that they have opened the entire park—and indeed the entire publicly accessible NPS system—for expressive photographic activity and therefore it is all a public forum for this kind

of expressive activity.[16] *See United States v. Grace*, 461 U.S. 171, 180. Indeed, the Complaint alleges that members of the media and the general public have created videos from the exact location where Mr. Price filmed his project and that the NPS represented to him that those individuals were engaged in protected First Amendment activities. *See* Complaint at para. 41-44. The government opened the park up for those "approved" individuals to engage in expressive activity without restriction but charged Mr. Price with a crime for doing the same. Because the permit requirement being challenged here involves restrictions on photography and filming in areas where the public generally is allowed to engage in expressive photographic activity, that area is a public forum.

## VI. A REQUIREMENT THAT SOME SPEAKERS—BUT NOT OTHERS—MUST BE SUBJECT TO AN ARBITRARY PERMITTING SCHEME IN ORDER TO ENGAGE IN EXPRESSIVE ACTIVITY IS A PRESUMPTIVELY INVALID SPEAKER-BASED PRIOR RESTRAINT.

*Amici* do not dispute that the National Park Service can charge admission fees for members of the public, including photographers and filmmakers, who seek to enter NPS parks and engage in expressive conduct. However, the government cannot require permits and impose hefty financial barriers targeted at those who plan to take photographs or engage in other expressive activities, based solely on the content of the film or the identity of the speaker. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."). Such speaker-based distinctions are constitutionally suspect because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). It is widely understood that a permit scheme for expressive activity is a prior

---

[16] *Amici* note that some of the free speech areas in national parks are merely sections in a parking lot—which are hardly sufficient to take pictures of the national parks. https://www.nps.gov/puho/learn/management/upload/1st-Ammend-Rights-Area-Map-2010.pdf.

restraint on speech.[17] "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Thus, a requirement to obtain a permit prior to engaging in expressive First Amendment conduct bears "a heavy presumption against its constitutional validity." *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (content-based permit denial for theater was unconstitutional); *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 167, 122 S. Ct. 2080, 2090, 153 L. Ed. 2d 205 (2002) (a permit requirement to engage in expressive conduct "is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society."). In addition to the generalized prior-restraint impact, permitting requirements for solely expressive behavior interfere with spontaneous speech. *Id*. A permit requirement as a condition of expressive activity also interferes with anonymous speech. *Id*. at 166-67. *See also*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342, 115 S. Ct. 1511, 1516, 131 L. Ed. 2d 426 (1995).

Accordingly, it might be feasible for the NPS to require permits of photographers and filmmakers whose activities require access to areas where members of the public are generally not allowed, where additional administrative costs are likely, when there is a likelihood of resource damage or when it might cause an unreasonable disruption to the public use and enjoyment of the site. *See, e.g.*, 16 U.S.C. § 460l-6d (c)-(d). But it can only do so if the permitting requirements: 1) are not overbroad; 2) are not based on the content of the message; 3)

---

[17] Permit fees for filming based solely on the fact that the filming is deemed "commercial" impose fees ranging from $150 to $750 per day while still photography fees range from $50 to $250 per day. See Complaint at p. 21. In addition to the significant financial burden of the permits themselves, the insurance requirement in 43 C.F.R. § 5.7 adds an additional oppressive financial burden. *See* Complaint at p. 8.

are narrowly tailored to serve a *significant* governmental interest, and 4) leave open ample alternatives for communication. *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). The current permitting scheme fails this test. The permit requirements are overbroad—they apply, regardless of the harm caused by the underlying filming activity. The determination that the work is commercial is a vague distinction, open to subjective review of the content—that can only be reached by viewing the work—as evidenced here by the fact that the fine was issued *after* the film was released. The kind of speaker-based and content-based discrimination at issue here is clearly proscribed by the First Amendment. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content," *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 170, 135 S. Ct. 2218, 2230, 192 L. Ed. 2d 236 (2015); *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S. Ct. 3262, 3267, 82 L. Ed. 2d 487 (1984) (regulations that discriminate based on the content of the message are not tolerated under the First Amendment). For example, a "speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. When a law "singles out a class of speakers" it is content-based. *Id*. For all of these reasons, the presumptive unconstitutionality of the NPS permit requirement is not overcome.

**VII. THE GOVERNMENT'S ONLY LEGITIMATE PURPOSE HERE—MINIMIZING RESOURCE DAMAGE OR IMPACT TO VISITORS—HAS NO RELATION TO WHETHER A WORK IS FOR PERSONAL USE, NEWS, DOCUMENTARY, OR FICTIONAL FILM.**

The stated governmental purpose of "obtaining a rent-like return for use of the property" and that "the fee shall provide a fair return to the United States" in exchange for exercising a First Amendment right, is not a legitimate governmental purpose, let alone a compelling one. Raising revenue alone, simply is not an interest that overcomes First Amendment rights. *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S. Ct. 1722, 1729, 95 L. Ed. 2d 209

(1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 593, 103 S. Ct. 1365, 1376, 75 L. Ed. 2d 295 (1983). *See also*, *Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105, 120 (1991). The government may recover its administrative costs invested in assisting a production, but the statute runs afoul where costs related to administrative expenses are *in addition* to the permit fee. *See* 43 C.F.R. § 5.8 ("the location fee is in addition to any cost recovery amount assessed"). The government's desire to get its cut of the value of First Amendment speech is not a valid justification for the fees.

As NPPA and other *amici* testified and commented over the years, the government may use permits as content-neutral time, place, and manner restrictions under certain conditions such as when there is a clear impact to the park or excessive disturbance of visitors. Protection of governmental resources or traffic management are recognized interests (although case law suggests that there needs to be a certain threshold regarding the number of people involved before a permit may be required). When such a regulation involves costs, government may charge an amount that is calibrated to reflect administrative costs. But it is impermissible to simply condition the exercise of First Amendment rights on the payment of a tax or fee. That the government wants a cut of the money is not a valid justification.

Understanding this distinction further clarifies why the differential treatment between filming and still photography makes no sense. "Why the making of audio and video recordings of operations would implicate property [ ] harms, but photographs of the same content would not, is a mystery. This distinction defies the adage that 'a picture is worth a thousand words.'" *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204–05 (9th Cir. 2018). In that case, when analyzing a law banning audio and video recording of agriculture operations, the Ninth Circuit explained that such a "recording prohibition gives agricultural facility owners veto power,

allowing owners to decide what can and cannot be recorded, effectively turning them into state-backed censors able to silence unfavorable speech about their facilities." *Id.* at 1205. In the case at bar, the government is operating as its own censor, and instead of making permitting distinctions based on interference with the parks, the government is arbitrarily deciding what is commercial, and what requires a permit—in this case, almost a year after the fact.



## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Cross-Motion for Judgment on the Pleadings.

/s/ MARK I. BAILEN
MARK I. BAILEN (D.C. BAR #: 459623)
  *COUNSEL OF RECORD*
BAKER & HOSTETLER LLP
WASHINGTON SQUARE, SUITE 1100
1050 CONNECTICUT AVENUE, NW
WASHINGTON, DC 20036-5304
(202) 861-1500
MBAILEN@BAKERLAW.COM

MICKEY H. OSTERREICHER*
ALICIA WAGNER CALZADA*
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
120 HOOPER STREET
ATHENS, GA 30602
(716) 983-7800
LAWYER@NPPA.ORG
ADVOCACY@NPPA.ORG

* MOTION FOR ADMISSION *PRO HAC VICE* PENDING

*COUNSEL FOR NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION,*
*FIRST LOOK MEDIA WORKS, INC., AND OTHER AMICI CURIAE*

JULY 8, 2020



## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system on July 8, 2020. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

/s/ Mark I. Bailen
Mark I. Bailen (D.C. Bar #: 459623)
  *Counsel of Record*
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304
(202) 861-1500
mbailen@bakerlaw.com

Mickey H. Osterreicher*
Alicia Wagner Calzada*
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
120 Hooper Street
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org

* Motion for Admission *Pro Hac Vice* Pending

*Counsel for National Press Photographers Association, First Look Media Works, Inc., and Other Amici Curiae*

July 8, 2020