# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| GORDON M. PRICE, |
|     Plaintiff, |
| |
|     v. |
| |
| WILLIAM P. BARR, U.S. Attorney General, et al., |
|     Defendant. |

Civil Action No. 19-3672 (CKK)

## MEMORANDUM OPINION
(January 22, 2021)

Plaintiff Gordon M. Price is an independent filmmaker from Yorktown, Virginia. In this action, Mr. Price asserts a facial constitutional challenge to the permitting requirements imposed on commercial filming by 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5. Mr. Price brings this action against the Attorney General of the United States of America, the Secretary of the Department of the Interior, and the Director of the National Park Service ("NPS") (collectively, "Defendants"). Defendants have now moved for a judgment on the pleadings, seeking the complete dismissal of Mr. Price's case. *See* Defs.' Mot. at 1. In turn, Mr. Price has filed a cross-motion for a judgment on the pleadings in his favor. *See* Pl.'s Mot. at 1.

Upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court concludes that Mr. Price has established his claim on the merits that the restrictions on

---

[1] The Court's consideration has focused on the following briefing and material submitted by the parties:
- Compl., ECF No. 1;
- Am. Answer, ECF No. 13;
- Defs.' Mem. in Supp. of Def.'s Mot. for J. on the Pleadings ("Defs.' Mot."), ECF No. 18;
- Pl.'s Cons. Mem. of P. & A. in Supp. of Cross-Mot. for J. on the Pleadings and in Opp'n to Defs.' Mot. ("Pl.'s Mot."), ECF No. 25-1;
- Defs.' Reply in Supp. of Defs.' Mot. & Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), ECF No. 31; and
- Pl.'s Reply to Defs.' Opp'n ("Pl.'s Reply"), ECF No. 33.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

commercial filming set forth in 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5, violate the First Amendment.  Accordingly, the Court **DENIES** Defendants' motion for a judgment on the pleadings and **GRANTS** Mr. Price's cross-motion for a judgment on the pleadings.  As set forth below, the Court will enter a declaratory judgment and permanent injunction in Mr. Price's favor.

## I.   BACKGROUND

### A.  Section 100905

Mr. Price raises a facial constitutional challenge to 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5.  *See* Compl. ¶ 1.  Section 100905 provides that the Secretary of the Interior "shall require a permit and shall establish a reasonable fee for commercial filming activities or similar projects in a System unit."  54 U.S.C. § 100905(a)(1).  The statute's paid permit requirement, however, does not apply to non-commercial filming.  *See id.*  Separately and in addition to the permit fee required for commercial filming by § 100905(a)(1), the Secretary of the Interior "shall [also] collect any costs incurred as a result of filming activities or similar projects, including administrative and personnel costs."  *Id.* § 100905(b).  Additionally, § 100905(c) imposes a distinct permit requirement for "still photography," applicable in limited circumstances.  *Id.* § 100905(c)(1)–(2).  Section 100905's permitting regime for "commercial filming" and "still photography" applies to "any area of land and water administered by the Secretary [of the Interior], acting through the Director [of the National Park Service], for park, monument, historic, parkway, recreational, or other purposes."  *Id.* § 100501 (defining a "system unit"); *see also id.* § 100102(1)–(6).  Section 100905 itself does not define the terms "commercial filming" or "still photography."  *See id.* § 100905; Compl. ¶ 24.

The permitting regime required by § 100905 promotes two principal goals: land preservation and rent extraction.  As to the former, Congress endeavored to reduce "the impairment

of the values and resources which are to be protected on federal lands." H.R. Rep. 106-75, at 3 (1999).  Accordingly, § 100905 prohibits the issuance of a permit for "any filming" or "still photography" that threatens "a likelihood of resource damage." 54 U.S.C. § 100905(d)(1). Section 100905, however, also furthers the purpose of rent extraction.  On its face, § 100905 states that the permit fees imposed on "commercial filming" "shall provide a fair return to the United States," measured in relation to the "number of days of the filming activity," the "size of the film crew present," the "amount and type of equipment used," *id.* § 100905(a)(1)(A)–(C), or any other factor the Secretary of the Interior deems "necessary," *id.* § 100905(a)(2).  All such fees collected under § 100905 "shall be available for expenditure by the Secretary [of the Interior], without further appropriation and shall remain available until expended."  *Id.* § 100905(e)(1).  Notably, the statute's legislative history emphasizes the fact that "high-grossing films" are produced in national parks and indicates that § 100905's purpose "is to authorize the Secretary of the Interior . . . to assess fees for commercial filming activities on Federal lands."  S. Rep. 106-67, at 2–3 (1999). Relatedly, Congress has declared "that it is the policy of the United States that the United States receive fair market value of the use of the public lands and their resources."  43 U.S.C. § 1701(a)(9).

To implement the permitting regime required by § 100905, the Department of the Interior ("DOI") promulgated the regulations found at 43 C.F.R. Part 5.  The regulations thereunder "cover[] commercial filming and still photography activities on lands and waters administered by the National Park Service, the Bureau of Land Management, and the U.S. Fish and Wildlife Service."  43 C.F.R. § 5.1.  In accordance with § 100905, the DOI implementing regulations require a permit for "[a]ll commercial filming."  *Id.* § 5.2(a).  The DOI regulations define "commercial filming" as:

> [T]he film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income. Examples include, but are not limited to, feature film, videography, television broadcast, or documentary, or other similar projects. Commercial filming activities may include the advertisement of a product or service, or the use of actors, models, sets, or props.

*Id.* § 5.12.  The DOI regulations, however, specifically exempt "news-gathering" activities from the permitting regime.  *Id.* § 5.4(a).  For the purposes of 43 C.F.R. Part 5, "news" is defined as "information that is about current events or that would be of current interest to the public, gathered by news-media entities for dissemination to the public."  *Id.* § 5.12.  The DOI regulations also set forth a separate set of less restrictive permitting criteria for "still photography."  *Id.* § 5.2(b).

Finally, the DOI regulations enumerate seven permissible bases for the denial of a commercial filming or still photography permit.  *See id.* § 5.5(a)–(g).  Specific to the national parks themselves, a permit may be denied where the commercial filming or still photography would "[r]esult in unacceptable impacts or impairment to National Park Service resources or values."  *Id.* § 5.5(d).  Failure to comply with any provision of 43 C.F.R Part 5, including the obligation to procure a permit for commercial filming or still photography, is a violation of 36 C.F.R. § 5.5. Thereunder, a permit violation carries the potential for fines and up to six months in prison.  *See* 18 U.S.C. § 1865; 36 C.F.R. § 1.3.

## B.  Mr. Price's Commercial Filming

Mr. Gordon Price is a part-time independent filmmaker who lives and works in Yorktown, Virginia.  *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. July 31, 2019), ECF No. 10-1 (Price Decl.), ¶ 1.  In February 2017, Mr. Price and a colleague began filming an independent feature entitled *Crawford Road* about "a stretch of road in York County, Virginia, that has long been the subject of rumors of hauntings and was the location of unsolved murders."  *Id.* ¶ 2.  Mr. Price filmed some *Crawford Road* scenes "in areas open to the general public at about four

locations within the Yorktown Battlefield in the Colonial National Historical Park," which is property administered by NPS. *Id.* ¶ 8. Mr. Price shot multiple scenes on the Yorktown Battlefield, as well as a location known as "Crybaby Bridge" along Crawford Road. *Id.* ¶ 9. No more than four people were present during this filming, and Mr. Price used only a camera tripod and a microphone, without any "heavy equipment," for his recordings in the park. *Id.* Mr. Price, however, "neither sought nor received a permit from [NPS] before filming on the Battlefield." *Id.* ¶ 10.

*Crawford Road* premiered at a restaurant in Newport News, Virginia on October 17, 2018 before a crowd of approximately 250 people. *Id.* ¶¶ 3–4. The film garnered some attention in the local press and on social media sites. *See id.* ¶¶ 5–6. In December 2018, however, two NPS officers located Mr. Price at work and "issued him a violation notice for failure to obtain a commercial filming permit under 36 C.F.R. § 5.5(a)." *Id.* ¶ 11; *see also United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Mar. 26, 2019), ECF No. 1 (Not. of Violation), at 1. Mr. Price subsequently appeared before the United States District Court for the Eastern District of Virginia, and, after retaining counsel, challenged his 36 C.F.R. § 5.5 violation on grounds that § 100905 was "facially invalid as a content-based prior restraint of freedom of speech." *United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. July 31, 2019), ECF No. 9 (Mot. to Dismiss), at 1. In response, the government elected to dismiss the charge against Mr. Price rather than litigating the constitutional question raised, explaining that "the interests of justice [were not] served by pursuing this prosecution." *United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 27, 2019), ECF No. 19 (Gov't Mot. to Dismiss), ¶ 6.

Nonetheless, the government maintained that § 100905's permitting regime was constitutional, that all commercial filming within NPS's jurisdiction still required a permit, and

that "failure to comply with any provision of 43 CFR part 5 is a violation." *Id.* ¶¶ 2–5. As such, "the government did not suggest in any way that it would refrain from issuing further violation notices to Mr. Price if he films on federal land in the future." Compl. ¶ 53; Am. Answer ¶ 53. Ultimately, the district court dismissed the criminal case against Mr. Price and found that the government's voluntary dismissal deprived the court of jurisdiction to consider the merits of Mr. Price's First Amendment challenge to § 100905 and its implementing regulations. *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Nov. 1, 2019), ECF No. 23 (Order), at 4. The district court, however, advised Mr. Price that he could still "assert his constitutional claims in a civil action." *Id.*

Following the dismissal of the charge against Mr. Price, the specter of future violations under § 100905 had at least two effects on Mr. Price's conduct. First, Mr. Price altered his plans for his original *Crawford Road* film. After receiving the 36 C.F.R. § 5.5 violation notice, Mr. Price "canceled upcoming screenings of *Crawford Road* and reedited [the film] to delete footage that had been taken on property covered by the charge." Compl. ¶ 46; Am. Answer ¶ 46. He also suspended ongoing negotiations regarding the distribution of the film and presently remains unable to obtain distribution for *Crawford Road*. *See* Compl. ¶ 47; Am. Answer ¶ 47. Second, Mr. Price altered the plans for his new film entitled *Ten Doors*, *United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 29, 2019), ECF No. 20-1 (Price Decl.), ¶ 3, which was to "include a re-creation of the Saltville Massacre that occurred on October 3, 1864, in Saltville, Virginia." *Id.* In preparation for this second film, Mr. Price had scouted filming locations "that included the Yorktown Battlefield and the Manassas National Battlefield," both federal parks under NPS jurisdiction. *See id.* ¶ 4. Mr. Price, however, has not proceeded with any filming at these sites

out of concern for a subsequent citation and penalty under § 100905 and its implementing regulations.  *See id.*

On December 9, 2019, Mr. Price filed a civil complaint with this Court challenging the facial constitutionality of 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5.  *See* Compl. ¶ 1.  In his complaint, Mr. Price asks this Court for "[a] declaratory judgment stating that the requirements in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5 that those engaged in 'commercial filming' must obtain permits and pay fees are unconstitutional."  Compl. at Prayer for Relief, ¶ A.  Relatedly, Mr. Price seeks "[a] permanent injunction enjoining the permit and fee requirements for commercial filming in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5, and enjoining prosecution and the imposition of criminal liability thereunder."  Compl. at Prayer for Relief, ¶ B.  To support his request for relief, Mr. Price alleges, in Counts I through VI of his complaint, six reasons why 54 U.S.C. § 100905 and its implementing regulations violate the First Amendment.  *See* Compl. ¶¶ 56–107.  In Count VI of his complaint, Mr. Price also alleges that 54 U.S.C. § 100905 and its implementing regulations violate the equal protection component of the Fifth Amendment.  *See* Compl. ¶¶ 103–07.

In response to Mr. Price's complaint, Defendants filed their answer on February 11, 2020, *see* Answer, ECF No. 9, and, shortly thereafter, filed an amended answer to Mr. Price's complaint on April 2, 2020, *see* Am. Answer, ECF No. 13.  Defendants then moved under Federal Rule of Civil Procedure 12(c) for a judgment on the pleadings against Mr. Price.  *See* Defs.' Mot. at 1.  In turn, Mr. Price opposed Defendants' Rule 12(c) motion and filed his own cross-motion under Rule 12(c) for a judgment on the pleadings against Defendants.  *See* Pl.'s Mot. at 1.  In his cross-motion, Mr. Price specifically moves the Court to "declare that the requirements in 54 U.S.C. § 100905,

43 C.F.R. Part 5, and 36 C.F.R. § 5.5 that those engaged in 'commercial filming' must obtain permits and pay fees are unconstitutional" and also to "permanently enjoin their enforcement and any prosecution or imposition of criminal liability thereunder." Pl.'s Mot. at 45. The parties have now completed their briefing on the pending cross-motions, and those motions are ripe for this Court's review.

## II.   LEGAL STANDARD

The parties have each moved for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Rule 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "[A] Rule 12(c) motion asks the court to render a judgment on the merits by looking at the substance of the pleadings and any judicially noted facts." *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 49 (D.D.C. 2018) (quotation omitted). "Thus, a Rule 12(c) motion requires the court to consider and decide the merits of the case, on the assumption that the pleadings demonstrate that there are no meaningful disputes as to the facts such that the complaint's claims are ripe to be resolved at this very early stage in the litigation." *Id.* (citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1369 (3d ed. 2004)).

To prevail on a Rule 12(c) motion, the "moving party [must] demonstrate[ ] that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008) (quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992)). "[T]he Rule 12(c) burden is substantial: if the Rule 12(c) movant cannot show both that there is no material dispute of fact (as reflected in the parties' pleadings) *and* that the law is such that the movant is entitled to judgment as a matter of law, then the motion for judgment on the pleadings must be denied." *Murphy*, 326 F.R.D. at 49 (emphasis in original).

## III.    DISCUSSION

For the reasons set forth herein, the Court concludes that Mr. Price has established Article III standing to pursue his claim.  Mr. Price has also established that 54 U.S.C. § 100905 and its implementing regulations impose a content-based restriction on expressive speech in public forums that runs afoul of the First Amendment.  Accordingly, the Court **DENIES** Defendants' motion for a judgment on the pleadings, and the Court **GRANTS** Mr. Price's cross-motion for a judgment on the pleadings.  The Court shall enter a declaratory judgment and permanent injunction in Mr. Price's favor.

### A.  Article III Standing

"The Constitution grants Article III courts the power to decide 'Cases' or 'Controversies.'" *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (quoting U.S. CONST. Art. III, § 2).  "The doctrine of standing implements this requirement" by demanding "that a case embody a genuine, live dispute between adverse parties."  *Casey*, 141 S. Ct. at 498.  "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  In this case, Defendants argue that Mr. Price lacks Article III standing to challenge the constitutionality of § 100905 and its implementing regulations because he "has failed to establish a sufficient injury in fact."  *See* Defs.' Mot. at 10.   The Court disagrees.

Mr. Price raises a classic First Amendment pre-enforcement challenge to § 100905 and its implementing regulations.  "Pre-enforcement review is permitted where the threatened enforcement of a law is 'sufficiently imminent.'"  *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020) (quoting *SBA*, 573 U.S. at 159).  In this context, "a plaintiff satisfies

the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Woodhull*, 948 F.3d at 370 (quotations omitted). The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") "has interpreted the Supreme Court's pre-enforcement standing doctrine broadly in the First Amendment sphere," *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018), and "[a]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *Woodhull*, 948 F.3d at 370 (quotation omitted).

Mr. Price meets the pre-enforcement standard for injury-in-fact in this case. First, Mr. Price has sufficiently "allege[d] an intention to engage" in his proposed filmmaking activity. *Id.* As set forth above, Mr. Price is an independent filmmaker. *See* Compl. ¶ 36. Mr. Price is "presently working" on a new commercial film entitled *Ten Doors*, about an historical massacre in Saltville, Virginia in 1864. *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 29, 2019), ECF No. 20-1 (Price Decl.), ¶¶ 3–4. For this film, Mr. Price has actively scouted filming locations within two separate national park sites: Yorktown Battlefield and the Manassas National Battlefield. *See id.* ¶ 4. Moreover, these filming sites are geographically proximate to Mr. Price, himself a resident of Yorktown, Virginia, *see id.* ¶ 2, and Mr. Price has, in fact, already carried out similar commercial filming at Yorktown Battlefield for his previous production of *Crawford Road*, *see* Compl. ¶ 38; Am. Answer ¶ 38. For these reasons, Mr. Price has presented a sufficiently "credible statement" of his intention to conduct commercial filming within a national park. *ANSWER Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009); *see also Woodhull*, 948 F.3d at 370.

Next, the Court must consider whether Mr. Price's proposed course of conduct implicates a "constitutional interest." *Woodhull*, 948 F.3d at 370. It does. Filming scenes within selected locations, as Mr. Price plans to do here at Yorktown Battlefield and the Manassas National Battlefield, is a constituent part of creating a movie. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). Accordingly, Mr. Price's filmmaking at these parks constitutes a form of expressive speech protected by the First Amendment. *See* disc. *infra* at § III.B.1; *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) ("It defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity."). Mr. Price argues this point forcefully in his opening brief, *see* Pl.'s Mot. at 9–12, and Defendants appear to concede the argument in their opposition brief by not responding. Regardless, the Court is convinced that Mr. Price's filmmaking constitutes a form of expressive speech protected by the First Amendment. *See* disc. *infra* at § III.B.1.

Finally, Mr. Price has also established that his proposed filmmaking creates "a credible threat of prosecution." *Woodhull*, 948 F.3d at 370. Where a plaintiff "challenge[s] [a] law[] burdening expressive rights" and offers a "credible statement . . . of intent to commit violative acts," he may rely upon the "conventional background expectation that the government will enforce the law." *United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 739 (D.C. Cir. 2016) (quotation omitted). This is particularly true in the First Amendment context, where the willingness of the courts "to permit pre-enforcement review is at its peak." *Id.* at 740. Consequently, Mr. Price could very well satisfy the "threat of prosecution" standard absent any showing of prior prosecutions under § 100905 and its implementing regulations. *See Sandvig*, 315

F. Supp. 3d at 19.  But, of course, in this case Mr. Price does not rely on the hypothetical.  NPS officials have *already* charged Mr. Price under 36 C.F.R. § 5.5 for filming without a permit at "Yorktown Battlefield in the Colonial National Historical Park."  Compl. ¶ 38; *see also United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Mar. 26, 2019), ECF No. 1 (Not. of Violation), at 1.  And even while the government dismissed that charge against Mr. Price, it continued to defend the constitutionality of § 100905 and its enforcement against commercial filmmakers.  *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 27, 2019), ECF No. 19 (Gov't Mot. to Dismiss), ¶¶ 2–5.  Now, Mr. Price plans to shoot another commercial film at Yorktown Battlefield—the very same site where he received his initial violation.  *See* Compl. ¶ 54.  On this record, Mr. Price has convincingly demonstrated a credible threat of prosecution under § 100905 and its implementing regulations.

In sum, Mr. Price has adequately demonstrated injury-in-fact in this pre-enforcement action to challenge the restrictions on commercial filming imposed by § 100905 and its implementing regulations.  *Woodhull*, 948 F.3d at 370.  Defendants, moreover, do not challenge the remaining two elements of Article III standing: traceability and redressability.  *See SBA*, 573 U.S. at 158. And for good reason.  The restriction on Mr. Price's ability to film at Yorktown Battlefield and the Manassas National Battlefield is clearly traceable to § 100905 and its implementing regulations.  Furthermore, any unconstitutional infringement this regime might effectuate would be redressable through an injunction against its enforcement, the very relief Mr. Price now seeks. For these reasons, Mr. Price has satisfied each element of Article III standing in this action.  *See SBA*, 573 U.S. at 157–58.

There is, however, an important limitation to Mr. Price's Article III standing.  As noted above, § 100905 imposes two distinct permitting requirements: one for commercial filming and

one for photography.  *See* 54 U.S.C. § 100905(a), (c).  The regulations in 43 C.F.R. Part 5 similarly

distinguish between permits for commercial filming on the one hand, *see* 43 C.F.R. § 5.2(a), and

for photography on the other, *see id.* at § 5.2(b).  While Mr. Price has established a constitutional

injury under the commercial filming regulations, the Article III "case" and "controversy"

requirement still separately constrains this Court's authority to review the distinct provisions in §

100905 and 43 C.F.R. Part 5 pertaining to photography.  *See Williams v. Lew*, 819 F.3d 466, 476

(D.C. Cir. 2016).  This is problematic because the record in this case relates exclusively to Mr.

Price's commercial filming efforts and says nothing of his photography ambitions.  *See* Compl. ¶

54; *United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 29, 2019), ECF No. 20-1 (Price

Decl.), ¶¶ 3–4.  In this way, Mr. Price has not established any "intention" to carry out photography

in a manner that would credibly threaten prosecution under the photography permitting

requirements of § 100905 and its implementing regulations.  *Woodhull*, 948 F.3d at 370.  Such a

"controversy" is purely hypothetical at this time.

Therefore, the Court "declines to scrutinize the constitutionality of those provisions of

[§ 100905 and its implementing regulations] that are not before it in this case."  *Am. Soc. of Ass'n*

*Executives v. United States*, 23 F. Supp. 2d 64, 71 (D.D.C. 1998), *aff'd sub nom. Am. Soc. of Ass'n*

*Executives v. United States*, 195 F.3d 47 (D.C. Cir. 1999).  Where a plaintiff's constitutional injury

derives from a specific statutory or regulatory provision, a court should constrain its review to the

alleged defect therein.  *See id.*; *Tanner Advert. Grp., L.L.C. v. Fayette Cty.*, 451 F.3d 777, 795

(11th Cir. 2006) (Birch, J., concurring) ("[S]tanding to make a facial challenge to a particular

provision under the overbreadth doctrine does not give the plaintiff standing to challenge other

sections, or the entire statutory scheme, if the plaintiff was not injured thereunder.").  To opine on

the constitutionality of statutory provisions unrelated to the actual "case" or "controversy" before

the Court would contravene the ethos of the Article III standing doctrine.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  Mr. Price implicitly acknowledges this limitation, as he requests injunctive relief specific to the "commercial filming" provisions of 54 U.S.C. § 100905 and 43 C.F.R. Part 5.  *See* Pl.'s Mot. at 45; Compl., at Prayer for Relief, ¶¶ A–B.  The Court thinks this wise.  As such, the Court concludes that Mr. Price has established Article III standing only to challenge the permit requirements for "commercial filming" in § 100905 and its implementing regulations.  The Court will limit its constitutional review accordingly.

## B.  First Amendment Analysis

"The First Amendment prohibits laws 'abridging the freedom of speech.'"  *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting U.S. CONST. amend. I).  In his motion, Mr. Price argues that 54 U.S.C. § 100905 and its implementing regulations, 43 C.F.R. Part 5 and 36 C.F.R. § 5.5, violate this First Amendment right.  *See* Pl.'s Mot. at 6–7, 45.  Accordingly, Mr. Price asserts a facial challenge to 54 U.S.C. § 100905 and its implementing regulations.  *See* Pl.'s Mot. at 16; Compl. ¶ 2.  Such a facial challenge is appropriate where a plaintiff, like Mr. Price here, maintains that a law is overbroad and impermissibly restricts "'a substantial amount of speech that is constitutionally protected.'"  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 513 (D.C. Cir. 2010) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992)); *see also* disc. *infra* at § III.B.3 (discussing overly broad scope of § 100905 and its implementing regulations).

"Claims under the Free Speech Clause of the First Amendment are analyzed in three steps."  *Boardley*, 615 F.3d at 514.  First, the Court must determine "whether the activity at issue is speech protected by the First Amendment."  *Id.* (quotation omitted).  Second, the Court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic."  *Id.*  And third, the Court must "assess whether the

government's justifications for restricting speech in the relevant forum satisfy the requisite standard." *Id.* The Court will apply this framework to Mr. Price's facial First Amendment challenge to § 100905 and its implementing regulations, addressing each prong of the analysis in turn.

### 1. Filming A Movie Constitutes Expressive Speech Protected By The First Amendment

As discussed above, filming a movie is expressive speech protected by the First Amendment. Two foundational First Amendment principles compel this conclusion. First, "the Supreme Court has long recognized that the First Amendment protects film" itself. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) ("[W]e conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments.")); *see also Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) ("Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press."). Second, the Supreme Court has found that "the *creation* and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (emphasis added); *see also Citizens United*, 558 U.S. at 336 ("Laws enacted to control or suppress speech may operate at different points in the speech process."). Taken together, these First Amendment principles indicate that the creation of a film must also fall within the ambit of the First Amendment's protection of freedom of expression.

To find otherwise, would artificially disconnect an integral piece of the expressive process of filmmaking. Indeed, "[i]t defies common sense to disaggregate the creation of the video from the video or audio recording itself." *Animal Legal Def. Fund*, 878 F.3d at 1203. Applying this reasoning, multiple circuit courts have granted First Amendment protection to filmmaking. *See,*

*e.g.*, *id.* at 1204 ("Because the recording process is itself expressive and is inextricably intertwined with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely expressive activity.") (quotation omitted); *Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings . . . and for this . . . to have meaning [it] must protect the act of creating that material."). This Court is persuaded by such reasoning, which comports with the Supreme Court's First Amendment jurisprudence protecting not only the final form of expression, but also its medium and the iterative steps used in the creative process. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) ("[R]egulation of a medium inevitably affects communication itself."). Finally, as a practical matter, Defendants do not respond in their opposition brief to Mr. Price's argument that filming a movie is a form of speech, apparently conceding the point. *See* Pl.'s Mot. at 9–12; *see generally* Defs.' Opp'n, ECF No. 31. For these reasons, the Court concludes that filming a movie is a form of speech protected by the First Amendment.

   **2. Section 100905 And Its Implementing Regulations Restrict Speech In Public Forums**

   Because § 100905 and its implementing regulations affect speech protected by the First Amendment, the Court must next "identify the nature of the forum" within which they restrict such speech. *Boardley*, 615 F.3d at 514. The Supreme Court has recognized "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters All.*, 138 S. Ct. at 1885. "In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* "The same standards apply in designated public forums." *Id.* "In a nonpublic forum, on the other hand—a space that 'is not by tradition or

designation a forum for public communication'—the government has much more flexibility to craft rules limiting speech." *Id.* (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983)).

"The dispositive question" in characterizing a particular forum is "what purpose [the forum] serves, either by tradition or specific designation." *Boardley*, 615 F.3d at 515.   Relevant here, a "park" becomes a traditional public forum where "it has 'immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).   Moreover, the government may "create a designated public forum if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quotation omitted).

Section 100905 and its implementing regulations restrict speech in public forums.   On its face, the permitting regime applies to "any area of land and water administered by the Secretary [of the Interior], acting through the Director [of the National Park Service], for park, monument, historic, parkway, recreational, or other purposes." 54 U.S.C. § 100501.   The scope of § 100905's permitting regime, therefore, necessarily covers multiple locations that courts have already identified as traditional public forums.   For example, the National Park Service administers the National Mall, a forum "where men and women from across the country will gather in the tens of thousands to voice their protests or support causes of every kind" and where "the constitutional rights of speech and peaceful assembly find their fullest expression." *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 952 (D.C. Cir. 1995).   By way of further example, § 100905 applies to sidewalks outside the Vietnam Veterans Memorial, which the D.C. Circuit has also identified as a

traditional public forum. *See Henderson v. Lujan*, 964 F.2d 1179, 1183 (D.C. Cir. 1992); 36 C.F.R. § 7.96(g)(ix)–(x). Unsurprisingly, the D.C. Circuit has also concluded more broadly that "many national parks undoubtedly include areas that meet the definition of traditional public forums." *Boardley*, 615 F.3d at 515.

Beyond this traditional public forum analysis, § 100905 and its implementing regulations also apply to *designated* public forums administered by the National Park Service. *See Pleasant Grove City*, 555 U.S. at 469. For example, the national parks contain designated "free speech areas" where visitors can specifically engage in First Amendment protected activities, such as speechmaking or picketing. *See* 36 C.F.R. § 2.51; *Boardley*, 615 F.3d at 515 ("The government concedes the 'free speech areas' made available within national parks . . . are 'designated public forums.'"). In fact, Defendants acknowledge that Colonial National Historical Park itself, the national park where Mr. Price filmed *Crawford Road*, "has designated an area close to the Yorktown Battlefield visitor center . . . for demonstrations, making that portion of the park a designated public forum." Defs.' Mot. at 16. Accordingly, § 100905 and its implementing regulations apply not only to traditional public forums like the National Mall, but also to designated public forums, like free speech areas within the national parks.

### 3. Section 100905 And Its Implementing Regulations Do Not Satisfy Heightened Constitutional Scrutiny

As set forth above, § 100905 and its implementing regulations restrict expressive speech (*i.e.*, filming a movie) carried out in traditional public forums and designated public forums. The Court, therefore, must apply a heightened level of First Amendment scrutiny to this permitting regime. *See Minnesota Voters All.*, 138 S. Ct. at 1885. For the reasons provided herein, § 100905 and its implementing regulations do not satisfy this heightened level of constitutional review and, therefore, run afoul of the First Amendment.

a)  **Section 100905 And Its Implementing Regulations Impose a Content-Based Restriction on Speech**

The applicable form of heightened scrutiny that § 100905 and its implementing regulations receive depends on whether they impose a "content-based" or "content-neutral" restriction on speech.  *See Minnesota Voters All.*, 138 S. Ct. at 1885.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Id.* (quoting *Sorrell*, 564 U.S. at 566).  "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose."  *Reed*, 576 U.S. at 163.  Both, however, "are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."  *Id.* at 163–64.  The parties dispute whether § 100905's specific application to "commercial filming" qualifies as a content-based restriction.

To support the argument that § 100905 and its implementing regulations are content-*neutral*, Defendants rely principally on the Eighth Circuit's decision in *Josephine Havlak Photographer, Inc. v. Village of Twin Oaks*, 864 F.3d 905 (8th Cir. 2017), which of course is not binding authority in this case.  *See* Defs.' Mot. at 25.  In *Havlak*, the Eighth Circuit considered a First Amendment challenge to a municipal ordinance stating that: "[T]he maintaining of a concession or the use of any park facility, building, trail, road, bridge, bench, table or other park property for commercial purposes is prohibited unless a permit is issued by the Board of Trustees or its designated representative(s)."  *Id.* at 910 n.2.  The plaintiff in *Havlak* asserted that the ordinance created a content-based distinction between commercial and non-commercial

photography in the park.  *See id.* at 914.  The Eighth Circuit, however, disagreed.  Instead, the Eighth Circuit reasoned that the ordinance was content-neutral because it "does not reference any specific commercial enterprise or any specific message.  It applies equally, for example, to commercial photographers and to hot dog vendors."  *Id.*  Defendants now argue, here, that the restriction on "commercial filming" in § 100905 is analogous to the content-neutral ordinance in *Havlak*, which required a permit for all commercial activity on municipal park grounds.  *See* Defs.' Mot. at 25.

Conversely, Mr. Price relies on the Supreme Court's holding in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), to argue that § 100905 and its implementing regulations are, in fact, content-based restrictions on speech.  In *Sorrell*, the Supreme Court considered a First Amendment challenge to a Vermont law, "Act 80," that regulated the disclosure of "prescriber-identifying information."  *Id.* at 558.  Prescriber-identifying information is the data collected by pharmacies regarding the prescriptions sent to them by various physicians, which, in turn, is valuable to pharmaceutical manufacturers who can use that data to more precisely tailor their own physician-facing marketing practices for new prescription drugs.  *See id.*  Act 80, however, circumscribed the use of such data by providing that certain entities, such as pharmacies, "'shall not . . . permit the use of regulated records containing prescriber-identifiable information for marketing or promoting a prescription drug.'"  *Id.* at 559 (quoting Vt. Stat. Ann. tit. 18, § 4631(d)).  Act 80 similarly stated that "[p]harmaceutical manufacturers and pharmaceutical marketers shall not use prescriber-identifiable information for marketing or promoting a prescription drug."  *Sorrell*, 564 U.S. at 559.  Reviewing this statutory language, the Supreme Court reasoned that Act 80 created a content-based restriction by prohibiting "any disclosure when recipient speakers will use the information for marketing."  *Id.* at 564.  The Court also found that Act 80's "second sentence

prohibits pharmaceutical manufacturers from using the information for marketing" and, therefore, "disfavors marketing, that is, speech with a particular content." *Id.*   Mr. Price argues that § 100905's restriction on "commercial filming" is comparable to Act 80's content-based restriction on pharmaceutical marketing, struck down in *Sorrell*.  *See* Pl.'s Mot. at 25.

Mr. Price has the better argument.  Section 100905 and its implementing regulations impose a content-based restriction on "commercial filming," a form of speech.  Unlike the municipal ordinance in *Havlak*, § 100905 and its implementing regulations do not apply generically to all commercial activity in national parks.  To the contrary, the permitting regime applies to filming, a form of expressive speech, *see* disc. *supra* at § III.B.1, and specifically to a type of filming, "commercial filming."  54 U.S.C. § 100905(a).  Section 100905's implementing regulations make this content-based distinction even more apparent, defining "commercial filming" as the "recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income."  43 C.F.R. § 5.12.  The application of § 100905's permitting regime, therefore, necessarily turns on an assessment of whether the content of a film was meant to appeal to a market audience and generate income.  *See id.*

Consider, for example, the enforcement of § 100905 against Mr. Price and his film *Crawford Road*.  *See* Compl. ¶¶ 43–44.  To determine whether *Crawford Road* ran afoul of § 100905's permitting regime, NPS officials needed to review the film and determine *ex post* whether the content Mr. Price included therein was geared towards a "market audience" or evinced some "intent of generating income."  43 C.F.R. § 5.12.  If, however, Mr. Price's film was "non-commercial" or happened to feature only news worthy "information . . . about current events or . . . of current interest to the public," *id.*, the permitting requirement would not apply, *see id.* at § 5.4(a).  In this way, § 100905's permitting requirement is comparable to the content-based

regime created by Vermont's Act 80, which disfavored the disclosure of prescriber-identifying information specifically for "marketing," but not for other purposes.  *Sorrell*, 564 U.S. at 564.

The Supreme Court's analysis in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), further reinforces this conclusion.   In *Discovery Network*, the Supreme Court addressed a First Amendment challenge to a municipal ordinance that prohibited the distribution of "commercial" handbills on public property, but permitted the distribution of "non-commercial" materials, like newspapers.  *Id.* at 413.  The Court found the ordinance to be content-based:

> [T]he very basis for the regulation is the difference in content between ordinary newspapers and commercial speech. True, there is no evidence that the city has acted with animus toward the ideas contained within respondents' publications, but just last Term we expressly rejected the argument that discriminatory treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas. Regardless of the mens rea of the city, it has enacted a sweeping ban on the use of newsracks that distribute "commercial handbills," but not "newspapers." Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content based."

*Id.* at 429 (quotations omitted).  In much the same way, § 100905 and its implementing regulations impose a content-based restriction on commercial filming.  *See Barr v. Am. Ass'n of Political Consultants, Inc.,* 140 S. Ct. 2335, 2347 (2020) ("In *Sorrell*, this Court held that a law singling out pharmaceutical marketing for unfavorable treatment was content-based."); *Reed*, 576 U.S. at 169 ("For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed.").

### b)  Section 100905 And Its Implementing Regulations Do Not Satisfy Heightened Constitutional Scrutiny

As the foregoing analysis demonstrates, § 100905 and its implementing regulations impose a content-based restriction on expressive speech in traditional public forums.  The Court, therefore,

must evaluate the permitting regime they create for commercial filming under strict scrutiny. *See Minnesota Voters All.*, 138 S. Ct. at 1885; *AAPC*, 140 S. Ct. at 2347. To survive strict scrutiny, "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotation omitted). Defendants do not even attempt to argue that § 100905 and its implementing regulations meet this standard. *See* Defs.' Mot. at 21–33 (addressing only intermediate scrutiny); Defs.' Opp'n at 15–21 (same). They do not meet this standard.

As an initial matter, Defendants contend that § 100905 furthers the government's interest in collecting compensation from commercial filmmakers and thereby raising funds for the National Park Service. *See* Defs.' Mot. at 27–28. But, as noted, Defendants make no argument that this governmental interest in revenue collection could satisfy strict scrutiny. Nor would such an argument succeed. Section 100905 requires the imposition of a "fair market" permit fee for commercial filming, assessed *in addition to* payment for "any costs incurred as a result of filming activities or similar projects, including administrative and personnel costs." 54 U.S.C. § 100905(a), (b). Put differently, § 100905 mandates payment not only for the incidental costs of filming and permit administration, but for the act of filming itself. In accordance therewith, the DOI's implementing regulations require a stand-alone "location fee" for commercial filming, assessed in addition to a payment to cover any administrative costs incurred. *See* 43 C.F.R. § 5.8(a), (b). This regime is difficult to square with the longstanding rule that the government may not "impose a charge for the enjoyment of a right granted by the federal constitution," including the First Amendment right to free expression. *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). Moreover, the Supreme Court has specifically rejected the government's attempt to justify content-based restrictions on speech by pointing to a need to raise revenue. *See Arkansas*

23

*Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987).  Instead, "the State could raise the revenue by taxing [persons] generally, avoiding the censorial threat implicit in a tax that singles out" a particular speaker or form of speech.  *Minneapolis Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 586 (1983).  As such, any attempt to justify § 100905's permitting regime on the basis of a governmental need to raise revenue is a dead end.

Defendants, however, also offer another governmental interest that merits attention: protecting national park land from resource depletion and damage.  *See* Defs.' Mot. at 28; *see also* Commercial Filming & Similar Projects & Still Photography Activities, 78 Fed. Reg. 52,087-02, 52,090 (noting that national parks have "limited space, fragile resources, or experience high visitation" and emphasizing the "need to protect nesting areas of threatened or endangered species during certain times of the year").  Protecting national park land and the resources it contains is a substantial governmental interest.  *See Boardley*, 615 F.3d at 519 (collecting cases).  Mr. Price does not challenge the validity of this interest, but instead questions the tailoring of § 100905 and its implementing regulations to this governmental goal.  Specifically, Mr. Price argues that "there is no direct connection under [§ 100905] between the burden on commercial filming and its effect on property managed by DOI" and, further, that § 100905 "uniquely burdens commercial filming not only when there is no greater impact on federal lands than noncommercial filming . . . but also in instances when it has *less* of a burden."  Pl.'s Mot. at 26 (emphasis in original).

The D.C. Circuit's decision in *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010), provides considerable support for Mr. Price's argument.  In *Boardley*, the D.C. Circuit evaluated a First Amendment challenge to two NPS regulations that prohibited "'[p]ublic assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views' and '[t]he sale or distribution of . . . printed matter' within park areas, unless 'a permit [authorizing

the activity] ha[d] been issued.'"  *Id.*; *see also* 36 C.F.R. §§ 2.51, 2.52.  The D.C. Circuit found

that even under *intermediate* scrutiny, these regulations violated the First Amendment.  *See*

*Boardley*, 615 F.3d at 525.

First, the D.C. Circuit in *Boardley* concluded that the NPS regulations "'burden[ed]

substantially more speech than [wa]s necessary' to achieve the government's substantial interests"

in protecting national park lands and resources from damage.  *Id.* at 519 (quoting *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 798–99 (1989)).  A "crucial problem" with the NPS regulations

was their over-inclusivity, as the permitting requirements "applied to groups of all sizes."

*Boardley*, 615 F.3d at 521.  On this point, the D.C. Circuit reasoned: "The government asserts

interests in preventing overcrowding, protecting park facilities, protecting visitors, and avoiding

interference with park activities. But why are individuals and members of small groups who speak

their minds more likely to cause overcrowding, damage park property, harm visitors, or interfere

with park programs than people who prefer to keep quiet?"  *Id.* at 522.  The D.C. Circuit further

emphasized that "[t]he fit between means and ends, [was] far more precise when the NPS

regulations [we]re applied to large groups."  *Id.*  In short, the NPS permitting requirements for all

demonstrations and distribution of printed material imposed "too high a cost, namely, by

significantly restricting a substantial quantity of speech that does not impede the NPS's permissible

goals."  *Id.* at 523 (quotation omitted).

Next, the D.C. Circuit in *Boardley* also considered the rule that "a time, place, or manner

regulation must 'leave open ample alternatives for communication.'"  *Id.* at 524 (quoting *Forsyth*

*County*, 505 U.S. at 130).  Here, the D.C. Circuit explained that the possible "alternatives" must

be available to potential speakers "within the forum in question."  *Boardley*, 615 F.3d at 524

(quotation omitted).  The NPS regulations at issue in *Boardley* flatly failed this test.  Under those

regulations, anyone who wanted to distribute leaflets or host an assembly in a national park needed to first obtain a permit.  *See id.*  Indeed, the regulations "completely excluded" any person planning to engage in such expression within a national park without a permit, leaving no options for these speakers other than acquiescence to the permitting regime or withholding their speech altogether. *Id.* at 525 (quoting *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990)).  It was no cure that such individuals could engage in speech on *other* properties *near* to the national parks, as this was not a viable "intra-forum alternative."  *Boardley*, 615 F.3d at 525.

    In this case, § 100905 and its implementing regulations suffer from flaws remarkably similar to those which rendered the NPS regulations unconstitutional in *Boardley*.  First, § 100905 and its implementing regulations are overinclusive.  On their face, § 100905 and its implementing regulations flatly require a paid permit for all "commercial filming." 54 U.S.C. § 100905(a); 43 C.F.R. §§ 5.1, 5.8.  This regime, therefore, requires "individuals and small groups to obtain permits before engaging in expressive activities," just the same as it does for large groups with heavy and potentially disruptive filming equipment.  *Boardley*, 615 F.3d at 525; *see also* Commercial Filming & Similar Projects & Still Photography Activities, 78 Fed. Reg. 52,087-02, 52,090 ("There is no basis for an exclusion based on crew size or amount of equipment under this statute.").  Defendants offer no explanation for how the broad sweep of this permitting regime is sufficiently tailored to the government's goal of protecting federal land.  *See* Defs.' Mot. at 29–30; Defs.' Opp'n at 17–18.  Mr. Price, for example, filmed *Crawford Road* with no more than a camera tri-pod, a microphone, and a crew of no more than four people.  *See* Compl. ¶¶ 38–39.  Restricting Mr. Price's filming activity has no clear connection to the government's land conservation goals, yet Mr. Price was still threatened with a criminal sanction under § 100905 and its implementing regulations for filming without a permit.  *See id.* ¶ 43.

As the *amici* in this case persuasively argue, the overinclusive sweep of § 100905's permitting regime is particularly problematic given the ease of filming in the modern technological age.  *See* Br. of Amici Curiae, ECF No. 29, at 5–12.  Section 100905's legislative history reveals a Congressional focus, over twenty years ago, on "major motion pictures" filmed in national parks, such as "Star Wars" and "Dances with Wolves."  S. Rep. 106-67, at 3 (1999).  Yet, Congress did not limit the reach of § 100905 to these "major" productions alone, but instead drew the line only at "commercial" filming.  54 U.S.C. § 100905(a).  Now, over two decades after the passage of § 100905, any individual may easily enter a national park and shoot a high-quality video at will using nothing more than a smart phone.  *See* Br. of Amici Curiae, ECF No. 29, at 7.  And with the expansion of mass-media outlets like YouTube, such filmmakers may expediently disseminate and monetize those videos on the internet.  Yet, so long as these modern filmmakers attempt to commercially market their videos, § 100905 and its implementing regulations require a permit, without any regard for the effect that their filming might have on the preservation of national park land.  *See* 43 C.F.R. § 5.12.

Relatedly, § 100905's permitting regime also *excludes* non-commercial filming without any consideration for the damage that activity might also cause to national parks.  *See* Pl.'s Mot. at 41.  For example, a "non-commercial" filming production carried out by a non-profit organization or a news crew would escape the reach of § 100905's permitting regime, *even if* those groups used heavy filming equipment that damaged federal land.  *See* 54 U.S.C. § 100905(a).  Or consider the case of Mr. Price and his forthcoming film *Ten Roads*.  If Mr. Price shoots *Ten Roads* at Yorktown Battlefield by himself, with no more than a hand-held camera, he would still need a permit, so long as the film was "commercial."  *See* 43 C.F.R. § 5.2(a).  But what if instead Mr. Price produced *Ten Roads* as a private, non-commercial film, using heavy filming equipment and

a crew of thirty workers?  In such a case, Mr. Price's non-commercial film would pose a far greater threat to federal land, but could nonetheless proceed without a permit under § 100905.  These under- *and* over-inclusivity problems demonstrate the obvious tailoring defects of § 100905's restriction on commercial filming.  *See, e.g.*, *Gilleo*, 512 U.S. at 51 (addressing the First Amendment problem of underinclusive regulations); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 121 (1991) (addressing the First Amendment problem of overinclusive regulations).

Indeed, the D.C. Circuit struck down a similar NPS permitting regime in *Boardley* for this very reason.  *See Boardley*, 615 F.3d at 521–25.  It is also notable that in response to the *Boardley* decision, the NPS regulations at issue were revised to include a "small group permit exception" for expressive activities "involving 25 persons or fewer."  36 C.F.R. § 2.51(b)(1); *id.* § 2.52(b)(1). This small group exception responded directly to the D.C. Circuit's holding that "[r]equiring individuals and small groups to obtain permits before engaging in expressive activities within designated 'free speech areas' (and other public forums within national parks) violates the First Amendment." *Boardley*, 615 F.3d at 525.  As Mr. Price has demonstrated here, however, § 100905 and its implementing regulations contain no such exception for individual commercial filmmakers or small groups of commercial filmmakers.

It also bears mentioning that § 100905 and its implementing regulations do not leave open any adequate alternatives for commercial filmmakers who would like to film on national park grounds without a permit.  *See* Pl.'s Mot. at 32–33.  As explained above, the permitting regime applies to "any area of land and water administered by the Secretary [of the Interior], acting through the Director [of the National Park Service], for park, monument, historic, parkway, recreational, or other purposes."  54 U.S.C. § 100501 (defining a "system unit"); *see also id.*

§ 100102(1)–(6).  Consequently, commercial filmmakers who would like to shoot on national park grounds must either obtain a permit or cancel their filming plans altogether.  Mr. Price's decision to halt production of his forthcoming film on the Saltville Massacre, absent a permit, is a paradigmatic example of this scenario.  *See* Compl. ¶ 54.  Tellingly, Defendants argue that "*with a permit*, [filmmakers] would have multiple alternative channels to film [their] movie[s], most obviously *applying for a permit* . . ."  Defs.' Mot. at 33 (emphasis added).  Defendants also later suggest that filmmakers could simply "choose not to generate income from the film."  Defs.' Opp'n at 20.  But these are not "alternatives."  They are simply ways of complying with § 100905's permitting regime.  At bottom, § 100905 and its implementing regulations leave commercial filmmakers with no "intra-forum" alternative, but rather a binary proposition: either obtain a permit or forgo commercial filming in a national park.  *Boardley*, 615 F.3d at 524 (quoting *Turner*, 893 F.2d at 1393).  This lack of alternative channels is impermissible under First Amendment scrutiny, as the D.C. Circuit also made clear in *Boardley*.  *See id.*

****

As the foregoing analysis shows, § 100905 and its implementing regulation impose a content-based restriction on speech that does not pass constitutional muster.  Just as the NPS regulations struck down in *Boardley*, § 100905's permitting regime for commercial filming "'burden[s] substantially more speech than is necessary' to achieve the government's substantial interests" in protecting national park lands and resources from damage.  *Boardley*, 615 F.3d at 519 (quoting *Ward*, 491 U.S. at 798–99).  Section 100905 and its implementing regulations also fail to leave open any alternative channels for commercial filmmakers who would like to film in national parks without a permit.  *Boardley*, 615 F.3d at 524 (quoting *Turner*, 893 F.2d at 1393).  Accordingly, Mr. Price has established that the permit requirement for commercial filming

29

imposed by 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5 violates the First Amendment.[2]  The Court may, therefore, enter a "judgment on the merits" in Mr. Price's favor on his First Amendment claim.  *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 49 (D.D.C. 2018) (quotation omitted); *see also* Compl. ¶¶ 71–80.

## C. Equitable Relief

The last remaining issue for the Court to consider is the equitable relief requested by Mr. Price.  Mr. Price seeks two forms of equitable relief: (1) a declaratory judgment stating that the requirements in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5 that those engaged in "commercial filming" must obtain permits and pay fees are unconstitutional, and (2) a permanent injunction enjoining the permit and fee requirements for commercial filming in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5, and enjoining prosecution and the imposition of criminal liability thereunder.  *See* Compl. at Prayer for Relief, ¶¶ A, B; Pl.'s Mot. at 45.  Both forms of equitable relief are appropriate here.

First, the Court will enter a declaratory judgment stating that 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5 impose an unconstitutional permitting requirement on "commercial filming."  "In a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  "To invoke the Declaratory Judgment Act, a plaintiff must demonstrate that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008) (quotation omitted).

---

[2] Neither party proposes severing any portion of the commercial filming restrictions set forth in 54 U.S.C. § 100905, 43 C.F.R. Part 5, or 36 C.F.R. § 5.5.  The Court finds no basis for doing so here.  *Boardley*, 615 F.3d at 525 ("Neither party has argued that we should sever the regulations in order to leave part of them intact, and we perceive no basis for doing so.").

Mr. Price meets this standard.  As set forth above, Mr. Price has presented an actual Article III "case" over which this Court has jurisdiction.  *See* disc. *supra* at § III.A.  Moreover, the Court has also concluded that the permitting regime for "commercial filming" mandated by 54 U.S.C. § 100905 and its implementing regulations is an unconstitutional restriction on speech protected by the First Amendment.  *See* disc. *supra* at § III.B.  Declaratory relief is appropriate in such a case, where the plaintiff demonstrates on the merits, as Mr. Price has done here, that a law violates the First Amendment.  *See e.g.*, *Boggs v. Bowron*, 842 F. Supp. 542, 547 (D.D.C. 1993), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995) )("[C]ivil actions for declaratory relief against criminal prosecution have become a common method of challenging the constitutionality of federal statutes," particularly "where First Amendment rights are at stake."); *Nat'l Ass'n of Manufacturers v. United States Sec. & Exch. Comm'n*, No. 1:13-CV-00635-KBJ, 2017 WL 3503370, at *1 (D.D.C. Apr. 3, 2017) (issuing a declaratory judgment against a statute and regulations in violation of the First Amendment).

The Court will also grant Mr. Price's motion for a permanent injunction enjoining the permit and fee requirements for commercial filming in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5, and enjoining prosecution and the imposition of criminal liability thereunder.  *See* Pl.'s Mot. at 45.  "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "The decision to grant or deny permanent

injunctive relief is an act of equitable discretion by the district court." *Id.*; *see also Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1408 (D.C. Cir. 1998).

Mr. Price has satisfied this threshold. First, the Court has already concluded that Mr. Price has successfully shown on the merits that 54 U.S.C. § 100905 and its implementing regulations violate the First Amendment. *See* disc. *supra* at § III.B. A permanent injunction, however, "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). And while "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the D.C. Circuit has charted a more discerning course when considering injunctive relief for First Amendment injuries. To establish "irreparable injury" in the context of free speech claims, the movant must also "demonstrate a likelihood that they will engage in the constitutionally protected expressive conduct." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). But Mr. Price still clears this bar. As discussed above, the record in this case demonstrates Mr. Price's tangible plan to shoot a commercial film about the Saltville Massacre at two different national park locations. *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 29, 2019), ECF No. 20-1 (Price Decl.), ¶¶ 2–4. These locations are proximate to Mr. Price's residence, and he had just recently produced a similar film on one of these sites in the past. *See* Compl. ¶¶ 38–39. Mr. Price, however, stopped his commercial filming plans because of the unconstitutional permitting restrictions imposed by § 100905. *See United States v. Price*, No. 4:19-po-180-DEM (E.D. Va. Aug. 29, 2019), ECF No. 20-1 (Price Decl.), ¶ 4. Mr. Price has, therefore, established an irreparable injury caused by § 100905 and its implementing regulations. *See, e.g.*, *Henderson v. Lujan*, 964 F.2d 1179, 1181 (D.C. Cir. 1992) (affirming injunction of NPS regulation in violation of the First Amendment); *Guffey v. Duff*, 459 F. Supp. 3d 227, 255 (D.D.C.

2020); *Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 87 (D.D.C. 2004).  It is also clear that a legal remedy, *i.e.,* a monetary award, would do nothing to permit Mr. Price the ability to conduct his filming absent § 100905's permitting restrictions. *See eBay Inc.*, 547 U.S. at 391; *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Defendants do not contest this point.

Finally, Mr. Price has shown that the "balance of the hardships" between the parties, as well as the public interest, weigh in favor of a permanent injunction.  *eBay Inc.*, 547 U.S. at 391. Here, the hardship imposed upon Mr. Price by § 100905's unconstitutional permitting regime is consonant with the strong public interest in "always . . . prevent[ing] the enforcement of unlawful speech restrictions."  *Guffey*, 459 F. Supp. 3d at 255 (citing *Lamprecht v. FCC*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("[A] policy that is unconstitutional would inherently conflict with the public interest.")).  And given the broad scope of § 100905, the statute imposes a chilling effect on the expressive activities of a wide swath of national park visitors.  *See* disc. *supra* at § III.B.3.b. Consequently, there is a significant equitable interest in avoiding the unconstitutional application and enforcement of § 100905 and its implementing regulations.  *See Pursuing Am.'s Greatness*, 831 F.3d at 511.

Moreover, the governmental and public interests in favor of § 100905 and its implementing regulations are insufficient to counterbalance such a chilling effect.  While the government and the public do have an interest in preserving federal lands, such an interest does not justify a widely overinclusive law that infringes upon free expression.  *See Boardley*, 615 F.3d at 525; disc. *supra* at § III.B.3.b.  And, as Mr. Price notes, "filming and photography . . . had long proceeded on federal lands before [the] enactment" of § 100905.  Pl.'s Mot. at 44; *see also* S. Rep. 106-67, at 3 (1999) (noting prior motion pictures filmed on national park lands).  Moreover, the National Park

Service has also shown itself capable of enacting regulations that preserve park resources without overly burdening expressive activity, and may continue to do so in ways that do not run afoul of the First Amendment.  *See, e.g.*, 43 C.F.R. §§ 3.3, 3.11; 36 C.F.R. §§ 2.51, 2.52.  This leaves, then, only the government's interest in raising revenue for federal land conservation.  *See* 43 C.F.R. § 5.12 (allocating commercial filming fees "for the use of Federal lands or facilities").  The government certainly has an interest in collecting money for such a public use.  But, as discussed, Congress may not tax the exercise of a fundamental right, *see Murdock*, 319 U.S. at 113, and, here, Congress could instead levy taxes without targeting any particular form of speech, *see Minneapolis Star*, 460 U.S. at 586.  Consequently, the government's interest in raising revenue does not tip the balance of the equities against an injunction of § 100905 and its implementing regulations.  To the contrary, the balance of the equities favors such an injunction.

For these reasons, the Court will issue a permanent injunction enjoining the permit and fee requirements for commercial filming in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5, and enjoining prosecution and the imposition of criminal liability thereunder.  The Court issues this injunction in an exercise of is discretionary authority and after a complete and independent review of the record and a balancing of the equities.  *See Winter*, 555 U.S. at 32.  The Court also notes that beyond the merits of Mr. Price's First Amendment claim, Defendants have presented no argument specifically against the propriety of injunctive relief.  Defendants' reticence on this issue further reinforces the Court's independent conclusion that a permanent injunction is appropriate.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings.  *See* ECF No. 18.  In turn, the Court **GRANTS** Mr. Price's Cross-Motion for Judgment on the Pleadings.  *See* ECF No. 25.  Accordingly, the Court will issue a declaratory judgment stating that the requirements in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and

36 C.F.R. § 5.5 that those engaged in "commercial filming" must obtain permits and pay fees are unconstitutional under the First Amendment.  The Court will also enter a permanent injunction enjoining the permit and fee requirements for commercial filming in 54 U.S.C. § 100905, 43 C.F.R. Part 5, and 36 C.F.R. § 5.5, and enjoining prosecution and the imposition of criminal liability thereunder.  In issuing this injunction, the Court observes that a more targeted permitting regime for commercial filming, which is more closely connected to the threat posed by large groups and heavy filming equipment, may pass constitutional muster in the future.[3]

An appropriate Order accompanies this Memorandum Opinion.

**Dated**:  January 22, 2021

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[3] For example, Defendants suggest that an "alternative" available to commercial filmmakers wishing to operate without a permit is "filming with a smaller crew and equipment with a lighter footprint."  Defs.' Opp'n at 20.  The logic behind this proposal is sound and meaningfully connected to the goal of land conservation.  Unfortunately, § 100905 and its implementing regulations, in their current form, contain no such exemption for filmmakers with "lighter footprints."  As explained above, even the most non-intrusive filmmaker must obtain a permit, so long as his or her film is "commercial."  54 U.S.C. § 100905(a); 43 C.F.R §§ 5.1, 5.8.